Tony PICKERING, et al., Plaintiffs,

v.

USX CORPORATION, Defendant.

Lynn A. BARNEY, et al., Plaintiffs,

v.

USX CORPORATION, Defendant.

Reldon C. KENNEY, et al., Plaintiffs,

v.

USX CORPORATION, Defendant.

Civ. Nos. 87–C–838J, 88–C–763J and 91–C–636J.

United States District Court,
D. Utah, C.D.

Nov. 3, 1992.

Lynn C. Harris, Provo, UT, Edward Moriarity, Robert P. Schuster, Gerry Spence, Spence, Moriarity & Schuster, Jackson, WY, Allen K. Young, Young & Kester, Springville, UT, and Jonah Orlofsky, Plotkin & Jacobs, Chicago, IL, for plaintiffs.

Dawne S. Hickton, D.B. King, Pittsburgh, PA, David A. Anderson, Michael L. Larsen, Gordon L. Roberts, Keith E. Taylor, Parsons, Behld & Latimer, Salt Lake City, UT, and Peter Post, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for defendant.

MEMORANDUM OPINION
AND ORDER

JENKINS, Chief Judge.

**TABLE OF CONTENTS**

I. **INTRODUCTION**
 A. Jurisdiction .................................................... 1509
 B. Nature of the Claims ........................................... 1509
 C. Parties ........................................................ 1510
 1. Defendant ................................................. 1510
 2. Plaintiffs ................................................. 1511
 a. Layoffs .............................................. 1511

 b. Actives ............................................... 1511
 c. Managements ......................................... 1511
 d. Retireds ............................................. 1512
 e. LaRoches ............................................ 1512
 D. Trial ..................................................... 1512

**II. CASE SUMMARY**

 A. Pre–Work Stoppage ...................................... 1513
 B. LaRoche Sale ........................................... 1513
 C. Work Stoppage ......................................... 1513
 D. Geneva Closure ......................................... 1514
 E. June Agreement and Sale to BM & T ...................... 1514
 F. Affirmative Defenses .................................... 1514

**III. GENERAL FACTUAL BACKGROUND**

 A. Geneva .................................................. 1514
 B. United Steel Workers of America ......................... 1515
 C. USX Benefit Plans ..................................... 1515
 D. Rule of 65 and 70/80 Retirement Benefits ............... 1516
 E. USX's Recent Restructurings ............................ 1517

**IV. STATUS OF GENEVA ON DECEMBER 31, 1986**

 A. Introduction ............................................ 1518
 B. Facts ................................................... 1519
 1. USX–POSCO Joint Venture .......................... 1519
 2. June and November 1985 Studies ..................... 1520
 3. 1986 Discussions as to the Sale of Geneva ........... 1521
 4. Work Stoppage ...................................... 1521
 5. Facility Rationalization and Related Studies ......... 1522
 6. Steel Division Business Plan ........................ 1522
 7. USX Board of Directors Authorization Request ....... 1522
 8. Accounting Treatment of the Restructuring ........... 1523
 9. Settlement of the 1986 Labor Negotiations ........... 1524
 C. Analysis ................................................ 1524
 1. "Decision" Under Section 16(A) Requires Express Board Action ... 1525
 2. "Decision" Under Section 16(A) Without Express Board Action ... 1527
 a. Plaintiffs' Shutdown Theory ........................ 1528
 b. Analysis ........................................... 1528

**V. SECTION 510 OF ERISA**

 A. Introduction ............................................ 1531
 B. Layoffs ................................................. 1534
 1. Introduction ........................................ 1534
 2. Facts .............................................. 1534
 3. Analysis ............................................ 1535
 a. Section 510 of ERISA ............................. 1535
 1. Prima Facie Case .............................. 1536
 2. Nondiscriminatory Reasons ..................... 1537
 3. Evidence of Pretext ........................... 1538
 b. The Statute of Limitations ......................... 1540
 C. Retireds ................................................ 1541
 1. Introduction ........................................ 1541
 2. Facts .............................................. 1541
 3. Analysis ............................................ 1543
 a. Lump–Sum Retirement Benefits ..................... 1543
 b. Retirement Medical Benefits ....................... 1544
 c. Misrepresentations ................................ 1545
 D. Actives and Managements/Indefinite Idling ............... 1545
 1. Introduction ........................................ 1545
 2. Facts .............................................. 1546
 3. Analysis ............................................ 1547
 a. Prima Facie Case ................................. 1548
 b. Nondiscriminatory Reasons ........................ 1550

 c. Evidence of Pretext ................................... 1550

 E. Actives and Managements/June Agreement and Sale ............... 1552

 1. Facts ............................................. 1553

 2. Analysis .......................................... 1555

 a. Prima Facie Case ...................................... 1556

VI. **SECTION 204(g) OF ERISA**

 A. Introduction ............................................. 1559

 B. Analysis ............................................... 1559

VII. **SECTION 204(h) OF ERISA**

 A. Introduction ............................................ 1560

 1. June Agreement ...................................... 1561

 2. Proper Notice and the June Agreement ....................... 1563

 3. LaRoche Sales Agreement ................................ 1564

 4. Proper Notice and the LaRoche Sales Agreement .............. 1564

 B. Effect of USX's Failure to Give Notice Under Section 204(h) ........ 1564

VIII. **SECTION 404(a) OF ERISA**

 A. Introduction ............................................. 1566

 B. USX as a Fiduciary ....................................... 1567

 C. Fiduciary Duties......................................... 1568

IX. **CONCLUSION**........................................... 1569

## I. INTRODUCTION

### A. *Jurisdiction*

Jurisdiction of this matter, brought under section 502(a), 29 U.S.C. § 1132(a) (1988), of the Employee Retirement Income Security Act of 1974 ("ERISA"), is footed on subsection (e) of section 502, 29 U.S.C. § 1132(e).[1] Because defendant, a Delaware corporation, was doing business in the State of Utah during the time of the acts complained of in this lawsuit, venue is proper under 28 U.S.C. § 1391(c) (1990 & Supp.1992).

The action was tried to the court without jury pursuant to section 502(a)(3) of ERISA, which empowers benefit plan participants or beneficiaries "to obtain ... appropriate equitable relief...." 29 U.S.C. § 1132(a)(3). Because section 502(a)(3) provides only equitable relief, there is no right to a jury trial. *See Cox v. Keystone Carbon Co.*, 861 F.2d 390, 393 (3d Cir.1988) (citing *Great American Fed. Sav. and Loan Assoc. v. Novotny*, 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979)).

### B. *Nature of the Claims*

Plaintiffs assert five general claims for relief. First, plaintiffs allege that defendant USX Corporation ("USX") interfered with plaintiffs' employment, thereby depriving them of identified and vested employee benefits, and did so in violation of section 510 of ERISA, 29 U.S.C. § 1140 (1988). Section 510 provides in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

*Id.*

Second, plaintiffs assert the USX decreased plaintiffs' accrued benefits by amending a defined benefit plan without obtaining appropriate approval for such an amendment in violation of section 204(g) of ERISA, 29 U.S.C. § 1054(g) (1988). Section

---

1. Section 502(e) states in pertinent part: "[T]he district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by ... a participant [or] beneficiary ..." under subsection (a)(3) of section 502. 29 U.S.C. § 1132(e).

**1510**

204(g) provides in pertinent part: "The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) . . . of this title. . . ." *Id.*

Third, plaintiffs assert that USX significantly reduced the rate of plaintiffs' future benefit accrual by amending a defined benefit plan without giving appropriate notice in violation of section 204(h) of ERISA, 29 U.S.C. § 1054(h) (1990). Section 204(h) provides in pertinent part:

A [defined benefit plan] may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to—

(A) each participant in the plan,

(B) each beneficiary who is an alternate payee . . ., and

(C) each employee organization representing participants in the plan. . . .

*Id.*

Fourth, plaintiffs assert that USX failed to discharge its fiduciary duties solely in the interest of the participants or beneficiaries of a defined benefit plan in violation of section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1) (1988 & Supp. II 1990). Section 404(a)(1) provides in pertinent part:

[A] fiduciary shall discharge his [or her] duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

. . . . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]. . . .

*Id.*

### C. Parties

#### 1. Defendant

USX is a Delaware corporation currently headquartered in Pittsburgh, Pennsylvania.[2] Originally named United States Steel Corporation, USX is the largest integrated steel manufacturer in the United States.[3] On July 9, 1986, United States Steel changed its name to USX to reflect the fact that it had diversified its corporate operators to include oil and other non-steel businesses. For purposes of this Opinion, however, defendant will be referred to as USX regardless of whether the events discussed occurred before or after July 9, 1986. At all times relevant to this lawsuit, USX was an "employer" within the meaning of section 3(5) of ERISA, 29 U.S.C. § 1002(5) (1988).[4]

2. Plaintiffs' Complaint also named "United States Steel and Carnegie Pension Fund" (the "Pension Fund") as a defendant. The Pension Fund assisted in administering the applicable USX benefit plans at all times relevant to this lawsuit. On September 22, 1989, the Pension Fund filed a Motion for Summary Judgment as to all claims alleged against it in plaintiffs' Complaint. On April 24, 1990, the court granted the Pension Fund's Motion without prejudice on the limited ground that plaintiffs must exhaust their administrative remedies against the Fund. *See Pickering v. USX Corp.*, No. 87–C–838J, slip op. at 28, 1990 WL 299419 (D.Utah April 24, 1990).

3. An integrated steel producer processes raw materials such as iron ore, coal, limestone and scrap through various stages into semi-finished and finished products.

4. Section 3(5) of ERISA states in pertinent part: "The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan. . . ." 29 U.S.C. § 1002(5).

### 2. Plaintiffs

Plaintiffs are 1,892 former employees of USX, who were employed prior to July 31, 1986, at either the Geneva Works or the Keigley Quarry (collectively referred to as "Geneva"), both of which are located in the State of Utah. The majority of the plaintiffs are hourly, union-represented employees whose terms and conditions of employment were established through collective bargaining between USX and the United Steel Workers of America (the "USWA"). The terms and conditions of employment of the non-union represented employees and the management employees were established unilaterally by USX. At all times relevant to their claims, each plaintiff was a "participant" under the relevant benefit plans, within the meaning of section 3(7) of ERISA, 29 U.S.C. § 1002(7) (1988).[5]

For convenience, the court categorizes the plaintiffs in the following five groups: "Layoffs", "Actives", "Management", "Retireds", and "LaRoches". The separate causes of action as filed by each category of plaintiffs are summarized below.

#### a. Layoffs

Of the 1,892 plaintiffs, 238 are union-represented employees who were laid off by USX prior to July 31, 1986 (the "Layoffs"). The Layoffs state four claims as follows:

1. USX violated section 510 of ERISA by failing to recall laid off workers in order to avoid future pension liability;
2. USX violated section 204(g) of ERISA by amending a benefit plan on June 8, 1987 and February 8, 1988, to reduce benefits which were accrued and vested in plaintiffs as of December 31, 1986;
3. USX violated section 204(h) of ERISA by amending a benefit plan on June 8, 1987 and February 8, 1988, to significantly reduce the future accrual of benefits without proper notice; and

4. USX breached its fiduciary duty under section 404(a)(1) of ERISA by failing to acknowledge benefits which were accrued and vested as of December 31, 1986.

The Layoff plaintiffs' section 204(g) and 404(a)(1) claims are dependant on the court finding that USX "shut down" Geneva on December 31, 1986.

#### b. Actives

The Active plaintiffs are 1,349 union-represented employees who were actively employed by USX as of July 31, 1986 (the "Actives"). The Actives state four claims as follows:

1. USX violated section 510 of ERISA by shutting Geneva down on December 31, 1986, idling Geneva at the end of the work stoppage, and/or selling Geneva on August 31, 1987;
2. USX violated section 204(g) of ERISA by amending a benefit plan on June 8, 1987 and February 8, 1988, to reduce benefits which were accrued and vested as of December 31, 1986;
3. USX violated section 204(h) of ERISA by amending a benefit plan on June 8, 1987 and February 8, 1988, to significantly reduce the future accrual of benefits without proper notice; and
4. USX breached its fiduciary duty under section 404(a)(1) of ERISA by failing to acknowledge benefits which were accrued and vested as of December 31, 1986.

The Active plaintiffs' section 510, 204(g) and 404(a)(1) claims are dependant either in whole or in part on the court finding that USX "shut down" Geneva on December 31, 1986.

#### c. Managements

The Management plaintiffs are 66 non-union represented employees who were actively employed by USX as of July 31, 1986

**5.** Section 3(7) of ERISA states in pertinent part: "The term 'participant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

(the "Management"). The Management's claims are identical to the Actives' claims.

### d. Retireds

The Retired plaintiffs are 208 union-represented employees who retired from USX prior to the date Geneva was sold to Basic Manufacturing and Technology ("BM & T") on August 31, 1987 (the "Retireds"). The Retireds state four claims as follows:

1. USX violated section 510 of ERISA by misrepresenting facts in order to interfere with accrued benefits, and by requiring the suspension or repayment of pensions upon employment with BM & T;
2. USX violated section 204(g) of ERISA by amending a benefit plan on June 8, 1987 and February 8, 1988, to reduce benefits which were accrued and vested as of December 31, 1986;
3. USX violated section 204(h) of ERISA by amending a benefit plan on June 8, 1987 and February 8, 1988, to significantly reduce the future accrual of benefits without proper notice; and
4. USX breached its fiduciary duty under section 404(a)(1) of ERISA by misrepresenting facts, wrongly advising plaintiffs and failing to disclose material information.

The Retired plaintiffs' section 510 and 204(g) claims are dependant in whole or in part on the court finding that USX "shut down" Geneva on December 31, 1986.

### e. LaRoches

The LaRoche plaintiffs are 31 union represented employees who were actively employed at the nitrogen plant at Geneva when it was sold to LaRoche Industries on May 30, 1985 (the "LaRoches"). The LaRoches state three claims as follows:

1. USX violated section 204(g) of ERISA by amending a benefit plan on May 30, 1985 and August 11, 1986, to reduce benefits which were accrued and vested as of May 30, 1985;
2. USX violated section 204(h) of ERISA by amending a benefit plan on May 30, 1985 and August 11, 1986, to significantly reduce the future accrual of benefits without proper notice; and
3. USX breached its fiduciary duty under section 404(a)(1) of ERISA by failing to acknowledge benefits which were accrued and vested as of May 30, 1985, and by misrepresenting facts, wrongly advising plaintiffs and failing to disclose material information.

The LaRoche plaintiffs' section 204(g) and 404(a)(1) claims are dependant in whole or in part on the court finding that USX "shut down" the Geneva nitrogen plant on May 30, 1985.

### D. *Trial*

This matter originated in three separate actions, *Pickering v. USX Corp.*, No. 87–C–838J (D.Utah filed Sept. 20, 1987), *Barney v. USX Corp.*, No. 88–C–763J (D.Utah filed Aug. 30, 1988), and *Kenney v. USX Corp.*, No. 91–C–636J (D.Utah filed June 20, 1991). *Pickering* and *Barney* were consolidated on January 31, 1989, encompassed the individual claims of 1,869 named plaintiffs, and formed the basis of the trial. *Kenney* was consolidated with *Pickering* and *Barney* post-trial on July 29, 1991 upon a finding that *Kenney* involved substantially the same questions of law, the same defendant, and similarly situated plaintiffs.[6]

---

**6.** On August 21, 1991, USX filed a Motion for Summary Judgment in the *Kenney* action. Having carefully considered the *Kenney* pleadings, the court grants defendant's Motion with respect to both of the Age Discrimination in Employment Act ("ADEA") claims, 29 U.S.C. § 623(a) and (b) (1988), and the state law claims. As to the remaining ERISA claims, the judgment set forth in this Opinion applies equally to the *Kenney* plaintiffs.

The record also reflects fourteen pending motions in the consolidated cases of *Pickering* and *Barney*. These motions are as follows: a Motion for Summary Judgment filed August 10, 1990; a Motion to Strike filed August 17, 1990; a Motion to Amend filed October 22, 1990; a Motion for Protective Order filed November 9, 1990; a Motion to Dismiss filed January 22, 1991; two Motions for Miscellaneous Relief filed January 25, 1991; a Motion for Miscellaneous Relief filed March 5, 1991; a Motion for Reconsideration filed March 7, 1991; a Motion to Substitute Party filed June 3, 1991; a Motion for Summary Judgment filed August 21, 1991; a

The court bifurcated the trial as to the issues of liability and damages or other relief, with the liability phase commencing on March 25, 1991, and concluding on May 31, 1991. The purpose of the liability phase was to deal with questions of fact and law common to some or all of plaintiffs and defendant, and if liability be determined, to provide a common legal and factual context in which the instant claims could be consistently determined.[7]

## II. CASE SUMMARY

Plaintiffs' various claims are based on an allegedly multifaceted benefits avoidance scheme, implemented by USX to interfere with the rights of the Geneva work force, in violation of section 510, 29 U.S.C. § 1140, section 204, 29 U.S.C. § 1054, and section 404, 29 U.S.C. § 1104, of ERISA. The alleged scheme can be summarized in five categories: Pre-work stoppage; LaRoche sale; Work stoppage; Geneva closure; and June Agreement and sale to BM & T.

### A. Pre–Work Stoppage

USX's benefits avoidance scheme allegedly began in the early 1980's. At that time, USX began a cost reduction program throughout its steel division that led to the lay off of many Geneva workers. It is conceded by plaintiffs that while some initial layoffs may have been legitimate, USX allegedly violated section 510 of ERISA by failing to recall laid-off workers in order to interfere with the accrual of future pension benefits.

### B. LaRoche Sale

On May 30, 1985, USX sold the nitrogen plant located at Geneva to LaRoche Industries. As part of the sale, USX limited the future calculation of USX pension benefits for those USX workers who went to work for LaRoche Industries. Plaintiffs assert that USX violated ERISA in connection with the LaRoche Industries sale in two ways. First, USX allegedly violated section 204 by improperly amending the USX pension plan so as to diminish both vested and future pension benefits. Second, USX allegedly breached its fiduciary duty under section 404, by misrepresenting material facts to the LaRoche plaintiffs concerning their pension benefits.

### C. Work Stoppage

From August 1986 to February 1987, Geneva was closed due to a "work stoppage."[8] Sometime during the work stoppage, plaintiffs claim that USX decided to shut down Geneva on December 31, 1986. If a plant were shut down within the terms of the relevant labor agreements, workers are automatically eligible for "shutdown" benefits, benefits generally more valuable to a plan participant than "normal" retirement benefits.

Plaintiffs assert USX that violated section 510 of ERISA by concealing its decision to shut down Geneva so as to induce the Retireds to retire prior to the planned shutdown, and thereby avoid paying the Retireds shutdown benefits. USX's supposed concealment of the planned shutdown also allegedly breached USX's fiduciary duty under section 404 of ERISA to provide material information to the Retireds.

In August of 1987, Geneva was sold. At that time, USX incorrectly advised the Retireds that if they went to work for the purchasing company, their USX retirement pensions would be suspended. According-

---

Motion for Miscellaneous Relief filed December 16, 1991; a Motion to Stay filed September 23, 1991; and a Motion to Amend Exhibits filed October 18, 1991. The court does not rule on each of these motions individually, rather the pending motions are subsumed by this Opinion.

7. If liability is determined, individual plaintiffs' claims for relief may be referred to a court-appointed special master. The court envisions that the individual relief phase will consist pri-

marily of a mathematical exercise, with limited findings of fact, consistent with this Opinion.

8. While Plaintiffs assert that USX engaged in a "lockout" from August 1986 to February 1987, USX alleges that plaintiffs went on "strike" during that time. For purposes of this Opinion, the court need not make a determination as to the parties' conflicting interpretations, but rather, neutrally refers to the condition of Geneva during that period as a "work stoppage."

ly, plaintiffs allege that USX also breached its fiduciary duty under sections 510 and 404 of ERISA by providing misinformation to plan participants.

### D. *Geneva Closure*

Plaintiffs allege that USX's secret decision to shut down Geneva in December 1986, also violated the rights of the non-retiring plaintiffs. Plaintiffs argue that USX's motive in choosing a December 31, 1986 shutdown date, as compared to a later date, was to interfere with the future benefit eligibility of non-retiring workers in violation of section 510 of ERISA. Additionally, plaintiffs claim that USX violated section 510 by idling Geneva after the work stoppage so as to interfere with the accrual of plaintiffs' pension benefits.

### E. *June Agreement and Sale to BM & T*

On August 31, 1987, USX sold Geneva to BM & T. In anticipation of the sale, on June 8, 1987, USX and the USWA negotiated an agreement (the "June Agreement"), which limited the calculation of USX pension benefits payable after the sale. Both the retiring plaintiffs and the non-retiring plaintiffs maintain that the sale of Geneva violated ERISA in three ways. First, the sale violated section 510 because it was allegedly motivated by USX's desire to interfere with plaintiffs' pension benefits. Second, the agreement negotiated by USX and the USWA allegedly violated section 204 by improperly amending the USX pension plan to diminish both vested and future benefits. Third, USX allegedly breached its fiduciary duty under section 404 by failing to reveal to plaintiffs that their benefits vested on December 31, 1986.

### F. *Affirmative Defenses*

In addition to disputing each of plaintiffs' claims, USX also argues that plaintiffs' claims are barred by one or more affirmative defenses. These affirmative defenses are:

1. under the June Agreement, plaintiffs are estopped to contend that Geneva was shut down on December 31, 1986;

2. plaintiffs ratified the June Agreement;

3. plaintiffs failed to carry their burden of proving that the USWA breached its duty of fair representation and therefore, the June Agreement is valid and binding on the parties;

4. assuming discriminatory conduct, USX would have taken the same action absent the discriminatory motive;

5. plaintiffs' claims are barred by the statute of limitations;

6. plaintiffs' claims are barred by prior arbitration decisions;

7. plaintiffs who received their pension benefits in a lump sum lack standing;

8. plaintiffs failed to mitigate their damages; and,

9. plaintiffs failed to exhaust their contractual remedies as required by ERISA, Federal Labor Law, or the Federal Arbitration Act.

Several of USX's affirmative defenses are addressed in the body of the Opinion as they arise. Those defenses that are not specifically addressed are otherwise subsumed by the findings of the court.

### III. GENERAL FACTUAL BACKGROUND

### A. *Geneva*

In 1941, USX designed and built a steel mill in Orem, Utah on behalf of the United States Government. Utah was chosen because of its accessibility to iron ore, coal, lime-stone, dolomite and fresh water, as well as its distance from the Pacific Coast. The new steel mill was named Geneva after a small summer resort on the shore of Utah Lake.

At the close of World War II, the War Assets Administration sold Geneva to USX. Since that time, USX has added new facilities to Geneva, increased its steel-making capacity and expanded its product line. Geneva's principal post-war products have included steel plates, hot-rolled sheets and coils, structural shapes, welded steel pipe, pig iron, coke blast furnace and open hearth slag products, cold chemicals, and nitrogen products.

### B. *United Steel Workers of America*

In 1939, the USWA was designated as the exclusive collective bargaining representative of certain USX employees. Since that time, USX and the USWA have entered into successive collective bargaining agreements establishing the terms and conditions of employment for union-represented employees at USX's basic steel facilities nationwide, including Geneva.

Such nationwide collective bargaining agreements between USX and the USWA are commonly referred to as Basic Labor Agreements ("BLAs"). The "Agreement between United States Steel Corporation and the United Steelworkers of America", dated March 1, 1983 (the "1983 BLA"), and the "Agreement between USS Division of USX Corporation and the United Steelworkers of America", dated February 1, 1987 (the "1987 BLA"), are the two BLAs which were in effect during the relevant time frame of this action. *See* Defendant's Exhibits ("DX's") 3 and 5.

For several years USX and the USWA have also entered into successive collectively bargained pension agreements that established the pension rights and benefits for represented employees. The "Pension Agreement between United States Steel Corporation and United Steelworkers of America", dated July 31, 1980, (the "1980 Pension Agreement"), and the "Pension Agreement between USS Division of USX Corporation and United Steelworkers of America", dated January 31, 1987 (the "1987 Pension Agreement"), are the two pension agreements which were in effect during the relevant time frame of this action. *See* DX's 7 and 8.

### C. *USX Benefit Plans*

In addition to the collective bargaining agreements, USX maintained an employee pension benefit plan, the "United States Steel Corporation Plan for Employee Pension Benefits" (the "Pension Plan"), and other employee benefit plans, within the meaning of subsections 3(2)(A) and 3(35) of ERISA, 29 U.S.C. § 1002(2)(A) and (35) (1990).[9] *See* DX's 9 and 10. Pursuant to the Pension Agreements, the Pension Plan provided additional benefit terms and conditions to employees represented by the USWA.

The terms and conditions of the Pension Plan that govern different classes of employees are set forth in "pension rules". For example, the terms and conditions of the Pension Plan for union-represented employees are set forth in the "USX 1987 Non–Contributory Pension Rules". *See* DX's 11A and B. Similarly, the terms and conditions of the Pension Plan for non-union represented salaried plaintiffs are set forth in the "United States Steel 1984 Salaried Pension Rules". *See* DX 12.

In addition to pension benefits, USX also provided its workers various types of insurance benefits. For example, union-represented active employees received short term disability, hospital, surgical, major medical, dental and vision benefits. Retired union employees were provided life insurance, hospital, surgical and major medical benefits. The various insurance benefits were set forth in the "Programs of Insurance Benefits" between USX and the USWA. *See* DX's 17 and 18. USX also provided "Supplemental Unemployment Benefit Plan(s)" to both its union and management employees. *See* DX's 14 and 15.

The Pension Fund, a nonprofit Pennsylvania Membership Corporation, is a named administrator of the USX Pension Plan and related employee benefits plans within the meaning of section 3(16) of ERISA, 29

---

**9.** Section 3(2)(A) of ERISA states in pertinent part:

[T]he terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.... 29 U.S.C. § 1002(2)(A). Subsection (35) of section 3 provides that, "[t]he term 'defined benefit plan' means a pension plan other than an individual account plan...." 29 U.S.C. § 1002(35).

**1516**

U.S.C. § 1002(16) (1988).[10] The majority of the Pension Fund's officers are employees of USX. The other Pension Fund employees work exclusively for the Fund.

### D. *Rule of 65 and 70/80 Retirement Benefits*

Eligibility for receipt of pension benefits under USX retirement benefits such as "normal retirement", "62/15 retirement", "30–year retirement" and "deferred vested retirement", is generally based upon a formula which consists of a combination of age and years of service without any contingent events, such as a shutdown or layoff, occurring.[11] The Pension Agreements also provide for other types of early retirement "shutdown" or "layoff" pensions, sometimes referred to in the industry as "Magic Number" pensions. Employees generally become eligible for Magic Number pensions only if they are laid off or if a plant is shut down. Thus, if USX shuts down a plant, or a worker is laid off, *and* the worker achieves the needed combination of age and years of service (or magic number), the worker becomes eligible for a Magic Number pension. A major portion of plaintiffs' case seeks Magic Number pensions.

Magic Number pensions are generally more valuable to an employee than a normal retirement pension, and, in turn, generally cost USX more than a normal pension.

An employee eligible for a Magic Number pension can receive lifetime monthly pension benefits commencing at an earlier age than normal benefits, and hence would receive a pension for a longer period of time, than an employee retiring on an age 65–pension. In addition to the pension, the employee entitled to a Magic Number pension could also receive a special monthly supplement of $400 until reaching age 62, or, until the employee earns sufficient income to trigger a suspension of the supplement.[12]

USX provides two types of Magic Number pensions; a "Rule of 65" pension, and a "70/80" pension. Section 2.7 of both the 1983 and the 1987 Pension Agreements set forth the eligibility requirements for Rule of 65 retirement in pertinent part as follows:

> Any participant (i) who shall have had at least 20 years of continuous service as of his [or her] last day worked, (ii) who has not attained the age of 55 years, and (iii) whose combined age and years of continuous service shall equal 65 or more but less than 80, and
>
> (a) whose continuous service is broken by reason of a layoff or disability, or
>
> (b) whose continuous service is not broken and who is absent from work by reason of a layoff resulting from his election to be placed on layoff status pursuant to the provisions of the Basic

---

**10.** Section 3(16)(A) of ERISA states:

The term 'administrator' means—
(i) the person specifically so designated by the terms of the instrument under which the plan is operated;
(ii) if an administrator is not so designated, the plan sponsor; or
(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).

**11.** A USX employee is eligible for "normal retirement" when he or she has reached age 65 and has at least 10 years of continuous service. *See* DX 8 at 21. An employee is eligible for "62/15 retirement" when he or she is between the ages of 62 and 65 and has at least 15 years of continuous service. *See id.* An employee is eligible for "30–year retirement" when he or she

has not reached age 62 but has at least 30 years of continuous service. *See id.* An employee is eligible for "deferred vested pension" when he or she is not eligible to retire on pension under any other provisions of the 1987 Pension Agreement, who has at least five years of continuous service and whose continuous service breaks for any reason. *See id.* at 24–25.

**12.** A Magic Number pension also results in significant immediate costs to USX. For example, a 43–year–old employee laid off with 19 years and 11 months of service is entitled to a deferred pension, payable at age 62. Because a deferred pension does not entitle the participant to any immediate benefit, there is no immediate cost to USX. If that same employee is laid off just one month later, however, he or she has attained eligibility for a Magic Number Rule of 65 pension which is payable immediately. In the latter case, the immediate liability to USX is approximately $217,000.

Agreement applicable in the event of a permanent shutdown, or

(c) whose continuous service is not broken and who is absent from work by reason of a physical disability or a layoff other than a layoff resulting from an election referred to above and whose return to active employment is declared unlikely by his Employing Company, or

(d) who considers that it would be in his interest to retire, and his [or her] Employing Company considers that such retirement would likewise be in its interest and it approves an application for retirement under mutually satisfactory conditions,

and who has not been offered suitable long-term employment as defined in Appendix A, shall be eligible to retire on or after January 31, [1983 or 1987, respectively], and shall upon his retirement ... be eligible for a pension....

DX's 7 and 8. Thus, in addition to age and service requirements, section 2.7 of the Pension Agreements requires either that continuous service be broken, or that layoff or retirement be elected in lieu of termination.

Section 2.6 of both the 1980 and 1987 Pension Agreements set forth the eligibility requirements for 70/80 retirement in pertinent part as follows:

Any participant who has not attained the age of 62 years and who shall have had at least 15 years of continuous service and (i) shall have attained the age of 55 years and whose combined age and years of continuous service shall equal 70 or more, or (ii) whose combined age and years of continuous service shall equal 80 or more, and

(a) whose continuous service is broken by reason of a permanent shutdown of a plant, department or subdivision thereof or by reason of a layoff or physical disability, or

(b) whose continuous service is not broken and who is absent from work by reason of:

(1) a layoff resulting from his [or her] election to be placed on layoff

status pursuant to the provisions of the Basic Agreement applicable in the event of a permanent shutdown, or

(2) a physical disability or a layoff other than a layoff resulting from an election referred to above and whose return to active employment is declared unlikely by his [or her] Employing Company, or

(c) whose continuous service is not broken and who, while on layoff status by reason of his [or her] election to be placed on such status pursuant to the provisions of the Basic Agreement applicable in the event of a permanent shutdown, accepts a job with an Employing Company and, prior to the expiration of 90 consecutive calendar days from the first day worked on such job, elects to retire, or

(d) who considers that it would be in his [or her] interest to retire, and his [or her] Employing Company considers that such retirement would likewise be in its interest and it approves an application for retirement under mutually satisfactory conditions,

shall be eligible to retire on or after January 31, [1983 or 1987, respectively] and shall upon his [or her] retirement ... be eligible for a pension.

DX's 7 and 8. Thus, in addition to age and service requirements, section 2.6 of the Pension Agreements also requires either that continuous service be broken by reason of a shutdown, or that layoff be elected in lieu of termination as a result of a plant shutdown.

### E. USX's Recent Restructurings

In 1979, USX engaged in a major restructuring which involved the permanent shutdown of several facilities. The restructuring plan, which was drafted in the summer of 1979, and approved by the USX Board of Directors in December of that year, estimated restructuring liabilities in excess of $500 million, and appropriate accounting entries were made. After the restructuring plan was implemented, USX determined that the estimates made in 1979 had resulted in a $163 million over accrual of liability.

USX's liability accounts were adjusted by that amount in later years.

In 1982, USX again contemplated a major restructuring. Accordingly, following several costs studies, USX engaged in another massive restructuring in 1983. As with the 1979 restructuring, the 1983 restructuring proposal was drafted early in the restructuring year, and was subsequently approved by the USX Board of Directors. Following the restructuring, USX noted in its Annual Report that the Board of Directors specifically approved the shutdown of several facilities. *See* DX 88D at 48–49. Although the facilities involved in the 1983 restructuring were not actually shut down until sometime in 1984, the estimated cost relating to the restructuring was accounted for in the USX financial statements as of December 31, 1983.

## IV. STATUS OF GENEVA ON DECEMBER 31, 1986

### A. *Introduction*

Several of plaintiffs' ERISA claims are contingent on the court first finding that Geneva was shut down on December 31, 1986. Accordingly, the court begins its analysis of plaintiffs' case by examining the following two issues: (1) whether Geneva was "shut down" on December 31, 1986, within the terms of the 1983 BLA; and if so, (2) whether plaintiffs are entitled to shutdown benefits as of that date.[13]

The relevant terms, conditions, and procedure necessary for USX to effect a plant shutdown as of December 31, 1986, are set forth in section 16(A) of the 1983 BLA which states in relevant part:

When, in the sole judgment of the Company, it decides to close permanently a plant or discontinue permanently a department of a plant or substantial portion thereof and terminate the employment of individuals, an employee whose employment is terminated either directly

or indirectly as a result thereof because he was not entitled to other employment with the Company under the provisions of Section 13—Seniority of this Agreement and paragraph B–2 below shall be entitled to a severance allowance in accordance with and subject to the following provisions.

Before the Company shall finally decide to close permanently a plant or discontinue permanently a department of a plant it shall give the Union, when practicable, advance written notification of its intention. Such notification shall be given at least 90 days prior to the proposed closure date, and the Company will thereafter meet with appropriate Union representatives in order to provide them with an opportunity to discuss the Company's proposed course of action *and to provide information to the Company and to suggest alternative courses.* Upon conclusion of such meetings, which in no event shall be less than 30 days prior to the proposed closure or partial closure date, the Company shall advise the Union of its *final decision. The final closure decision shall be the exclusive function of the Company.*

DX 3 (emphasis in original). Accordingly, section 16(A) of the 1983 BLA outlines a five-step process for shutting down a facility, as follows:

(1) "[w]hen, in the sole judgment of [USX], it decides to close permanently a plant ...";

(2) USX "shall give the Union, when practicable, advance written notification of its intention ...";

(3) "[s]uch notification shall be given at least 90 days prior to the proposed closure date ...";

(4) USX will "meet with appropriate Union representatives in order to provide them with an opportunity to discuss the Company's proposed course of ac-

---

**13.** In the Pretrial Order plaintiffs also assert as an issue:

"If the Geneva works was not 'shut down' on December 31, 1986, did the sale on August 31, 1987 to BM & T terminate all plaintiffs and render all 'shutdown' benefits vested and ac-

crued at that time?" Pretrial Order ("PTO") at 38. The court finds that, other than the assertion in the Pretrial Order, plaintiffs neither pled nor argued this allegation. Accordingly, the court does not pass on the merits of plaintiffs' assertion.

tion *and to provide information to the Company and to suggest alternative courses ...*"; and

(5) "[u]pon conclusion of the meetings, which in no event shall be less than 30 days *prior to the proposed closure* ..., [USX] shall advise the Union of its final decision."

DX 3 (emphasis in original).

## B. *Facts*

### 1. USX–POSCO Joint Venture

Prior to July of 1986, approximately 70 percent of Geneva's steel was shipped to Geneva's sister plant in Pittsburgh, California ("Pit–Cal") for finishing into hot-rolled sheets and coils, otherwise known as hot bands. The production of tin plate, a steel used in the food processing industry, was also a major product produced at Pit–Cal. In the early 1970's, Pit–Cal was receiving over 400,000 tons of raw steel annually for the production of tin plate. By the 1980's however, with increasing competition from domestic and foreign competitors, Pit–Cal's tin plate sales were cut in half.

In an effort to remain in the West Coast tin plate market, USX met with Pohang Iron & Steel Co., Ltd. ("POSCO") of The Republic of Korea during November, 1984, to discuss possible joint business arrangements. The preliminary discussions led to negotiations during February, 1985, regarding the formation of a partnership between USX and POSCO, which would acquire and modernize Pit–Cal. On November 23, 1985, USX and POSCO entered into a "Memorandum of Understanding" which set forth the proposed terms of the venture. *See* DX 213. On January 9, 1986, a "Partnership Agreement" was signed which created "USS–POSCO Industries" ("UPI"). *See* DX 215.

At the time the Memorandum of Understanding was signed, the amount of steel that foreign nations such as Korea could sell in American markets was limited by the "U.S. Voluntary Restraint Adjustment" program (the "VRA" program). Under the VRA program, POSCO could not supply more than a minor portion of Pit–Cal's hot band requirements until October 1989, when the VRA program was to expire. Accordingly, during the UPI negotiations, an important issue was whether Geneva would continue to supply Pit–Cal with hot bands until such time that the hot bands could be shipped from Korea.

The USS–POSCO Memorandum of Understanding reflected USX's desire that Geneva continue to provide Pit–Cal hot bands through the expiration of the VRA program. *See* Trial Transcript ("Tr.") at 4021–22, 24. However, the Memorandum of Understanding gave USX the option to supply Pit–Cal from a source other than Geneva should USX so desire. *See id.* at 5746. Specifically, the Memorandum of Understanding states that USX will supply hot bands to Pit–Cal "from either U.S. Steel's Geneva Plant *or* some other specified source...." DX 213 at 4 (emphasis added).

The UPI joint venture was announced to Geneva employees on December 16, 1985, in a letter from USX Chairman David Roderick ("Roderick"). *See* DX 216. The letter assured employees that Geneva's operations would continue at least until the expiration of the VRA's in 1989, by stating:

> *The benefits of this move will be to* assure existing employment at the Pittsburgh Plant well into the next century and *allow continued operation of Geneva until at least the latter part of 1989* when the future of our Utah plant beyond that date will be determined by then prevailing market conditions. *Meanwhile, this advance notice should provide as much lead time as circumstances permit for our western employees and communities to make any necessary adjustments* to the economic impact this development may have *and to plan accordingly for the future.*

DX 216 at 2 (emphasis added).

On December 16, 1985, USX also circulated a press release announcing the joint venture. *See* DX 218. As with Roderick's letter, the press release announced Geneva as the continued source of hot bands to Pit–Cal until the expiration of the VRA's by stating:

The agreement provides for [USX] to supply hot-rolled steel coils for finishing by the joint venture from its Geneva Plant near Provo, Utah, as required, until almost 1990.

. . . . .

On completion of the modernization and only after the expiration of the President's steel trade program in October 1989, will POSCO become the primary supplier of high quality cast steel coils for finishing at the California plant. Until then, the joint venture agreement assures a continued market for hot-rolled coils produced by [USX's] Geneva Plant.

*Id.* at 1–2.

On February 5, 1986, the UPI joint venture formalized the supplying of hot bands to Pit–Cal in the "U.S. Steel Hot Band Requirements Agreement". *See* DX 214. Contrary to the Memorandum of Understanding, Roderick's letter to Geneva employees, and the USX press release, the Hot Band Requirements Agreement does not provide for Geneva to be the source of hot bands to Pit–Cal through October of 1989. The Agreement simply states that, "[a]ll Hot Bands shall be produced by Seller at one of Seller's producing plants...." *Id.* at 2. Thus, USX had no contractual obligation under the Hot Band Requirements Agreement that Geneva supply Pit–Cal its hot bands requirements through the expiration of the VRA program.

Despite the fact that the Hot Bands Agreement did not specifically name Geneva to supply Hot Bands to Pit–Cal, from January to May of 1986, officers of USX made several requests to the USX Corporate Policy Committee which are some evidence of USX's desire that Geneva continue to supply Pit–Cal through the expiration of the VRA's. These requests were as follows:

(1) A January 31 Purchasing Memorandum discussing a proposed five-year agreement with Union Pacific for transportation of hot bands from Geneva to Pit–Cal. *See* DX 230.

(2) A February 17 Authorization Request seeking a five-year agreement with Union Pacific for transportation of hot bands from Geneva to Pit–Cal. *See* DX 230.

(3) An April 23 Authorization Request seeking a three-year lease agreement for ten new or remanufactured late model locomotives and two new or remanufactured locomotive cranes for use at Geneva. *See* DX 231.

(4) An April 23 Authorization Request seeking a five-year agreement with applicable transporters for the shipment of pellet and natural ores into Geneva for the manufacturing of hot bands. *See* DX 232.

(5) A May 19 Appropriation Request seeking $3.35 million to rehabilitate the No. 2 blast furnace at Geneva. *See* DX 235.

The May 19 Appropriation Request noted that Geneva would continue to supply Hot Bands to Pit–Cal by stating that, "[t]he hot metal plan over the next four years calls for this furnace to produce 2.1 million tons after the rehabilitation." DX 235 at 115133.

### 2. June and November 1985 Studies

On June 24, 1985, USX estimated the employee-related pension costs of shutting Geneva down on December 31, 1986. *See* PX 12. USX testified that the "Employee Benefit Costs Potential Shutdown of Geneva Plant" study was prepared during the joint venture negotiations in anticipation that Geneva might not be approved by POSCO as the primary source of hot bands to Pit–Cal. *See* Tr. at 4025–27. According to the June 24 study, the estimated employee-related costs if Geneva were shut down on December 31, 1986, would be approximately $169,056,000. *See* PX 12.

On November 27, 1985, shortly after the UPI Memorandum of Understanding was executed, USX ran a second study which estimated the employee-related pension costs of shutting Geneva down in 1989. *See* PX 14. The "Geneva Works Employee Benefit Eligibility in Event of Shutdown in 1989" study recalculated the totals of the June 24 study to see which pensions the employees would be eligible for in 1989. Like the June study, the November study

also estimated that the employee-related costs if Geneva were shut down in 1989 would be $169,056,000. *See* PX 14.

The reason that the June and November studies estimated identical employee-related costs as of two different shutdown dates was because the November study was limited to a totalling of the pension benefit categories that the Geneva work force would fall into in 1989, and did not contain a summary calculation of the total 1989 pension shutdown liability. Roderick testified that such a calculation was made, but he did not recall the figure. *See* Tr. at 4285. An expert for plaintiffs testified that, based on the June and November studies, USX's increased shutdown liability in 1989 as compared to 1986, would be an additional $50 million. *See id.* at 413.

#### 3. 1986 Discussions as to the Sale of Geneva

Soon after the execution of the UPI Memorandum of Understanding and the November study, USX engaged in discussions with Joseph Cannon ("Cannon"), a Washington D.C. attorney, concerning the possible sale and purchase of Geneva. *See* PX 502. The talks continued through mid–1986.

As part of the discussions with Cannon concerning the sale and purchase of Geneva, USX ordered the preparation of two more Geneva studies. On July 15, 1986, USX compared the cost of selling Geneva in 1986 to the cost of shutting the plant down in 1989. *See* PX 29. USX testified that the "Geneva Plant Shutdown Costs as of December 31, 1989" study was ordered based on the potential sale of Geneva. *See* Tr. at 5239–40. Two days later, on July 17, USX estimated the cash flow of Geneva. *See* PX 29. The "Geneva Works—P & L and Cash Flow" study calculated the anticipated cash flow from Geneva if the plant were kept open through 1989. The July 17 study, which subtracts the 1989 shutdown costs of the July 15 study from Geneva's anticipated cash flow, estimated that the 1989 shutdown costs would exceed anticipated cash flow through the years 1986 through 1989.

The Cannon discussions culminated in an August 4, 1986 offer to purchase Geneva. which USX rejected. *See* PX 30. Roderick testified that USX rejected the offer because the Company had no serious interest in selling Geneva at that time. *See* Tr. at 5629.

#### 4. Work Stoppage

Under the 1983 BLA, either USX or the USWA could terminate the Agreement at midnight, July 31, 1986, by giving 60 days prior written notice to the other party. On May 15, 1986, USX notified the USWA of its intention to terminate the 1983 BLA at its expiration, and offered to meet with the USWA and negotiate a successor labor agreement. On May 20, the USWA sent USX a similar termination notice. Despite numerous ensuing negotiating sessions the parties were unable to bargain a new labor agreement pre-shutdown.

In mid-July, USX began to curtail operations at its various plants and facilities nationwide in anticipation of a work stoppage at midnight July 31. At Geneva, the curtailment began on July 25, 1986. On July 27, USX informed the USWA that USX was beginning the final idling phase of its plants and facilities.

On July 29, 1986, USX presented the USWA with its final proposal for a new basic labor agreement. On July 31, the USWA rejected USX's proposal, but offered to allow its members to continue working after July 31, while a new agreement could be negotiated. USX rejected the USWA's offer. Representatives of USX and the USWA met on July 31. No new basic labor agreement was reached.

On August 1, 1986, the work stoppage began during which union-represented employees did not work. During the work stoppage, USX cut expenses at Geneva by not purchasing coal for continued coke production. USX also laid off several management and non-union represented employees, and cut the salaries of those that remained employed. At an estimated cost of about three million dollars per month, however, the Geneva coke batteries were retained on hot idle status. Failure to main-

tain the coke batteries on hot idle could cost millions of dollars to rebuild the damaged batteries. *See* Tr. at 6827–8. While Geneva was idled, Pit–Cal, which had special arrangements with the USWA, continued to operate and receive delivery of hot bands from the USX Gary and Fairless steel facilities. *See* DX 90E.

At no time during the work stoppage did USX publicly state that it was shutting down Geneva. The only statements made during that time which alluded to a possible USX plant shut down, occurred in July and August of 1986. In a July press conference, USX stated that certain plants were more vulnerable to a shutdown than others. *See* DX 197N. In August, USX made a similar statement to the Geneva Advisory Council in Provo, Utah. *See* Tr. at 4075–76.

### 5. Facility Rationalization and Related Studies

For the year 1986, the USX Steel Division nationwide had operating losses of $44 million in January, $37 million in February, $33 million in April, $36 million in May, and $28 million in June. *See* DX 90E. There was an operating profit of $14 million in March. *See id.* During the first six months of 1986, the Steel Division operated at only 36.6 percent of its capacity. *See* DX 277. To combat these losses, USX resolved to reduce its Steel Division to a core of facilities which could generate enough cash to permit the surviving core plants to be modernized. *See* Tr. at 2544. Accordingly, in May of 1986, USX began developing a plan similar to the 1979 and 1983 restructuring plans. USX also employed two investment firms to develop restructuring proposals.

As part of the 1986 restructuring, USX studied various aspects of Geneva's status and possible future. For example, on May 27, 1986, before the work stoppage, USX analyzed the employee cost liability numbers of several USX facilities including Geneva. The "Employee Related Costs Potential Shutdown of Selected Facilities Steel and Coal Operations" study estimated liability for employee-related costs as of

two alternative dates: July 31, 1986 and December 31, 1986. *See* PX 21. The estimated employee related cost liabilities for Geneva, if shut down, were $92,874,000 for July 31, and $91,974,000 for December 31.

As part of the restructuring plan, USX also prepared a "major corporate study" entitled "Facility Rationalization", one of several restructuring related studies. *See* Tr. at 5633. The Facility Rationalization proposed shutting down three USX facilities in December of 1986, including Geneva. *See* PX 32. According to the Facility Rationalization, the continued operation of the USX Fairfield, National and Geneva plants would result in a monthly loss of $100,000, as compared to a monthly profit of $15 million, if those plants were shut down.

### 6. Steel Division Business Plan

Concurrently with the development of the Facility Rationalization, USX employees also began developing the 1986 "Steel Division Business Plan", a formal yearly plan used in the budgeting and management process. *See* PX 79. Because of the uncertainties of the work stoppage, however, the 1986 Business Plan, which would normally have been presented to the USX Board of Directors in January of 1987, was not presented, considered or approved until April, 1987.

An early draft of a portion of the Business Plan, dated August 12, 1986, after the work stoppage began, showed that there was to be no post-work stoppage production at Geneva. *See* PX 79. Subsequent drafts of the Business Plan, completed in October and December of 1986, similarly showed that there was to be no post-work stoppage production at Geneva. USX testified that future Geneva production was excluded from the Business Plan drafts in anticipation that the Facility Rationalization, which proposed the shutdown of Geneva, would be adopted by the USX Board of Directors. *See* Tr. at 4076–81.

### 7. USX Board of Directors Authorization Request

On January 15, 1987, the Corporate Policy Committee reviewed both the USX gen-

erated proposal and investment bankers' restructuring proposals. At that time, Roderick specifically recommended to the Committee that the USX restructuring proposal, which included the Facility Rationalization, be pursued in preference to the proposals developed by the investment bankers. *See* DX 73. However, Roderick recommended the "indefinite idling" of Geneva at that time as opposed to shutting down the plant. Based on Roderick's recommendation, the Corporate Policy Committee authorized a modified version of the Facility Rationalization restructuring proposal to the USX Board of Directors, and included the recommendation that Geneva be idled. The Authorization Request to the Board of Directors states in relevant part:

[W]e recommend the following actions for the consideration of the Board:

1. Approve the *indefinite idling* and recognition of impairment of the operating assets at Geneva....

. . . . .

3. Since under various agreements with certain labor unions, [USX] is obligated to to [sic] discuss with such unions its proposed course of action before such action is final, then with respect to facilities where employees covered by such agreements are affected, authorize the Corporate Policy Committee to add or delete facilities from those as to which the *indefinite idling* and/or recognition of impairment is approved where such action is deemed advisable as a result of such discussions.

DX 73 (emphasis added).

At trial, Roderick defined "indefinite idling" as putting a facility on stand-by until USX decided to operate, sell or shut down the plant. Simply put, Roderick testified that he was concerned about the condition of the steel market after the work stoppage, and deemed it premature to make shutdown decisions at that time. *See* Tr. at 5639.

On January 27, 1987, the USX Board of Directors approved the Corporate Policy Committee's Authorization Request. *See*

DX 56. The Board Approval states in pertinent part:

RESOLVED: That the restructuring by this Corporation, ... by the *indefinite idling* and recognition of impairment of operating assets, certain facilities, certain costs and shortfall, ... including termination and modification of agreements, contracts and leases, related employee costs, termination or transfer of affected employees and incurring one-time costs and the taking of other actions necessary to effect the shutdowns and idling of facilities, ... and the same hereby is, recommended.

DX 56 (emphasis added). In sum, the Board's resolution involved a $1.02 billion write-down charge associated with asset impairment, employee costs, and supply contract terminations and modifications. The action projected to improve future annual before tax profits by $230 million. *See* DX 73.

On February 4, 1987, USX held a Press Conference to discuss, among other things, the indefinite idling of Geneva. At that time, USX emphasized that Geneva was not shut down. *See* DX 197A. Similarly, the 1987 USX Annual Report also noted that Geneva had not been shut down. The Report states in applicable part:

In early February, 1987, USX announced the *indefinite idling* of four [USX] plants: Geneva Works (Provo, Utah)

. . . . .

*These operations are not permanently shut down. Improved market conditions for the products from these plants may make it feasible to reopen some of them. On the other hand, a lack of any future market improvement may necessitate their permanent closing.*

DX 88G at 16–17 (emphasis added).

8. Accounting Treatment of the Restructuring

Although Geneva was designated as indefinitely idled, financial account records as of December 31, 1986, reflected: (1) a total write-down of the restructured assets, including Geneva, to zero book value; and,

(2) an accrual of employee benefit and other costs as if Geneva had been shut down. *See* 88G at 32. Both USX and its outside auditor, Price Waterhouse, testified that under generally accepted accounting principles ("GAAP"), it was proper for USX to account for the estimated financial impact of a Geneva closure, regardless of the fact that Geneva had not been shut down. *See* Tr. at 3625–26, 4465–66, 4860–61. USX testified that under GAAP, when there was an "event" (the 1986 proposed restructuring) in the accounting year in question, and a subsequent "confirming event" (the Board authorization of January 27, 1987), which occurred before financial statements were issued, and the confirming event provided further evidence of conditions existing before year end (overcapacity, weak steel markets, operating losses), the confirming event was considered a "Type I" subsequent event and its estimated results were to be reflected in the financial statements if the results were "probable" and the effects were "reasonably estimable." *See* Tr. at 3165, 3602, 3608–10, 3625–26, 4613–14, 4468–72.

The accounting pronouncements and practices which purportedly made such reporting appropriate and necessary in connection with USX's 1986 financial statements included: FAS 5 (losses must be recognized when probable and reasonably estimable), *see* Tr. at 3595, 3821, 4468–69; the interpretation of APB 30 (accounting for the disposal of part of a business), *see* Tr. 4620, 3825, 4468–75; FAS 88 (certain pension costs must be recognized when probable and reasonably estimable), *see* Tr. at 3599, 4476; and the doctrine of conservatism (reporting of losses early and income late), *see* Tr. at 4447–4474.

In sum, USX "booked" or recognized the contingent liabilities of a Geneva shutdown by estimating potential employee-related costs and by taking a credit to accumulated depreciation on Geneva's assets involved up to their full book value. All anticipated employee costs associated with a shutdown of Geneva as of December 31, 1986, were entered on the corporate books. As to Geneva's assets, they remained on the books, but added nothing to the net equity because of the full booked offset of accumulated depreciation. USX's Annual Report stated that the provision for estimated restructuring charges totalled $1,457,000,000 of which $927 million was a write down of assets and $530 million were employee-related costs. *See* DX 88G at 32 n. 3.

### 9. Settlement of the 1986 Labor Negotiations

On January 27, 1987, the same date the USX Board of Directors approved the indefinite idling of Geneva, USX and the USWA reached a tentative agreement settling the nationwide work stoppage. The agreement was ratified by local union officers and members employed at Geneva on February 1, 1987. As part of the settlement, USX and the USWA agreed on the terms of the 1987 Pension Agreement, which by agreement became retroactively effective as of January 1, 1987. *See* DX 8. The parties to the new BLA also agreed that non-working union-represented employees, nationwide, would be considered on layoff as of February 1, 1987, and that the work stoppage time would be counted for purposes of computing continuous service of an employee under the applicable BLA and Pension Agreement. *See* DX 439.

### C. *Analysis*

To prevail on the status issues, plaintiffs must demonstrate, by a preponderance of the evidence, that Geneva was "shut down" on December 31, 1986, within the terms, conditions, and procedures set forth in section 16(A) of the 1983 BLA. As analyzed below, the court finds that plaintiffs failed to prove that USX, in its sole judgment, made a "decision" to shut down Geneva as of December 31, 1986.[14] *See* DX 5 at 142.

---

14. At Pretrial USX continued to raise the affirmative defense that plaintiffs failed to exhaust their contractual or plant remedies before bringing this action in Federal District Court.

The court refers to and incorporates its analysis in *Pickering,* slip op. Jan. 16, 1991 at 3–9, and rejects USX's exhaustion of remedies defense as

1. "Decision" Under Section 16(A) Requires Express Board Action

■ Historically, the U.S. Supreme Court has held that arbitration decisions interpreting the terms of a collectively bargained contract are part of the labor contract itself. *See United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 568–69, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). In *Warrior*, 363 U.S. at 581, 80 S.Ct. at 1352, the Court stated:

> [T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. *The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.*

(emphasis added).

Since the 1960's, the Supreme Court has emphasized that great deference be given to arbitration decisions. For example, in *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), the Court stated that " '[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes ...'." *Id.* at 562, 96 S.Ct. at 1055 (quoting 29 U.S.C. § 173(d) (1988)). The Court further stated that, " [t]his congressional policy 'can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.' " *Id.* (quoting *American Mfg.*, 363 U.S. at 566, 80 S.Ct. at 1346). The Court also cautioned

to each of plaintiffs' pending claims for the

the judiciary to avoid usurping the functions which collective bargaining contracts have " 'entrusted to the arbitration tribunal' ", and instructed the courts to defer to the forum chosen by the parties. *Id.* at 562–63, 96 S.Ct. at 1055 (quoting *American Mfg.*, 363 U.S. at 569, 80 S.Ct. at 1347).

Although the 1983 BLA contains an arbitration provision, the parties in this case have not arbitrated the issue of whether Geneva was shut down as of December 31, 1986. Accordingly, the court is not bound by an underlying arbitration decision which interprets the term "shutdown" under section 16(A) of the 1983 BLA. In several prior unrelated arbitration decisions, however, USX and the USWA have arbitrated the issue of shutdown versus indefinite idle under section 16(A) of the 1983 BLA. Consequently, although these prior decisions are not binding on the court in these proceedings, in light of the great deference the Supreme Court has given arbitration decisions which give "meaning and content ... to the collective bargaining agreement", this court gives weight and consideration to these prior decisions. *See Warrior*, 363 U.S. at 581, 80 S.Ct. at 1352. The court finds that it would be injudicious to ignore prior arbitration decisions which ⋅involve the identical BLA provision and the identical issues now before the court.

In September of 1984, the USWA filed a collective bargaining grievance against USX contending that the hot strip finishing department at the USX Irvin plant had been "permanently discontinued" or "shutdown" within the meaning of section 16(A) of the 1983 BLA, and that the union-represented members were therefore entitled to severance benefits. *See* DX 392. On March 17, 1986, the Board found that, although the hot strip department had been indefinitely idled for over four years, a shutdown had not occurred under section 16(A). *See id.* at 7.

In reaching its decision, the Board first noted the improbability that the facility would ever reopen, by stating:

second time.

There is no question that under current market conditions resumption of Hot Strip Finishing operations is *highly unlikely*, and there is certainly no firm basis on which to predict that those conditions will change in the near future, if ever. But they may change, and, given the right mix of circumstances, this could result in the resumption of production at Irvin.

DX 392 at 7 (emphasis added). Despite the unlikelihood that the plant would resume production, however, the Board emphasized that "[u]nder Section 16 [of the 1983 BLA], it [was] clear that it [was] *solely* within the discretion of [USX] Management to determine whether a given operation [was] permanently discontinued ...", and that section 16(A) required more than a finding of unlikely future operation. *Id.* at 5 (emphasis in the original). In denying the grievance, the Board found, in pertinent part:

As noted earlier, ... the Board's role in a case such as this is limited to determining whether Management in fact has permanently discontinued a given operation. The Labor Agreement does not permit the Board to substitute its judgment for that of Management to determine that a given operation should be permanently discontinued. The objective facts before the Board in this case compel a finding that the Company has not yet made such a determination with respect to Hot Strip Finishing operations at Irvin.

DX 392 at 8 (emphasis added).

Similarly, in a June 7, 1985 arbitration decision, USX allegedly violated section 16(A) of the 1983 BLA by failing to give the USWA proper notice of a decision to close the blast furnaces of the USX South Works plant. *See* DX 391. In December of 1983, the South Works Superintendent had notified the USWA of the impending closure. The letter stated in pertinent part:

The Executive Management of [USX] ... has instructed me to advise each employee that it will recommend to [USX's] Directors at their December Board Meeting that most or all of South Works be closed permanently. *The Board will undoubtedly take that action and its decision will be irreversible.* South Works will have little future without a rail mill.

DX 391 at 5 (emphasis added). Under section 16(A) of the BLA, USX must "afford 90 days' notice to the Union of its intent to close a Plant or a Department thereof before it *finally* decides to close such facilities." *Id.* at 12. Accordingly, based on the Superintendent's letter, the USWA argued that USX violated section 16(A) because it had already decided to shut down the South Works without giving the union proper notice.

The Board of Arbitration disagreed with the USWA's contention, and found that despite the Superintendent's letter, the South Works had not yet been shut down under section 16(A) because the USX Board of Directors had not yet made a shutdown decision. In denying the USWA's grievance, the Board of Arbitration stated:

[T]he language of [section 16(A)] contemplates a fairly precise formulation of the Company's intent. For instance, in establishing a timetable there are several references to a proposed closure date indicating that any intention to engage in a closure may, indeed, must, be formulated to the point of having established a specific target date for closing an operation. *In any proposed closure as substantial as South Works, this must be viewed as a decision to be made by the highest policy makers of the Company, in this case, the Board of Directors.*

DX 391 at 12 (emphasis added).

Finally, in a December 30, 1986 arbitration decision, the USWA sought severance under section 16(A) of the 1983 BLA, due to USX's alleged shutdown of the forge division of the USX Mon Valley Works Homestead plant. *See* DX 443. According to USX, in the summer of 1984, "the Company decided to indefinitely idle commercial forging operations and to continue on a restructured basis only with plate work...." *Id.* at 6. Although USX acknowledged that a portion of the Mon Valley plant had been shut down, USX asserted that the remaining portion of the Forge

Division was indefinitely idled. The Board of Arbitration explained indefinite idling as follows:

> Most of the remainder of the Forge Division, the Company maintains, currently is not operating due to lack of sufficient business. As a result, the Company has rearranged the remaining work. If other operations were to resume, the Company could make the necessary adjustments, but in the meantime it has to arrange the work in light of the reality of the current indefinite idling of the rest of the Forge Division.

*Id.* at 7. Accordingly, the Board recognized a distinction between indefinite idle and permanent discontinuance, or shutdown, denied the USWA's severance claim, and found that the "[c]ommercial forging operations were *indefinitely idled ...*", and thus the operations had not been shut down for purposes of section 16(A). *Id.* at 12.

As with the Arbitration decisions above, this court likewise draws a distinction between the terms "indefinite idling" and "shutdown" within the meaning of section 16(A) of the 1983 BLA. Under section 16(A) of the 1983 BLA, the first step in effecting a shutdown occurs "[w]hen, in the sole judgment of the Company, it decides to close permanently a plant or discontinue permanently a department of a plant or substantial portion thereof...." DX 7. As the Board of Arbitration found, this court finds that USX "decides to close permanently a plant" under section 16(A) when, "a decision [is] made by the highest policy makers of the Company, in this case, the Board of Directors." DX 391 at 12. Prior to such a final, express decision, it is entirely consistent with section 16(A) that USX choose to indefinitely idle a facility.

■ Further, the court notes that the probability of future production or related company communication is irrelevant to the narrow issue of Board action within the meaning of section 16(A). Until such time as the USX Board of Directors formally acts to permanently close a facility, neither a high probability that the plant will not resume operations, nor provisional compa-ny communications or studies concerning an impending closure, will substitute for the judgment and action of the Board.

■ Plaintiffs presented numerous pieces of evidence that USX contemplated the consequences of closing Geneva on December 31, 1986. Despite plaintiffs' efforts, however, it is undisputed that the Board of Directors did not meet to discuss Geneva's status until January 27, 1987, a month after the purported shutdown. Until the Board met, no shutdown decision could have occurred. Any evidence linking Geneva to the claimed December 31, 1986 closure merely reflected USX's ongoing decision making process. At most, USX's conduct prior to the January Board meeting merely *proposed* the shutdown of Geneva and cannot be determinative as a final shut down decision.

At no time prior to the USX Board meeting in January of 1987, did the Board shut down Geneva. Instead, the Board expressly resolved to "indefinitely idle" Geneva as compared to shutting it down. As discussed above, indefinite idling is distinct from shutdown. Consequently, not only did plaintiffs fail to show Board action prior to the proposed December 31, 1986 shutdown, plaintiffs also failed to show that when the Board did in fact meet, that they resolved at that time to shut down Geneva.

### 2. "Decision" Under Section 16(A) Without Express Board Action

■ Plaintiffs assert that a "decision" to shutdown under section 16(A) can occur without a final express decision by the USX Board of Directors. Plaintiffs argue that, looking at the facts as a whole, the court may infer a decision by USX to shut down Geneva as of December 31, 1986. In other words, plaintiffs seek a more expansive definition of what can constitute a company decision under section 16(A) of the 1983 BLA. They argue that "decision" under section 16(A) is not limited to a final decision by the USX Board of Directors, but rather that a decision for purposes of shutdown benefits can occur by company conduct other than express Board action.

Even assuming plaintiffs' expansive theory of what can constitute a company decision under section 16(A) of the 1983 BLA bears merit, the court finds that plaintiffs nevertheless failed to show by a preponderance of the evidence that Geneva was shut down as of December 31, 1986. Plaintiffs' claims are footed on substantial evidence from which a December 31 closure date could be inferred. At trial, however, USX persuasively countered each of plaintiffs' theories with facts to the contrary. Accordingly, even assuming a broader definition of decision under section 16(A), the court finds that plaintiffs failed to meet their burden of showing proof of "shut down" as of December 31, 1986.

### a. Plaintiffs' Shutdown Theory

Plaintiffs' shutdown theory can be briefly summarized as follows. First, the terms of the UPI Memorandum of Understanding, which allowed USX to supply Pit–Cal from either Geneva or from some other source, coupled with the terms of the U.S. Steel Hot Band Requirements Agreement, that lacked any reference to Geneva, allegedly evidenced USX's intention to shutdown Geneva on December 31, 1986. Plaintiffs derive the December 31, 1986 shutdown date from the several studies completed by USX during 1985 and 1986 which specifically consider a shutdown as of that date. USX's purported decision to dispose of Geneva in 1986 was also allegedly reflected in USX's initial discussions with Cannon concerning the sale of Geneva.

Second, plaintiffs allege that the work stoppage was precipitated by USX in order to facilitate a restructure of its operations, including the shut down of Geneva. The work stoppage allegedly enabled USX to ignore Roderick's "promise" to keep Geneva open through 1989. USX purportedly decided in mid–1986 to shut down Geneva, and the work stoppage allegedly provided the excuse for that prior decision.

Third, plaintiffs assert that the Facility Rationalization was evidence of a decision to shut down Geneva that was made well in advance of the January, 1987 USX Board of Directors meeting. Similarly, plaintiffs claim that early drafts of the 1986 Business Plan clearly show a decision to cease production at Geneva post-work stoppage. Thus, the Board's subsequent approval of the Facility Rationalization simply formalized what had allegedly already been done.

Finally, plaintiffs claim that USX would not have listed Geneva as "shut down" for tax purposes as of December 31, 1986, unless USX had, in fact, made the decision that the plant was shut down as of that date.

### b. Analysis

Prior to the work stoppage, it was the stated intention of USX that Geneva supply Pit–Cal through 1989. See DX's 216 and 218. The court disagrees, with plaintiffs' argument that simply because the joint venture Agreements allowed a variety of sources for supplying of hot bands to Pit–Cal, that the language can be summarily construed as proof of a decision to close Geneva. At the most, the Agreements gave USX the necessary business flexibility to find an alternative source for Pit–Cal should circumstance dictate. The work stoppage illustrates the importance of such alternative planning. While Geneva was idled, by the work stoppage Pit–Cal was necessarily supplied by facilities other than Geneva. See DX 90E.

Moreover, the facts clearly indicate that USX made several requests to the USX Corporate Policy Committee which reflected USX's intention to continue to supply Pit–Cal through Geneva. See DX's 230–232, 235. One such request, which sought $3.35 million to rehabilitate the No. 2 blast furnace at Geneva, specifically referred to Geneva supplying Pit–Cal by stating that "[t]he hot metal plan over the next four years calls for this furnace to produce 2.1 million tons after the rehabilitation." DX 235 at 115133.

As to the several studies completed in 1985–86, which specifically recommended a December 31, 1986 shutdown, it was USX's policy to routinely perform these types of studies for any number of reasons, including the possible sale, restructuring, shut-

down, or idling of a facility. *See* Tr. at 5239–40. USX had run similar studies on several previous occasions, such as the restructuring of 1979 and 1983. *See* DX 406; PX's 2 and 3. Moreover, these documents were "studies", that is, analyses of the costs and consequence of *possible* courses of action. The studies by themselves clearly had no binding effect on Geneva's assets or the vesting of employee benefits.

As to the Cannon negotiations, these discussions run counter to plaintiffs' theory of shutdown. The Cannon discussions reflect USX's inability to ascertain Geneva's long-term status, as well as its newly acquired indecision in mid–1986 as to close, operate, or sell Geneva. Moreover, the fact that Roderick rejected Cannon's early offer shows USX's continued interest in either operating or closing Geneva. *See* Tr. at 5809.

With respect to the work stoppage, that was the type of contingent event during which a USX restructuring might take place. Accordingly, any long term projections USX made with regard to Geneva prior to the work stoppage could well be reconsidered. As for the work stoppage being an elaborate scheme to, among other things, close Geneva, the facts do not so reflect. Rather the evidence shows USX's good faith effort to settle the parties' conflicting interests in establishing a new BLA. During the work stoppage, USX engaged in continuing labor negotiations with the USWA, which represented all USX employees including Geneva's employees. The 1987 BLA also included the Geneva employees. Thus, USX's continued relationship with Geneva workers during and after the work stoppage shows that the company was *not* prepared to shut down Geneva as of December 31, 1986. The court is also unpersuaded that a company which purportedly decided to shut down a plant as early as May or June of 1986 would nevertheless continue to spend approximately three million dollars a month during the work stoppage to keep the plant operable. *See* Tr. 6827–8.

Roderick's proposal, and the Board's subsequent approval, of the idling of Geneva are the best evidence that USX intended to *idle* Geneva, as of January 27, 1987, rather than shut it down as of December 31, 1986. At no time prior to or during the work stoppage did Roderick or any other USX official state that USX had decided to shut down Geneva on December 31, 1986, or anytime thereafter. *See* Tr. at 4075–76. In fact, Roderick expressly rejected the idea that Geneva would be shut down. *See* DX 73. Similarly, it is undisputed that the Board resolved to indefinitely idle Geneva rather than shut it down. *See* DX 56.

The single most litigated area that might imply a decision by USX to shut down Geneva as of December 31, 1986, was USX's accounting treatment of the 1986 restructuring. Plaintiffs assert that USX's in-house and outside accountants would not have recorded Geneva as shut down as of December 31, 1986 unless the plant had in fact been shut down as of that date.

Although the accounting entries might be significant, the court is more interested in the events that took place *prior to* the actual entry of the accounting information. The narrow question before the court is whether *USX* made a decision to shut Geneva down on December 31, 1986. What the in-house or outside accountants did to comply with public corporation reporting requirements is wholly irrelevant in determining benefit eligibility. The evidence that this court need examine is not what conduct accounting principles dictated to the in-house or outside accountants, but rather, to determine what information flowed from USX to its accountants.

It is not the task of this court to judge the conduct of USX's tax accountants; rather, the relevant evidence concerns the discussions or statements made by USX to its accountants. This case is not about improper tax filings. Nor is it about improper conduct concerning in-house or outside tax accountants.[15] The issue before

---

**15.** USX set forth several arguments justifying why its accountants treated an idled facility as shutdown. For example, a Price Waterhouse accountant, who audited the 1986 restructuring, testified that he did not believe that the indefinite idling of Geneva fit conveniently into the

the court at this time is simply whether USX told its in-house or outside accountants that Geneva was shut down as of December 31, 1986.

Plaintiffs assert that USX told the Senior Audit Manager from Price Waterhouse assigned to the 1986 USX audit that Geneva was shut down as of December 31, 1986. Indeed, the Audit Manager testified that he was told that "the facilities subject to the proposal will be idled for an indefinite period with no prospect of re-opening." *See* Tr. at 4756. He was also told that "there were no plans of any nature that comprehend future use of the affected facilities. There will be no maintenance performed, and the facilities may be sold if a buyer can be located, dismantled by realty and the land developed, or simply abandoned in place." *Id.* at 4794.

However, the Audit Manager also expressly testified that he concurred with other Price Waterhouse accountants who testified that they were aware that the indefinite idling of Geneva was not a permanent shutdown. *See* Tr. at 4581; *see also* Tr. at 3820, 3824, 3624 (Price Waterhouse auditors' testify that Geneva was not shut down). He also testified that he knew that the USX Board of Directors Authorization Request did not contain a decision as

to the ultimate disposition of the idled facility. *See* DX 203. An internal memorandum drafted by the Audit Manager upon completion of his accounting analysis concluded:

> Specifically, the restructuring involved the indefinite idling of a variety of facilities and the write-off of various assets in each of the Corporation's significant divisions. The term "write-off" is throughout this memorandum, however, technically the assets are not being written off; rather the net book value is being reduced through a credit to accumulated depreciation. *The gross investment will not change since this is an indefinite idling instead of a shutdown.*

*Id.* (emphasis added).

Finally, all three Price Waterhouse auditors who worked on the 1986 restructuring testified that they had read USX's Annual Report concerning the restructuring which specifically states that Geneva was not shut down. *See* Tr. at 3624, 3830, 4684. USX's Annual Report states: "These operations are not permanently shut down. Improved market conditions for the products from these plants may make it feasible to reopen some of them. On the other hand, a lack of future market improvement may

APB 30 definition of disposal because Geneva's status did not have a sufficient degree of finality. *See* Tr. at 4624–25. After analyzing the probabilities of operating, selling, or shutting down the facilities, the accountant concluded that, from an accounting viewpoint, a shutdown was the most likely alternative. *See* Tr. at 4627–28.

USX officials also testified that if the Geneva had in fact been permanently shut down as of December 31, 1986, the accounting would have been different in that the assets would have been taken off the books. In the present case, USX left Geneva's asset on the books but increased the depreciation reserves. *See* Tr. at 3237–38. In contrast, the 1983 restructuring assets were completely written off. *See* Tr. at 3256.

In comparison, plaintiffs cite several pieces of evidence as consistent with a December 31 decision to shutdown. For example, USX's in-house actuary, who was assigned to prepare information for the outside actuaries for the evaluation for the plan year ending January 1, 1987, took all of the employees from Geneva and placed them in a separate "shut down file." *See* Tr. at 6571. The liabilities calculated by USX's in-

house actuary for the Geneva workers included all shutdown benefits, including $70/80$ and Rule of 65 pensions as of December 31, 1986. These benefits were categorized by USX as vested and accrued. *See* PX 45. The information collected by USX's actuary was then transferred to Buck Consultants, the enrolled actuary who handled the USX account. *See* Tr. at 1621. The January 1, 1987 Plan Valuation listed all of the Geneva employees in a non-active category, and characterized all of their benefits, including $70/80$ and Rule of 65 pensions as vested and accrued. *See id.* at 6566, 6606.

Further, the Schedule B to the Form 5500, which USX filed with several departments of the United States government, similarly listed the Geneva work force as non-active with all of their benefits, including shutdown benefits, vested and accrued. *See* PX's 149 and 166.

The court is not incognizant of the inconsistencies presented by USX's accounting treatment of the restructuring. It is the opinion of this court that the accounting treatment raises serious questions which have only been resolved through subsequent adjustments. However, the legality of these matters is not before the court, nor are they passed upon at this time.

necessitate their permanent closing." DX 88G at 16–17.

The evidence shows that USX's tax accountants were aware of USX's decision to indefinitely idle Geneva, and that the accountants were aware of the distinction between "indefinite idle" and "shutdown". Plaintiffs have failed to present any persuasive evidence that USX told its in-house or outside accountants that Geneva was in fact shutdown as of December 31, 1986. Nor have plaintiffs cited any authority which supports the proposition that, by virtue of the accounting treatment utilized, plaintiffs became entitled to shutdown benefits as of that date.

Having read and listened to extensive testimony, having examined numerous documents and exhibits, the court is simply not persuaded by a preponderance of the evidence that USX engaged in conduct which resulted in a shutdown of Geneva as of December 31, 1986. This case cannot be decided in a vacuum. USX's history reflects an ongoing decision-making process which sometimes led to restructuring decisions. In both 1979 and 1983 USX engaged in several studies and proposals as to the prospective life of certain plants. Indeed, during the 1983 restructuring, Geneva itself was studied. *See* PX 3. Although the studies completed in 1983 led to the closure of some facilities, others, such as Geneva, were not shut down at that time.

The years 1985 and 1986 similarly reflect USX's ongoing decision making process. Studies were conducted and proposals were made in an effort to give the USX Board of Directors the background information necessary to make restructuring decisions. The restructuring that occurred in 1986, however, did not result in a permanent shutdown of Geneva as of December 31, 1986. At that time, USX had not made a decision whether to sell, restart, idle or shut down Geneva. Furthermore, the work stoppage created uncertainties on the part of both USX and the USWA. It is persuasive to the court that, as the work stoppage continued, and labor negotiations vacillated, USX would consider restructuring its facilities to meet possible market changes.

Accordingly, even under plaintiffs' expansive theory of what can constitute a company decision under section 16(A) of the 1983 BLA, plaintiffs have presented insufficient evidence to convince this court that a "shut down" occurred as of December 31, 1986. Having so found, the court finds that the event required for the vesting of magic number pensions did not occur on December 31, 1986.

## V. SECTION 510 OF ERISA

### A. *Introduction*

The Layoff, Active, Management and Retired plaintiffs each bring claims under section 510 of ERISA. Section 510 provides in pertinent part:

> It shall be *unlawful for any person to discharge*, fine, suspend, expel, discipline, or *discriminate against* a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... *or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....*

29 U.S.C. § 1140. Thus, this portion of the Opinion examines the following section 510 issues: (1) whether USX violated section 510 with respect to the Layoffs by failing to recall certain workers in order to avoid the future accrual of pension benefits; (2) whether USX violated section 510 with respect to the Retireds by actively misrepresenting facts, and/or by requiring the repayment of pensions or the suspension of pensions upon employment with BM & T as a means of interfering with pension benefits; (3) whether USX violated section 510 with respect to the Actives and Management by indefinitely idling Geneva after the work stoppage, or by entering into the June Agreement and selling Geneva to BM & T in order to interfere with pension benefits.

Section 510 of ERISA was designed to complement the vesting provisions of the Act. Under ERISA's vesting

provisions, if an employer maintains a pension plan, within the meaning of ERISA, employees who work a requisite period of time obtain a nonforfeitable right to a pension benefit at normal retirement age. *See Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 377, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980). However, ERISA's vesting provisions are specific and limited and do not protect against an employer who interferes with an employee's ability to qualify for a vested interest in a benefit plan. Accordingly, section 510 was designed to prevent an employer from discharging or constructively discharging an employee on the eve of pension vesting. *See West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980). In other words, Congress enacted section 510 "primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights'." *Gavalik v. Continental Can Co.,* 812 F.2d 834, 851 (3rd Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987) (quoting *West,* 621 F.2d at 245).

◼ Before addressing the factual matters presented in this portion of the Opinion, the court first outlines the respective burdens of proof placed upon the parties. The court notes that in deciding cases under section 510, courts apply the rules for analyzing discrimination claims developed under Title VII and the ADEA. *See, e.g., Gavalik,* 812 F.2d at 852; *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 111–12 (2d Cir.1988); *cf. Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (discrimination claim brought under Title VII); *Branson v. Price River Coal Co.,* 853 F.2d 768, 770

(10th Cir.1988) (discrimination claim brought under the ADEA).

The court follows *Gavalik,* 812 F.2d at 851–53, as to the parties' respective burdens in an action such as this. *Gavalik* sets forth a three-step analytical framework for indirect proof of intent to discriminate under section 510 of ERISA. First, an employee must, by a preponderance of the evidence, make a *prima facie* showing of: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Gavalik,* 812 F.2d at 852. An employee need not prove, however, that the avoidance of pension benefits was " 'the *sole* reason' " for the employer's proscribed conduct. *Id.* at 851 (emphasis in original) (quoting *Titsch v. Reliance Group, Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (2d Cir.1983)). Rather, an employee need only prove that the desire to defeat pension eligibility was a "motivating" or "determinative", factor behind the challenged conduct. *Gavalik,* 812 F.2d at 860. An employee must, however, demonstrate that the [employer] had the " 'specific intent to violate ERISA'." *Id.* at 851 (quotation omitted). "Proof of incidental loss of benefits as a result of a termination will not constitute a violation of [section] 510." *Id.* (citing *Titsch,* 548 F.Supp. at 985).

◼ Second, if an employee establishes a *prima facie* violation of section 510, the burden then "shifts to the employer to introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged actions." *Gavalik,* 812 F.2d at 853 (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. The employer's burden is one of production.[16]

---

16. The Second Circuit has held that the employer's burden is strictly one of production, and that the defendant " 'need not persuade the court that it was actually motivated by the proffered reasons'." *Dister,* 859 F.2d at 1112 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094); *see also Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978) (employer need only produce evidence of legitimate nondiscriminatory reasons to meet the *prima facie* case).

In contrast, the Third Circuit has held that the employer's burden is one of both production *and* persuasion, and that the defendant must prove "it would have reached the same decisions in the absence of the illegal motivation." *Gavalik,* 812 F.2d at 863; *see also, Nemeth v. Clark Equipment Co.,* 677 F.Supp. 899 (W.D.Mich.1987) (employer must prove would have reached same conclusion or engaged in same conduct in absence of impermissible consideration).

The purpose of the shifting burden of proof in section 510 cases is to "sharpen vague allegations of discrimination and flush out the true reasons that prompted an employer's action." *Dister,* 859 F.2d at 1111–12. The allocation of burden recognizes the reality that direct evidence of discrimination is difficult to find. *See id.* at 1112. Specific intent will only rarely be demonstrated by smoking gun proof, or by eyewitness testimony as to the employer's mental processes. *See id.* (citing *Gavalik,* 812 F.2d at 852). The procedure of shifting the burden to the defendant compensates for this lack of evidence to ensure that the employee has his or her day in court.[17] *See Dister,* 859 F.2d at 1112.

If the employer fails to rebut the inference of discrimination that arises from the employee's *prima facie* case, the court may enter judgment for the employee. *See Gavalik,* 812 F.2d at 853. If the employer meets its burden of production, the burden of proof shifts back to the plaintiff, and the

> In the instant case, the parties have specifically limited USX's burden of proof to that required by the Second Circuit. *See* Defendant's Post–Trial Memorandum on Section 510 Motive Issues at 4 ("[T]he employer need only produce evidence of nondiscriminatory reasons for its actions; it need not prove that it was actually motivated by the proffered reasons."); Plaintiffs' Memorandum in Opposition to Defendant USX's Tenth Motion for Partial Summary Judgment (Counts I, III, VI and VII) at 45 (The "burden shifting model can be used under which: ... (b) the burden shifts to the Defendant to articulate a legitimate non-discriminatory reason for its conduct....").
>
> The court agrees with the allocation of section 510 burdens set forth by the Second Circuit and the parties, and finds that the proper burden required of a defendant in a section 510 case is one of production. Accordingly, the court diverges slightly from *Gavalik,* and finds that USX need only produce evidence of a nondiscriminatory reason for its actions. USX need not prove it was actually motivated by the proffered reasons.

**17.** By resolving the often nebulous claims of discrimination, the shifting procedure also assists the courts in fulfilling the remedial aim of section 510. *See Dister,* 859 F.2d at 1112. Congress intended that ERISA enforcement provisions provide benefit plan participants with " 'broad remedies for redressing or preventing violations of the Act.... [Such] safeguards are required to ... completely secure the rights and expectations' created by ERISA." *Id.* (quoting

plaintiff must prove by a preponderance of the evidence that the defendant's articulated reason for its action is a mere pretext to cloak a proscribed purpose. *See id.* Plaintiff can prove "that the employer's articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence'." *Id.* at 834 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1094). "[T]he burden of persuasion on the ultimate issue of intentional discrimination 'remains at all times with the plaintiff'." *Gavalik,* 812 F.2d at 852 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).[18]

For convenience, the court proceeds chronologically in examining plaintiffs' ERISA 510 claims, beginning first with the Layoffs' claims, then proceeding to the Retireds' claims, and ending with the claims of the Actives and Management.

H.R.Rep. No. 533, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News, 4639, 4655).

**18.** In the Pretrial Order, USX states as an affirmative defense that even assuming "any decision of USX affecting plaintiffs' employment was motivated in part by a prohibited discriminatory purpose, ... plaintiffs [are] still barred from recovery because USX would have made the same decision even absent that discriminatory motive." *See* PTO at 40. The three-step analytical framework for indirect proof in a section 510 case is summarized as follows: (1) the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employer's action; and (3) should the defendant carry its burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. To the extent USX's alleged "affirmative defense" that it would have made the same decision even absent a discriminatory motive is inconsistent with the above analytical framework it is dismissed. To the extent USX's defense is consistent with the shifting burden mechanisms, it is subsumed by the analysis set forth in this Opinion, and the court finds that it need not address the defense separately.

B. *Layoffs*

1. Introduction

The Layoffs claim that USX violated section 510 of ERISA by failing to recall workers who had been laid off some time prior to the 1986 work stoppage in order to avoid the accrual of pension benefits. USX defends the Layoffs' claims by asserting that, due to the slumping domestic steel market, it made legitimate work force reductions at all of its plants. As an affirmative defense, USX also argues that the Layoffs' claims are barred by the applicable statute of limitations.

2. Facts

"Man hours per ton" is a measure of efficiency used throughout the steel industry to measure the hours required to produce one ton of steel. In the early 1980's, the man hours per ton for USX's Steel Division was ten. In approximately 1983, USX began a concerted cost reduction program throughout its Steel Division, which included a program to reduce man hours per ton from ten to four.

USX referred to the 1983 cost reduction program as "Greenfield Manning" exercises. The Greenfield Manning exercises, which required plant supervisors to determine the most efficient way to perform each plant job were intended to formulate optimum efficiency targets in the assumed absence of labor contract constraints. The exercises resulted in recommendations for job combinations, job eliminations, and contracting out certain work. *See* DX 152.

At Geneva, plant management developed a cost-reduction plan under the Greenfield program which was designed to increase income by approximately $49 million per year. The program contemplated new capital expenditures by USX, conditioned upon USWA agreement to changes in work procedures, job combination, and job elimination. *See* DX 152. In February of 1984, Geneva's reduction program was presented to the USWA. The USWA rejected Geneva's proposal.

Shortly after the USWA rejected Geneva's proposed cost reduction program, USX unilaterally approved a cost-reduction program for Geneva. The unilateral reduction program resulted in job combinations, job eliminations, changes in work procedures, and contracting out certain work. As a result of the unilateral reduction program, USX operated Geneva with approximately six million fewer man hours per year from 1983 to 1986, than it had in 1982. Further, the man hours per ton decreased, and the total amount of raw steel produced during that period.

Two factors contributed heavily to USX's ability to reduce its work force at Geneva and yet still increase steel production: overtime and contracting out. USX's use of overtime at Geneva increased from 2.7% in 1982 to 10.6% in 1984, 11.8% in 1985 and 12.4% in 1986. *See* PX 245. USX's contracting out of certain work also increased significantly during that same time frame. For example, the cost of one contracting company's work for Geneva increased from approximately $20,000 in 1980 to approximately $1.9 million in 1985, and to approximately $1.6 million for the first seven months of 1986. *See* Tr. at 2254–55.

Section 13 of the 1983 BLA and section 5.1 of the 1980 Pension Agreement contain a system governing layoffs and recalls for seniority and pension purposes. Under these sections, when an hourly wage employee is laid off, his or her continuous service for pension purposes continues to accumulate for two years from the date of layoff. Union represented hourly wage employees also retain recall rights for up to three additional years, depending on the employee's length of continuous service at the time of layoff. *See* DX's 3 at 101–02; 7 at 79–81. If a laid off employee was recalled, even for one day, the two years for seniority and pension purposes would begin anew at the time that such employee was laid off again or his of her continuous service was otherwise broken.

As early as 1983, there is evidence that USX encouraged a policy against recalling workers where such recalls would renew the two year continuous service window for purposes of pension eligibility under sections 13 of the 1983 BLA and 5.1 of the

1980 Pension Agreement. *See* PX's 505 and 4. For example, in an August 10, 1982 Interorganization Correspondence authored by the Vice President of USX's Eastern Steel Operations on the subject of "Recalling Laid Off Employees", the Vice President stated in pertinent part:

> We must avoid, whenever possible, recalling laid off employees since by doing so we will re-entitle them to benefits that might otherwise have run out. Recalling workers should be reviewed particularly when you are faced with a temporary production "blip". In those situations, you may determine that the judicious use of overtime is preferable.

PX 505. Similarly, a September 25, 1985 Interorganization Correspondence, authored by USX's General Manager of Personnel, expressed the company's concern that the recalling of employees at the Fairless steel plant had not taken into account the potential long-term liability for future benefits. The letter berated the Fairless management for recalling workers by stating, "obviously these people now understand the results of their poor and irresponsible judgment and [the] necessity to prevent such occurrences in the future." PX 4.

Prior to the work stoppage, there is evidence that Geneva's management was also concerned with recalls that would begin anew the two year window of benefit eligibility. Geneva's former personnel manager testified that in 1984 through 1986 she recommended alternatives to recalling workers that had been laid off for a long period of time because, "if someone were laid off in excess of two years, and they came back, the benefit clock began to tick." *See* Tr. at 6219. Similarly, Geneva's former Division Engineer, who worked directly with USX management concerning Geneva's reduction program, also testified that he was advised that the primary benefit for reducing man hours per ton at Geneva was to avoid the trailing pension benefit liabilities. *See id.* at 576.

In contrast, Geneva's former plant manager testified that, even assuming a USX benefit avoidance policy existed, employee benefit status or length of layoff was never a factor in recalling Geneva workers. *See* Tr. at 5969–70. Geneva's plant manager further testified that because the bureaucratic procedure for recalling workers was cumbersome and time consuming he often chose overtime or contracting out work over recalling workers. *See id.* at 5972–3.

During 1984 through 1986, approximately 34 employees were recalled to Geneva who had been on lay off status for two years or more, and approximately 176 former employees were recalled who had been on lay off status for six months or more. *See* Tr. at 6137.

### 3. Analysis

#### a. Section 510 of ERISA

■ Initially, USX asserts that prohibited conduct under section 510 of ERISA does not include laying off or failing to recall laid off workers. USX argues that when enacting ERISA, "Congress certainly could not have intended to enact a law where if an employer maintained employee benefit plans, it could not lay off employees and then fail to recall them because the effect of the layoff ultimately would result in a reduction of benefits. Thus, USX asserts that with respect to USX's failure to recall workers, the Layoffs fail to state a claim under ERISA.

■ The court finds that USX mischaracterizes both plaintiffs' theory of recovery and the applicable law. To recover under section 510, plaintiffs must prove that USX had the "specific intent" to violate ERISA. *Gavalik*, 812 F.2d at 851. "Proof of incidental loss of benefits as a result of termination will not constitute a violation of [section] 510." *Id.* at 851. The Layoff plaintiffs do not merely state that a *consequence* of USX's failure to recall certain workers was necessarily a loss of benefits. Rather, the Layoff plaintiffs' theory of recovery is that the *motive* behind USX's failure to recall certain workers was to

discriminate against those workers on the basis of benefits.[19]

■ Further, the court finds that section 510 unquestionably encompasses a claim that, a motivating factor in an employer's decision to avoid recalls was the interference with the attainment of employee benefits. *See Gavalik,* 812 F.2d at 834. In *Gavalik,* the court expressly determined that a company policy of using layoffs, shifting work and failing to recall workers to avoid the accrual of employee pension benefits fell within section 510's prohibited conduct. *See id.* Thus, just as a business which terminates an employee to interfere with the attainment of pension benefits engages in prohibited conduct under section 510, an employer who fails to recall a worker as a means of interfering with pension benefits likewise engages in prohibited conduct under ERISA.

Neither section 510, nor its legislative history excludes recall avoidance as a form of prohibited conduct, under section 510, when such conduct is based on benefit eligibility. The court finds that plaintiffs have properly stated a claim under section 510, that is, that USX avoided recalling plaintiffs with the specific intent to interfere with plaintiffs' pension benefits in violation of ERISA. Accordingly, to the extent that worker recalls at Geneva were based upon benefit status, rather than non discriminatory reasons, such as employment need and worker skill, the court finds that USX engaged in prohibited discriminatory conduct under section 510 of ERISA.

### 1. *Prima Facie Case*

■ The court finds that the Layoffs established a *prima facie* case that USX violated ERISA when the company failed to recall certain workers in order to avoid future pension liability. At least two USX Interorganization Correspondence explicitly state a recall avoidance policy based on a desire to prevent triggering pension eligibility. First, in August of 1982, the Vice President of Eastern Operations candidly stated that plant managers should avoid "recalling laid off employees since by doing so, [USX could] re-entitle them to benefits that might otherwise have run out." DX 505. Second, in September of 1985, in another USX Interorganization Correspondence, USX's General Manager of Personnel expressed the company's concern that some recalling of former USX employees did not take into account the potential long term liability for future benefits, while emphatically insisting on the "necessity to prevent such occurrences in the future." PX 4. Similarly, the evidence shows that Geneva's management maintained a recall avoidance policy during the early 1980's for the specific purpose of preventing the triggering of benefit eligibility. *See* Tr. at 6219, 576.

The evidence also strongly indicates that USX's policy against recalling workers was in fact implemented. It is uncontroverted that USX's Greenfield Manning exercises and Geneva's unilateral reduction program resulted in substantial layoffs throughout USX, including Geneva. Further, rather than recall workers, Geneva engaged in substantial contracting out of work, and dramatically increased the use of overtime. USX increased its contracting out of work by almost five times between 1982 and 1986. *See* Tr. at 2254–55. USX also increased its overtime use increased from 2.7% in 1982 to 12.4% in 1986. *See* PX at 245.

In *Gavalik,* 812 F.2d at 840, the court found that such recall avoidance violated section 510. In *Gavalik,* the defendant devised a liability avoidance program "to avoid triggering future vesting by placing employees who had not yet become eligible for break-in-service on layoff, and to retain

---

**19.** In their Complaint, the Layoff plaintiffs allege that USX violated section 510 of ERISA both by laying them off and by failing to recall them. The court finds that plaintiffs have failed to present the slightest evidence that USX engaged in discriminatory conduct by laying them off. In fact, plaintiffs themselves seem to have abandoned this theory at trial, and instead focused strictly on the issue of recall. *See Plaintiffs' Proposed Findings of Fact* at 59 (proposed facts go solely to question of discrimination in recall). Because plaintiffs have failed to present any evidence that USX discriminated against them by laying them off, the court rejects plaintiffs' layoff contention and limits its analysis to the recall issue.

those employees whose benefits had already vested." *Id.* Laid-off employees whose recall would trigger pension liabilities "were designated as 'permanently laid off,' and could not be recalled [except after losing all right to recall or] under extreme circumstances...." *Id.* and n. 15. Plant managers handled excess work by shifting it to other plants. *See id.* The *Gavalik* court found that such conduct amounted to a section 510 violation. *Id.* at 854–55.

As with the defendant in *Gavalik*, this court finds that plaintiffs showed that USX implemented a plan to avoid triggering pension benefits by intentionally failing to recall certain laid-off workers. Rather than recall these workers, the evidence shows that USX engaged in significant and unusual amounts of overtime and contracting out. When coupled with USX's overriding concern with pension eligibility of those who may be recalled, the court finds, by a preponderance of the evidence, that USX acted with the specific desire to avoid benefit eligibility of plan participants in violation of section 510 of ERISA. Having so found, the burden of production to rebut plaintiffs' *prima facie* case shifts to defendants.

### 2. *Nondiscriminatory Reasons*

■ To dispel the inference of discrimination arising from plaintiffs' *prima facie* case, USX bears the burden "to introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged actions." *Gavalik*, 812 F.2d at 853. In sum, USX's articulated nondiscriminatory reasons for failing to recall the Layoff plaintiffs are as follows: (1) the steel industry was depressed and avoiding recalls increased efficiency and saved the company money; (2) recalls were cumbersome and time consuming, and the use of overtime and contracting out proved more efficient than recalls; and, (3) all recalls were accomplished within the seniority provisions of the 1983 BLA. USX also attacks plaintiffs' *prima facie* case directly, by asserting that: (1) plaintiffs' claim was dispositively decided in USX's favor in a December 16, 1985, collective bargaining grievance brought by the USWA against USX;

(2) Geneva's plant manager expressly testified that recalls were not based on benefit eligibility; and (3) Geneva did in fact recall several workers from 1984 to 1986. The court summarizes each of USX's claims in the order set forth above.

USX first asserts that the steel industry was depressed and that avoiding recalls increased efficiency and saved the company money. Due to the worker reductions made at Geneva, USX cut significant labor costs by operating the plant utilizing approximately six million fewer man hours per ton from 1983 through 1986, than if it had operated Geneva during 1982. Because the amount of raw steel that was produced at Geneva during 1982 through 1986 actually increased, the work force reduction was part of an effort to run a more efficient operation.

Second, USX argues that the bureaucratic procedure for recalls under section 13 of the 1983 BLA was cumbersome and time consuming, and that the use of employees working overtime proved more efficient than recalls. To recall an individual under section 13, USX was required to consult a seniority roster to determine recall eligibility, and then either telephone or give written notice of recall to that individual. If USX was unsuccessful in contacting the employee, or the employee rejected the recall, the process would begin anew with the next eligible employee. *See* DX 3. Employees laid off for more than 30 days would be subjected to a medical examination upon recall. *See id.*

Third, USX claims that all recalls were accomplished within the seniority provisions of the 1983 BLA. USX asserts that the hourly employees at Geneva were laid off based on continuous service, in that, the employees with less continuous service in a line of progression were laid off first. *See* Tr. at 6. Recalls were also allegedly based on the continuous service of those employees qualified to perform the vacant job, that is, that qualified employees with more service were recalled first.

USX also attacks plaintiffs' claims directly. USX first claims that the issue before the court, whether USX engaged in exces-

sive use of employees working overtime to avoid recalls, was decided in USX's favor in a Board of Arbitration Award dated December 16, 1985. *See* DX 374. In that collective bargaining grievance, the USWA claimed that USX violated section 10 of the 1983 BLA by scheduling and forcing "overtime work in departments of [Geneva] in order to prevent the callback of laid off employees." *Id.* The Board denied the USWA's grievance, finding that USX had not violated the notice provisions of section 10. *See id.*

Second, USX emphasizes that Geneva's plant manager expressly testified that recalls were not based on benefit eligibility. *See* Tr. at 5969–70. The plant manager also attempted to discredit Geneva's personnel manager's testimony, which stated that Geneva management worked under a policy of considering length of layoff prior to recall, asserting that he alone made recall decisions. He also attempted to clarify the personnel manager's testimony by stating that she was simply noting the increased costs associated with insurance benefits as compared to pension benefits.[20]

Based on the above, the court finds that USX introduced legitimate, nondiscriminatory reasons for its challenged actions, thereby dispelling the inference of discrimination arising from plaintiffs' *prima facie* case. The record is undisputed that the steel industry was depressed in the early 1980's. USX's decision to avoid recalls could have legitimately been based on the fact that avoiding recalls increased efficiency and saved the company money. USX's decision could also have been based on the fact that recalls were cumbersome and time consuming, and the use of overtime and contracting out proved more efficient than recalls. These propositions are further bolstered both by the statements of Geneva's plant manager, who testified that recall decisions were not based on benefit eligibility, and the fact that several employees were recalled during the period of 1984

through 1986. Therefore, the court finds that USX met its burden of producing admissible evidence of a nondiscriminatory reason for failing to recall the Layoff plaintiffs. *See e.g. Dister*, 859 F.2d at 1115 (corporate reorganization and a concomitant change in business priorities directed toward revising employer's product development goals and cutting overhead is non discriminatory reason).

### 3. *Evidence of Pretext*

■ Because USX met its burden of production, the burden of proof shifts back to the plaintiffs to prove by a preponderance of the evidence that USX's articulated reasons for its action were a mere pretext for discrimination. *See Gavalik*, 812 F.2d at 853. "In the context of a trial, [i]f the plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reason, then the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent...." *Dister*, 859 F.2d at 1113 (quotation omitted). Thus, "pretext can be established by a showing that the 'asserted neutral basis was so ridden with error' that the employer obviously could not honestly have relied on it." *Dister*, 859 F.2d at 1113 (quoting *Lieberman v. Gant*, 630 F.2d 60, 65 (2nd Cir.1980)).

Having carefully reviewed the record, the court finds that the reasons advanced by USX for failing to recall certain workers, were in fact a pretext for discrimination, and that it is more likely than not that USX did not act for its proffered reasons. The court finds that the asserted neutral basis' for USX's decision to avoid recalls was so ridden with error that USX could not honestly have relied on them.

First, USX's assertion that it was cost efficient to avoid recalls is without merit. It is undisputed that USX cut significant labor costs by operating Geneva with fewer

---

**20.** If an employee whose insurance benefit eligibility had expired was recalled, that individual would obtain wages and benefits while working, in addition to another six months of insurance benefits if subsequently laid off. Thus, for pur-

poses of insurance benefits, it may cost USX more to recall an employee than to pay an active employee overtime for the same work. *See* Tr. at 6219.

hours. It is also undisputed that Geneva produced more steel during 1983 through 1986 with fewer active workers. The error in USX's efficiency justification, however, was the *means* with which USX was able to reduce its work force still increase steel production. Geneva's ability to maintain low operation numbers, was due primarily to the significant amounts of overtime and contracting out that the company engaged in. Yet overtime and contracting out actually cost USX more short term than if the company had recalled workers.

Each hour of overtime cost USX time and a half. *See* Tr. at 577. In spite of this obviously more expensive way to do business, USX's overtime hours increased by five times, from 2.7% in 1982, to 12.4% in 1986, resulting in a dramatic increase in short term labor costs. Despite the evidence that overtime cost USX more than straight time, USX nevertheless engaged in, and increased, the use of overtime rather than recall available workers. Further, USX offered no persuasive evidence that the alleged costs saved by failing to recall certain workers amounted to less than the costs incurred for overtime.

USX ineffectively attempted to bolster its cost efficiency argument by asserting that recalls were cumbersome and time consuming, and therefore that the use of overtime proved more efficient than recalling former workers. *See* Tr. at 5972–3. Under the 1983 BLA, recalling an employee is a relatively uncomplicated procedure. It simply requires consulting a seniority roster to determine eligibility and then contacting the individual that is qualified for recall. If the employee has been laid off for longer than 30 days a simple medical examination is required.

Based on the above, the court does not believe that the allegedly time consuming burden of recalling a worker, to be paid at straight time, was less economical than paying an existing employee time-and-a-half. USX was clearly concerned with excessive use of overtime. *See* Tr. at 5968, 6004–5, 6008. The company presented no significant evidence, however, that the cost of recalling workers, albeit time consuming

or cumbersome, outweighed the substantial cost associated with increasing production cost by fifty percent.

In addition to increasing overtime work, USX also increased the amount of work that was contracted out. As with overtime, however, contractors generally cost USX more short term than paying its own employees to do the same job. *See* Tr. at 575, 2261. Further, USX's assertion that contracting out work was efficient because it reduced man hours per ton is completely misleading. USX's calculation that its worker reduction programs resulted in approximately six million fewer hours in 1983 through 1986, did not take into consideration the amount of contracting out Geneva engaged in during that time. *See* Tr. at 575. Thus, contracting out work reduced the number of man hours per ton *only* because USX did not count contract work in the calculation of hours.

 As an affirmative defense, USX asserts that the overtime versus recall issue is moot due to an Arbitration decision dated December 16, 1985. *See* DX 374. In December, 1985, the Board of Arbitration found that USX had not violated the notice provisions of section 10 of the 1983 BLA. The decision stated in pertinent part:

> The Union has not proven that overtime during the period at issue was distributable, which is required to trigger the notice provision. *It has not shown one example of where overtime was scheduled. The Union is obligated to show which job worked overtime for two consecutive weeks and which employee on layoff could have performed the work.* This not having been done, the grievance must be denied.

DX 374 at 6 (emphasis added). In other words, the arbitration decision was based on insufficiency of the evidence. In contrast, the issue before this court is whether USX had a discriminatory motive in failing to recall workers. The issue is not merely whether USX followed proper recall procedures. Nowhere in the 1985 arbitration decision is the issue of motive addressed. Accordingly, the court finds the decision inapposite to the case at hand.

USX also argues that several recalls were in fact made from 1984 to 1986, and that such recalls were properly accomplished within the seniority provisions of section 10 of the 1983 BLA. *See* Tr. at 6137. Thus, having fulfilled the terms of section 10, USX asserts that it did not violate section 510 of ERISA. Section 10 of the BLA merely contains procedural provisions relating to overtime work by union-represented employees where overtime is used to perform short term work in lieu of recalling workers. Thus, USX's assertion that all recalls, which were accomplished in 1984 through 1986, were accomplished within the seniority provisions of section 10, does not dispositively dismiss the issue of whether other recalls were avoided so as to interfere with benefit eligibility.

Finally, USX asserts that Geneva's plant manager expressly testified that he did not base his recall decisions on benefit eligibility. *See* Tr. at 116, 119. In contrast to the plant manager's testimony, there is direct evidence of a corporate wide policy to avoid recalls in favor of overtime or contracting out. Further, Geneva's personnel director, and Geneva's division engineer, expressly testified that Geneva management avoided recalls in order to avoid triggering benefits. Based on such evidence, the court finds that the plant manager's testimony is outweighed by substantial evidence to the contrary.

The evidence before this court demonstrates that many former Geneva workers were eligible for recall, and yet were intentionally not recalled by USX as a means of limiting future pension benefits. There is also evidence that the primary reason these workers were not recalled, was for the specific purpose of interfering with benefit eligibility. Accordingly, the court finds that USX violated section 510 of ERISA by failing to recall the Layoff plaintiffs so as to avoid future pension benefits liabilities.

b. The Statute of Limitations

■ As an affirmative defense, USX also asserts that the Layoffs' claims are barred by the applicable statute of limitations. Section 510 of ERISA, and the appli-cable enforcement provision, section 502, 29 U.S.C. § 1132, do not provide a statute of limitations for actions alleging violations of section 510. Where a federal statute does not state a statute of limitations period, the appropriate period is determined by reference to the state statute of limitations governing cases most analogous to the cause of action asserted by the plaintiffs, so long as such period is not inconsistent with federal law or policy. *See Reed v. United Transp. Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). The court declines to borrow a state statute of limitations, when a rule from else where in federal law clearly provides a closer analogy. *See Held v. Manufacturers Hanover Leasing Corp.,* 912 F.2d 1197, 1200 (10th Cir.1990). In the case of section 510 of ERISA, however, the Tenth Circuit has held that a court must apply an analogous state statute in preference to an ERISA statute of limitations. *See id.* at 1202.

■ When adopting a state statute of limitations, the court must first determine the essential nature of the claim under federal law and then focus on the period applicable to such a claim under the most analogous state law claim. *See Held,* 912 F.2d at 1205. In *Held,* the court addressed the proper characterization of a section 510 claim for purposes of determining an analogous statute of limitations period under New York law. *See id.* In *Held,* the plaintiff claimed that his employer had unlawfully discharged him for the purpose of interfering with the attainment of pension benefits. Accordingly, he sought equitable relief under section 502(a)(3) of ERISA for unlawful discharge under section 510. The court determined that the essential nature of a section 510 claim seeking equitable relief was a claim for employment discrimination. *See id.* at 1205. Accordingly, the court held that the most analogous claim for relief in New York was a claim for discrimination in employment. *See id.*

■ In the instant case, the Layoff plaintiffs' section 510 claim asserts that USX "unlawfully discriminated against these plaintiffs ... with the primary or determinative purpose of interfering with

the attainment of valuable rights which these plaintiffs, as participants [in benefit plans] were entitled to or would have become entitled to under the benefit plans." Fourth Amended Complaint for Damages and for Declaratory and Injunctive Relief ("Fourth Amended Complaint") at 40 (June 11, 1990). Like the *Held* case, the Layoffs seek equitable relief under section 502(a)(3) of ERISA.[21]

Having determined the essential nature of plaintiffs' claims under section 510 to be employment discrimination, the court next focuses on the limitations period applicable to such a claim under Utah state law. The State of Utah does not have a limitations period which specifically addresses claims based on employment discrimination. Consequently, for ERISA claims seeking equitable relief under sections 510 and 502(a)(3), the court adopts Utah's catch-all four-year statute of limitations period found in U.C.A. § 78–12–25(3) (1992) (action for relief not otherwise provided for by law may be brought within four years). Thus, the court finds that plaintiffs claims for equitable relief under section 510 may be brought within four years.

Now that the court has determined that USX violated section 510 of ERISA by failing to recall workers, it becomes the task of each individual Layoff to prove the measure of his or her relief. At what point, and in what amount, actual deprivation occurred as to any particular individual will be determined in the subsequent proceedings of this case. In order to prove their measure of relief, each plaintiff must prove, *inter alia,* the following: that he or she was a former Geneva employee, eligible for pension benefits, who was laid off, and continued on lay off status; that a job was available which would have occurred over two consecutive weeks or more; that he or she was ready willing and able to perform the work; and, that he or she,

although eligible for recall under the 1983 BLA, was nevertheless not recalled.

## C. Retireds

### 1. Introduction

The Retired plaintiffs are those workers that retired from USX prior to August of 1987, when Geneva was sold to BM & T. The Retireds claim that USX violated section 510 of ERISA by: (1) inducing them to retire during the work stoppage by offering "lump sum" retirement benefits instead of monthly pension payments; (2) instilling fear in them by not guarantying continued retirement medical benefits if the plaintiffs' retired after December 31, 1986; and (3) misrepresenting facts concerning plaintiffs' collection of benefits and their employment with BM & T.[22] USX defended plaintiffs' claims by contending that the Retireds failed to prove that USX had the specific intent to violate ERISA, and therefore that plaintiffs failed to establish a *prima facie* case of discrimination under section 510.

### 2. Facts

Although the 1983 BLA expired on July 31, 1986, the 1980 Pension Agreement did not expire until six months later, on December 31. *See* DX 7. On December 4, 1986, USX sent a letter to all steel plant locations, including Geneva, instructing employees on the procedures to be followed in processing pension applications prior to the 1980 Pension Agreement's expiration. *See* PX 39. The letter states in part:

Persons eligible for retirement with an immediate pension on or before December 31, 1986, who do not on or before that date request to retire on or before December 31, 1986, may retire after that date, but will *not* be eligible for retired health or life insurance coverage.

*Id.* 39 (emphasis in original).

On December 5, the USWA also distributed an informational letter to its members

---

**21.** The *Held* plaintiff also sought recovery of certain benefits under section 502(a)(1)(B). *See id.* at 1203–04. As to this separate claim for benefits, the Tenth Circuit applied New York's six-year statute of limitations period for claims brought on contract. *See id.* at 1207.

**22.** Plaintiffs also assert that USX violated section 510 by failing to disclose the decision to shut down Geneva on December 31, 1986. Having previously found that Geneva was not in fact shut down as of December 31, 1986, the court rejects plaintiffs' contention.

concerning the expiration of the 1980 Pension Agreement. *See* DX 172. The USWA letter specifically advised employees not to retire simply out of fear that the 1980 Pension Agreement would not be renewed at the end of the work stoppage. The letter states in pertinent part:

> With respect to the current [work stoppage] at USX, you have the benefit of the continuation of the Pension Agreement for five months after the expiration of the Basic Labor Agreement. If the [work stoppage] continues beyond the Pension Agreement's expiration date, we will proceed in exactly the same way as if that Agreement had expired earlier. *As part of any final settlement, we will insist that our members' pension benefits be protected from any losses resulting from the expiration of the Pension Agreement.*
>
> . . . . .
>
> We urge you not to make any retirement decision other than what you would have normally made prior to December 31, 1986. Do not make a decision out of fear that some benefit to which you are entitled will not be available after December 31, 1986.

*Id.* 172 at 1, 3 (emphasis in original).

Between January 1 and September 30, 1986, the Pension Rules applicable to union represented USX employees provided for a single lump sum payment, in lieu of monthly pension payments, for a pension with an actuarial value of more than $3,501, but less than $5,001. On September 30, 1986, the USX Pension Plan was amended to permit all Plan participants to elect lump sum distribution for all types of pensions, without regard to the dollar amount involved. *See* DX 10E at 12. No formal notice was given to Geneva employees of the lump sum amendment. Employees were made aware of the option if they made specific request for such information from Geneva's personnel office. *See* Tr. at 6174–7. By December 31, 1986, approxi-

mately 197 plaintiffs took 30–year retirement under the 1980 Pension Agreement.[23] *See id.* at 6230. Of these 197 plaintiffs, 111 took a lump sum distribution. *See id.*

On January 27, 1987, USX and the USWA reached a tentative agreement settling the work stoppage. On April 2, 1987, USX sent a letter to the USWA of the company's tentative decision to shut down Geneva on July 1, 1987. *See* DX 106. A proposed alternative to shutting Geneva down was to sell the plant as an ongoing business.

A group of Utah lawyers and businessmen formed the BM & T corporation for the purpose of purchasing and operating the Geneva steel plant. On August 31, 1987, USX sold Geneva to BM & T pursuant to an "Asset Sales Agreement" (the "BM & T Sales Agreement"). *See* PX 237. The conditions and procedure for the payment of USX pension benefits to USX workers who were subsequently employed by BM & T were set forth in section 6.2 of the 1987 Pension Agreement. Section 6.2 states, "Any participant who is receiving a pension under this or a prior Agreement between the parties shall upon reemployment by an Employing Company have his [or her] pension discontinued." DX 8; *see also* 11A (Part II–K Pension Rules).

On June 8, 1987, USX and the USWA entered into the June agreement which, like the 1987 Pension Agreement states that, "[t]he pension payable under the [USX] Plan to any Geneva Works employee who accepts employment with Buyer after retiring from [USX] shall be suspended for the period of employment with Buyer but shall be reinstated upon termination of the employment relationship with Buyer." DX 30. The June Agreement, however, was specifically limited to "each employee at Geneva Works accruing continuous service under the February 1, 1987 Basic Labor Agreement as of the date of sale [of Geneva to BM & T]." *Id.*

---

**23.** The majority of the Retired plaintiffs had 30 years of service with USX, and consequently were eligible for a "30–year sole option" retirement. An employee electing such retirement receives an immediate and unreduced retirement benefit. Unlike $^{70}/_{80}$ retirement, however, 30–year retirement does not entitle the employee to any social security supplement. *See* DX 7.

The BM & T Sales Agreement also placed conditions on the payment of USX pensions for all non-represented employees. Section 5.6.2 of the agreement states in part:

> The pension payable under the [USX] Pension Plan to any current USX employee who becomes an Employee of BM & T after retiring from USX shall, to the extent required by and in accordance with the [USX] Pension Plan, be suspended for the period of employment with BM & T but shall be fully reinstated upon termination of such employment for any reason.

PX 237.

Based on the 1987 Pension Agreement, the June Agreement and the BM & T Sales Agreement, the pension benefits of several Geneva employees were suspended during their employment with BM & T. To assist USX in determining which workers' benefits should be suspended, the Pension Fund's Employee Benefits Analyst prepared a chart showing how the benefits of current and former USX employees would be handled upon their employment by BM & T. *See* DX 145. The chart indicated that the Retireds' pension benefit would be suspended during BM & T employment. *See id.*

The Pension Fund's interpretation that the Retireds' pensions should be suspended was based on a misunderstanding of the June Agreement. In fact, the June Agreement, which was specifically limited to Geneva workers employed by USX at the time Geneva was sold to BM & T, did not prohibit the Retireds, who were not employed by USX at the time Geneva was sold, from continuing to collect their USX pensions *and* secure employment, if available, with BM & T. *See* Tr. at 6177.

Relying on the chart, Geneva's personnel office incorrectly advised several Retireds that, pursuant to the terms of the June Agreement, their pensions would be suspended upon employment with BM & T. *See* Tr. at 6174–5. Consequently the majority of the Retired plaintiffs chose not to work for BM & T, rather than have their pensions suspended based on the misinformation provided by USX. *See id.* at 2437, 2381, 2222–2226. Three Retireds did go to work for BM & T as permanent employees during the period between August 31, 1987 and October 6, 1988, resulting in the suspension of at least one retirement pension. *See id.* at 6252. Approximately 275 of the Retireds were employed by BM & T as "trainer consultants" under consulting agreements with SOS Temporary Services. *See id.* at 6231–32. These workers' pensions were not suspended, because they were not considered employees of BM & T. *See id.*

On October 17, 1988, the Pension Fund, realizing that the June Agreement had been incorrectly interpreted, issued a letter to USX, dated October 6, 1988, correcting their prior interpretation of the Retireds' pension benefits. *See* DX 400. The letter stated that the pension benefits of the Retireds would not be suspended upon employment by BM & T. The USWA and BM & T were also notified of the change. *See* PX 150. After October 17, 1988, all presale Geneva retirees, including the Retireds, were advised that employment with BM & T would have no affect on pension benefits. No formal notice of the corrected interpretation was given to individual participants. *See* Tr. at 6385.

### 3. Analysis

To establish a *prima facie* case under section 510, the Retired plaintiffs must demonstrate by a preponderance of the evidence that, with respect to their claims, USX had the specific intent to violate ERISA. The court finds that the Retired plaintiffs failed to sustain their burden.

### a. Lump Sum Retirement Benefits

■ On September 30, 1986, the USX Pension Plan was amended to permit all Plan participants to elect lump sum distribution of pension benefits without regard to the dollar amount involved. *See* DX 10E at 12. Plaintiffs argues that, in light of the ongoing work stoppage and the December 31, 1986 expiration of the Pension Agreement, USX amended the Pension

Plan to improperly induce plaintiffs into early retirement.

■ The court finds no evidence that USX offered the lump sum option with the specific intent to violate a prohibited conduct under ERISA. The allegedly "suspicious" timing of the amendment does not prove discrimination under section 510. No formal notice was given to Geneva employees of the lump sum amendment. Rather, employees were made aware of the option only if an employee specifically asked. *See* Tr. at 6174–7. The lump sum option was purely discretionary on the part of the employee; the plant officials did not encourage the employee one way or the other. *See id.* at 2442. Furthermore, the court notes that adding an optional form of payment to a pension plan, in itself, does *not* interfere with the attainment of a benefit in violation of section 510. *See Aronson v. Servus Rubber, Div. of Chromalloy,* 730 F.2d 12, 16 (1st Cir.), *cert. denied,* 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984) (section 510 prohibits discriminatory conduct directed against individuals, not actions involving plan in general).

### b. Retirement Medical Benefits

■ On December 4, 1986, USX sent a letter to all steel plant locations, including Geneva, instructing employees on the procedures to be used in processing pension applications at the expiration of the 1980 Pension Agreement. *See* PX 39. The letter stated that retirement after December 31, 1986, would not include health or life insurance retirement benefits. Plaintiffs argue that the letter represented a "scare tactic", seeking to frighten employees into early retirement. As illustration, one plaintiff testified that she retired during the work stoppage because she was afraid she would lose retiree medical benefits if she did not retire before December 31, 1986. *See* Tr. at 2427–28, 2441.

The court finds that the above evidence does not show that USX acted with the specific intent to interfere with the Retired plaintiffs' pensions. Plaintiffs fail to present any evidence that remotely suggests that USX encouraged or induced plaintiffs

to retire. Merely stating the conditions and procedure for retirement due to the expiration of the 1980 Pension Agreement does not amount to a violation of ERISA. On the contrary, providing open communication and employer disclosure concerning an employee's pension benefits is just the type of conduct ERISA was enacted to encourage.

The USX letter was sent to Geneva's personnel office, it was not distributed to plaintiffs individually. The purpose of the letter was to give Geneva management information by which to answer plaintiffs' questions concerning the expiration of the 1980 Pension Agreement. The only information that was sent to plaintiffs directly was a December 5 letter from the USWA, specifically advising workers not to retire simply out of fear that the 1980 Pension Agreement would not be renewed. The letter from the USWA also states in pertinent part:

> With respect to the current [work stoppage] at USX, you have the benefit of the continuation of the Pension Agreement for five months after the expiration of the Basic Labor Agreement. If the [work stoppage] continues beyond the Pension Agreement's expiration date, we will proceed in exactly the same way as if that Agreement had expired earlier. *As part of any final settlement, we will insist that our members' pension benefits be protected from any losses resulting from the expiration of the Pension Agreement.*

DX 172 at 1 (emphasis in original).

USX did not control the expiration of the 1980 Pension Agreement. That date was established through the 1983 BLA. Although the expiration of the agreement clearly caused anxiety for many plaintiffs, there is absolutely no evidence that USX actively encouraged early retirement.

■ Further, uncertainty about future retirement benefits alone does not constitute a "constructive discharge" which could violate section 510. Plaintiffs' claims are analogous to those rejected by the court in *Bartman v. Allis–Chalmer Corp.,* 799 F.2d 311 (7th Cir.1986), *cert. denied,*

479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987). In *Bartman,* the court held that the plaintiffs' uncertainty about their future retirement benefits caused by the expiration of the applicable collective bargaining agreements could not support a claim for constructive discharge against the employer. *See id.* at 314. The instant case shows nothing more than the same uncertainty and difficult decision making process as examined in *Bartman. See id.* at 314. Such uncertainty, however, simply does not constitute a violation of section 510 of ERISA.

#### c. Misrepresentations

■ The June Agreement applied only to "each employee at Geneva Works accruing continuous service under the February 1, 1987 Basic Labor Agreement as of the date of sale [to BM & T]." DX 30. It is undisputed, however, that USX provided incorrect information to the Retired plaintiffs concerning the suspension of their retirement upon employment with BM & T. Accordingly, plaintiffs claim that USX's giving of false or inaccurate information concerning the Retireds' pension benefits amounted to a violation of section 510 of ERISA.

The court finds that plaintiffs have failed to present any persuasive evidence that USX provided employees with inaccurate information with the specific intent to interfere with their benefits. Based on its understanding of the relevant documents, the Pension Fund inaccurately determined that the Retireds' pension benefits would be suspended during BM & T employment. Reasonably relying on the Pension Fund's misinformation, Geneva's personnel office incorrectly advised several Retireds that suspension of pension benefits would occur upon BM & T employment. There is no evidence, however, that either the Pension Fund, or USX, acted in concert, or individually, to purposely mislead the plaintiffs in an attempt to interfere with their benefits.

The several agreements entered into between USX and its employees are not uncomplicated. It is certainly understandable that mistakes may occur. In this case, when USX realized the incorrect interpretation of the June Agreement, USX took steps to immediately notify the USWA and BM & T, and if necessary, reinstate pension benefits. The court is not willing to find that, as a matter of law, the providing of incorrect benefit information by an employer to his or her employee, without more, amounts to a *per se* violation of ERISA. ERISA is not a strict liability statute. A showing of specific intent is necessary.

In *Slocum v. Cosmair Corp.,* 1989 WL 151666 (D.N.J. Dec. 8, 1989), the plaintiff brought a claim under section 510 against her employer for providing incorrect advice concerning her retirement benefits. The court rejected the claim, holding as follows:

> To establish liability for such a claim, plaintiff must show that the defendant had specific intent and took deliberate steps to interfere with protected rights. *Plaintiff has failed to allege any conduct by defendants which would constitute an unlawful interference with [plaintiff's] protected present or future rights under the policy in the inadvertent miscalculation of plaintiff's retirement benefits by defendant.*

*Slocum,* 1989 WL at 5–6 (citation omitted) (emphasis added). The court's reasoning in *Slocum* is helpful. There is no basis in section 510 for plaintiffs to turn an inadvertent mistake concerning the interpretation of complicated documents into a deliberate scheme by USX to interfere with pension benefits.[24]

#### D. *Actives and Managements/Indefinite Idling*

##### 1. Introduction

The Active and Management employees were actively employed by USX at the time

---

**24.** In the alternative, plaintiffs assert that the giving of incorrect information necessarily interfered with the attainment of a benefit in violation of section 510. In other words, plaintiffs seem to argue that a *consequence* of USX's actions was the interference with pension benefits, regardless of the intent behind the giving of

erroneous information. As stated above, plaintiff must demonstrate that USX had the "specific intent" to take action which violates ERISA. *Gavalik,* 812 F.2d at 851. "Proof of incidental loss of benefits as a result of termination will not constitute a violation of [section] 510." *Id.*

the work stoppage commenced. The Actives and Managements assert that USX violated section 510 by indefinitely idling Geneva after the work stoppage, and by entering into the June Agreement and selling Geneva to BM & T.[25] In this portion of the Opinion the court analyzes the Active and Management plaintiffs' first contention, that is, that USX violated ERISA by indefinitely idling Geneva.[26]

### 2. Facts

On November 23, 1985, USX and POSCO entered into a "Memorandum of Understanding" which set forth the proposed terms of the Pit–Cal joint venture. *See* DX 213. From Geneva's perspective, the critical feature of the joint venture agreement was that as of October of 1989, Pit–Cal would substitute the hot bands supplied by Geneva with hot bands from Korea. Thus, with the bulk of its output no longer needed, Geneva was destined to close in late 1989.

USX repeatedly assured the Geneva work force and Utah community leaders that Geneva would continue to provide hot bands to Pit–Cal at least through 1989. In fact, the Memorandum of Understanding expressly stated that "hot bands will be available from either U.S. Steel's Geneva Plant or some other specified source...." DX 213 at 4. Similarly, in a December 16, 1985 letter from Chairman Roderick to Geneva employees, Roderick stated that the joint venture would "allow continued operation of Geneva until at least the latter part of 1989...." DX 216 at 2. On that same date, USX circulated a press release acknowledging Geneva as the continued source of hot bands to Pit–Cal. *See* DX 218.

On November 27, within four days of signing the Memorandum of Understanding, USX counted the number of Geneva employees who would become eligible for Magic Number benefits by October of 1989. *See* PX 14. Of the 2,472 workers studied, 1,749, or almost three out of four, would be eligible for pensions by the end of 1989. Of those 1,749 workers, over 300 would advance from deferred vested pension status to Rule of 65 eligibility by December of 1989. The projected cost of each Rule of 65 pension to USX was approximately $217,000. *See* Tr. at 979–80. Based on the November study, an expert for the plaintiffs testified that the increased employee pension costs with a shutdown in 1989 as compared to a 1986 shutdown would be approximately $50 million. *See* Tr. at 413.

On February 5, 1986, the "U.S. Steel Hot Band Requirements Agreement" was signed. *See* DX 214. Despite the Memorandum of Understanding and USX's public statements and assurances, the Hot Band Requirements Agreement did not show Geneva as the source of hot bands to Pit–Cal. The Agreement simply stated that, "[a]ll Hot Bands shall be produced by Seller at one of Seller's producing plants...." DX 214 at 2. Between the signing of the Memorandum of Understanding and the Hot Band Requirements Agreement, the only new information USX received concerning Geneva was the November benefit study. *See* Tr. at 1386.

Between May and July of 1986, USX requested no fewer than four analyses of the employee benefit costs of closing Geneva at various future points in time. First, in May of 1986, USX studied the employee cost liability for a Geneva shutdown as of July 31, 1986, as compared to a shutdown as of December 31, 1986. *See* PX 21. The study showed that a shutdown as of July 31, involving 2,500 employees, would cost approximately $93 million. A shutdown as

---

**25.** In the Pretrial order, plaintiffs continued to contend that the nationwide work stoppage was part of the alleged benefits avoidance scheme. *See* PTO at 12. The court has previously found that USX did not violate ERISA section 510 by closing Geneva during the period of July 1986 to February 1987. *See Pickering,* slip op. April 24, 1990 at 12–17.

**26.** Plaintiffs also assert that USX violated section 510 by shutting Geneva down on December 31, 1986. Having previously found that Geneva was not shut down as of December 31, 1986, the court rejects plaintiffs' contention.

of December 31, 1986 would cost approximately $92 million for 64 less employees.

Second, on June 30, 1986, a study was conducted using the same employee profiles as the May 1986 study but using a 1989 projected shutdown date. *See* PX 25. The study revealed that a shutdown as of December 31, 1989, would cost approximately $87 million for 2,272 employees, with an additional $24 million in curtailment costs.

Similarly, on July 15, 1986, USX computed the estimated cost of shutting down Geneva in December of 1989. *See* PX 29. As with the June 30 study, the July 15 study revealed that in December 1989 pension costs would total more than $87 million, with an additional $24 million in curtailment costs.

Finally, on July 17, 1986, USX prepared a cash flow analysis for Geneva. *See* PX 29. The July 17 study showed the anticipated cash flow from Geneva if the plant were kept open through 1989. The study estimated that the 1989 shutdown costs would exceed anticipated cash flow for the period studied.

On August 1, 1986, the "work stoppage" began, and Geneva was idled. The work stoppage lasted from August 1, 1986 through January 27, 1987.

On August 12, 1986, just a few weeks after the July 17 cash flow study, USX produced a draft of its proposed 1986 Business Plan. *See* PX 79. The August draft of the Business Plan showed that there was to be no post-work stoppage production at Geneva in 1987. Subsequent drafts of the Business Plan, completed in October and December of 1986, similarly showed that there was to be no production at Geneva in 1987.

On August 18 and 19, 1986, USX prepared the Facility Rationalization, a three page document which proposed shutting down three USX facilities, including Geneva. *See* PX 32. The Facility Rationalization indicated that operating the USX Steel Division with the Geneva, Fairfield and National plants would result in a monthly loss of $100,000, while operations without those facilities would result in a monthly profit of $15 million.

Between the time USX entered into the Memorandum of Understanding, which named Geneva to source Pit–Cal, and the August draft of the Business Plan, other than the Facility Rationalization, USX failed to present a single study done between November of 1985 and December of 1986, which analyzed efficiency, quality, or shipping rates with respect to the ongoing operation of Geneva. *See* Tr. at 1386. The only studies done during that time were the pension studies.

On January 15, 1987, the Corporate Policy Committee of USX reviewed a USX Authorization Request for a major restructuring of the company's Steel Division, including the Facility Rationalization. Chairman Roderick believed that the restructuring proposal could improve USX's annual net income by approximately $230 million. *See* Tr. at 5668. Of that $230 million of increased net income, approximately $77.4 million was attributable to the proposed closure of Geneva. *See* PX 41A. Chairman Roderick and the Corporate Policy Committee modified the Facility Rationalization proposal and recommended to the Board of Directors an indefinite idling of Geneva rather than a shutdown. On January 27, 1987, the USX Board of Directors approved the Authorization Request as presented. *See* DX 56.

On that same day, USX and the USWA reached a tentative agreement settling the work stoppage. The agreement was ratified by the USWA and its members in February. Within a few days of the ratification, USX publicly announced the USX Board of Directors decision to idle Geneva. *See* PX 317. Although Geneva workers participated in the settlement negotiations, and ratified the agreements, USX did not recall these workers. Only 87 union-represented employees were recalled to Geneva in February of 1987 to perform maintenance work in the plant.

3. Analysis

■ Initially, USX asserts that prohibited conduct under section 510 of ERISA

does not include the indefinite idling of an entire plant. First, USX claims that section 510 was not enacted to regulate "every corporate business decision which [has] any possible collateral effect on pension benefits...." Memorandum in Support of USX's Tenth Motion for Partial Summary Judgment (Counts I, III, VI and VII) at 23 (quotation omitted). Second, USX argues that "[a]ll the [Geneva] employees were treated the same as a result of the decision not to operate the Geneva Works, which rules out any question of discrimination." *Id.* at 24 n. 6. Thus, USX argues that with respect to the idling of Geneva, the Active and Management plaintiffs fail to state a claim under ERISA. The court disagrees.

As to USX's first contention, the Active and Management plaintiffs' theory of recovery was that the *motive* behind USX's decision to indefinitely idle Geneva in January of 1987 was to discriminate against Geneva workers. Accordingly, because plaintiffs do not merely claim that a consequence of USX's decision to indefinitely idle Geneva was necessarily a loss of benefits, the court finds that plaintiffs have stated a claim under ERISA.

■ As to USX's second contention, the court observes that either the termination of one employee or the termination of 100 employees might violate section 510 if such action is taken for the determinative purpose to interfere with pension liability. *See Nemeth*, 677 F.Supp. 899, 907 (W.D.Mich. 1987). *Nemeth* involved 18 former employees of Clark Equipment Company who lost their jobs, and their full pensions, when Clark closed its Benton Harbor plant in Michigan, terminated the plaintiffs, and transferred production to two other facilities. The plaintiffs brought suit pursuant to section 510 claiming that the reason Clark closed the Benton Harbor plant, instead of one of the other plants, was attributable solely, or in large part, to the cost of Benton Harbor's pension plan. *See Nemeth*, 677 F.Supp. at 902.

The *Nemeth* court found that the plaintiffs had asserted a cognizable claim under section 510 by stating:

ERISA does not distinguish between the termination of one employee and the termination of 100 employees. Either action is illegal if taken with the purpose of avoiding pension liability. Rather, ERISA distinguishes between the intent to interfere with vested pension rights and the intent to terminate employment for other, nondiscriminatory reasons.

*Nemeth*, at 907 (citing *Gavalik*, 812 F.2d at 851; *Titsch*, 548 F.Supp. at 985). The court further stated that, "[w]hile termination of employees in order to reduce labor costs is not always illegal, ERISA prohibits such actions if the primary reason for high labor costs is pension liability." *Id.* Following *Nemeth*, this court finds that plaintiffs have stated a claim under section 510. USX may well have violated section 510 if action to indefinitely idle Geneva was done with specific intent to interfere with plaintiffs' pension benefits.

a. Prima Facie Case

■ Having carefully examined the Active and Management plaintiffs' claims with respect to the indefinite idling of Geneva, the court finds that these plaintiffs have established by a preponderance of the evidence a *prima facie* case that USX violated ERISA by engaging in prohibited conduct in violation of section 510.

Plaintiffs' *prima facie* case is footed on part on several pension studies and the events surrounding the preparation of the pension studies. The events relevant to plaintiffs' case began in November of 1985 when Geneva's future was put in jeopardy by the joint venture. *See* DX 215. After October of 1989, Pit–Cal would substitute the hot bands supplied from Geneva with hot bands from Korea. Thus, with the bulk of its output no longer needed, Geneva would likely close in October of 1989.

Initially, USX determined to keep Geneva open until October of 1989. For example, at the time the Memorandum of Understanding was signed, USX intended to keep Geneva open until at least October of 1989. In fact, the Memorandum of Understanding expressly named Geneva to source Pit–Cal until the expiration of the VRA program. Similarly, in a December 16, 1985

letter from Roderick, and a Press Release dated that same day, USX assured Geneva workers of the continued operation of Geneva through October of 1989. *See* DX's 216 and 218. On November 27, within four days of signing the Memorandum of Understanding, USX counted the number of Geneva employees who would become eligible for Magic Number benefits by October of 1989. *See* PX 14. The November 27 study brought to USX's attention the increased pension liability USX faced with the contemplated 1989 shutdown. Of the 2,472 workers studied, 1,749, or almost three out of four, would be eligible for pensions by the end of 1989. Many employees who would be eligible for a deferred pension or a Magic Number pension if laid off or terminated in 1989, however, would not qualify for these specific retirement benefits if laid off or terminated at an earlier date.[27] The result, simply calculated, demonstrates that USX could save in excess of $50 million if the closure of Geneva was accelerated and the employees were terminated prior to 1989. *See* Tr. at 413.

Immediately after the November 27 study, USX's in-house actions conflicted with Chairman Roderick's public statements. While Roderick was publicly stating that Geneva would source Pit–Cal with hot bands through 1989, USX was negotiating and agreeing to the following language in its final agreement: "[a]ll hot bands shall be produced by Seller at *one of Seller's producing plants....*" DX 214 at 2 (emphasis added). Geneva was dropped from the final agreement.

The Memorandum of Understanding, which expressly included Geneva as Pit–Cal's source of hot bands, was dated November 23, 1985. The final agreement, which deletes all mention of Geneva, was dated February 5, 1986. It appears that sometime between the date of the initial joint venture agreement and the final version, USX changed its mind. At the time of the deletion, however, the only new information USX had seen concerning Geneva was the November 27 pension benefit eligibility study. *See* Tr. at 1386. Geneva had not been specifically studied for its efficiency, profitability, or other business reason; only potential pension liability.

Between May and July of 1986, USX requested at least four analyses of the cost of employee benefits resulting from a Geneva closure at various projected times. A May 1986 study showed that a shutdown as of July 31, involving 2,500 employees, would cost approximately $93 million, while a shutdown as of December 31, 1986, would cost approximately $92 million for 64 less employees. Both a June 1986 study, and a July 15, 1986 study, involving 2,272 employees, showed that a December 31, 1986 shutdown would cost approximately $87 million, with an additional $24 million in curtailment costs. Finally, a July 17, 1986 study estimated that 1989 shutdown costs would exceed Geneva's anticipated cash flow.

Plaintiffs point out that these several studies show the large pension benefit costs which USX would incur by the continued operation of Geneva. In particular, the cash flow study showed that Geneva could be profitable short term if operated through October 1989, but that the benefit costs incurred in closing the plant in 1989, would be greater than the short term profit.[28]

---

**27.** For example, an employee like Tony Pickering, who as of July 31, 1986 was 45 and had 19 years of service, was entitled on that date to a $40/15$ deferred vested pension with an accrued value of $15,800. If Pickering would have been recalled or employed through 1989, and the plant was shut down at that time, the value of the Magic Number pension to which he would be entitled would have been approximately $217,000. *See* Tr. at 979–80.

**28.** USX argues that the face of the studies indicate that benefit liability actually decreased as time went on. The employee related cost estimated for a December 31, 1986 shutdown of Geneva was $92 million versus $87 million for shutdown in 1989. Thus, USX asserts that it is illogical to believe that the Company was persuaded to accelerate the closure of Geneva based on these studies.

The court disagrees. Looking at the studies as a whole, including the fact that the 1989 figures were based on fewer employees, the studies clearly indicate that the benefit liability in 1989 substantially exceeded the benefit liability in 1986.

On August 1, 1986, the "work stoppage" began, and Geneva was idled. On August 12, 1986, USX prepared a draft of its annual Business Plan listing Geneva as closed, post-work stoppage. Subsequent drafts of the Business Plan, completed in October and December of 1986, while the new BLA was being negotiated, showed that there was to be no post-work stoppage production at Geneva. Between the time USX entered into the joint venture agreement naming Geneva to source Pit–Cal, and the August Business Plan, there is an absence of any additional studies conducted with respect to Geneva, other than the Facility Rationalization and the pension studies listed above.

The court finds that the Actives and Managements demonstrated a *prima facie* case of discrimination in violation of section 510 of ERISA to avoid pension liability. Accumulating pension expenses were a significant item of cost which made the Geneva more expensive to operate through 1989 than to idle in 1986. It is undisputed that USX considered these costs in making its decision to idle Geneva and in failing to recall its workers after the work stoppage had been settled. Having so found, the burden of production shifts to USX to prove a nondiscriminatory reason for its actions.

#### b. Nondiscriminatory Reasons

■ First, USX asserts that the decision to idle Geneva was solely based on a desire to make the Steel Division more profitable and efficient. As early as 1982, USX notes that the Steel Division had too much steel-making capacity and was not generating enough income to provide capital to modernize the existing steel facilities. *See* DX 402. Accordingly, in 1983, USX closed a number of facilities in an effort to reduce steel making capacity and to extinguish unprofitable product lines. *See* DX 88D. USX had closed several plants in 1979 for allegedly the same reasons. Similarly, during 1986, the USX Steel Division as a whole was losing millions of dollars on an operating basis. *See* DX 90E. Thus, USX asserts that Geneva's idling was a small fraction of a larger effort from the years 1979 to 1987 to reduce lost revenue.

Second, USX argues that the Board of Directors decision to idle Geneva and not recall its workers was motivated by the Facility Rationalization, an internal corporate study which recommended the closure of Geneva. *See* Tr. at 5638. The Facility Rationalization indicated that the Steel Division's profits would increase on the order of $230 million per year if among other things, the Geneva, Texas and National plants were closed. USX claims that the Facility Rationalization was a major corporate study, the quality and content of which was reviewed by several USX officers including Chairman Roderick.

Finally, USX asserts that it was cost effective to switch from Geneva to Fairless to source Pit–Cal. *See* Tr. at 2535–36, 2555. Fairless, which was the only plant on the East Coast servicing that market, was newer than Geneva, with both a hot end and extensive finishing facilities. Allegedly, Fairless could also receive iron ore from Venezuela at economical shipping rates. *See* Tr. at 2546–48.

Based on the above, the court finds that USX introduced legitimate, nondiscriminatory reasons for its challenged actions. It is undisputed that the Steel Division was losing millions of dollars in the early 1980's. It is also undisputed that USX's decision to idle Geneva was specifically based on the Facility Rationalization. Finally, the plain evidence strongly suggests that Fairless was an economically viable alternative to Geneva as the source of hot bands for Pit–Cal. Accordingly, the court finds that USX met its burden of production and the burden shifted to plaintiffs to prove USX's articulated reasons are pretextual.

#### c. Evidence of Pretext

■ Having carefully reviewed the record, the court finds that the reasons advanced by USX for indefinitely idling Geneva and failing to recall its workers after the work stoppage was settled were, in fact, a pretext for discrimination in violation of 510, and that it is more likely than

not that a determinative factor behind USX's conduct was a section 510 proscribed reason.

First, USX argues that the decision to idle Geneva was based on a desire to make the Steel Division more profitable and efficient and that Geneva was just a minor part of a massive 1986 restructuring. The court finds that USX's broad assertions of massive curtailment overstates the case. At most, the 1986 restructuring shows the context in which USX idled Geneva. The narrow issue before the court, however, concerns solely Geneva, that is, when USX decided to idle *Geneva* in 1986, was a determinative factor in that decision the avoidance of pension liability.

The court has seen hundreds of documents and heard lengthy testimony regarding the restructuring of 1979, the restructuring of 1983 and the restructuring of 1986, as well as minor company changes in between. USX provided the court with a plethora of material showing the company's good sense in restructuring the company in 1986. The court accepts without question the fact that USX's Steel Division showed poor earnings in 1986. The court also acknowledges USX's power to close a plant based on losses without violating ERISA. Generally, such a closure may occur without court interference. However, after USX showed a clear publicly stated intention to keep Geneva open and operating for a defined period of time, the decision to accelerate the closure or idle that facility contrary to its public announcements requires careful scrutiny by the court. It is not enough for USX to simply assert that Geneva was closed as part of a massive restructuring. Indeed, by its own inconsistent statements and actions, USX raises the issue of why Geneva was idled in 1987 rather than closed in 1989, the publicly stated target date for closure.

USX further asserts that its conduct was legitimately based on the Facility Rationalization, a three page document which pro-

posed the closure of Geneva. The Facility Rationalization, which was prepared in the evening hours of August 18, 1986 and early morning hours of August 19, 1986, was prepared *after* the Business Plan, and *after* the cash flow analysis, which showed that Geneva could be profitable through 1989, except when profit was evaluated against pension liability. Having carefully examined the Facility Rationalization, the court finds that the document's was itself a pretext; that is recommendation to close Geneva, was predetermined as well as based upon false premises, including the following:

1. Wrongly listing Geneva's second quarter 1986 fixed expenses at $4.8 million per month, instead of the actual published cost of $3.7 million. The $1.1 million "mistake" on the monthly calculations inflated Geneva's annual costs by more than $13 million.[29] *See* Tr. at 662–64.

2. Overstating any potential improved production costs of transferring Geneva steel to other locations. For example, based on the actual Monthly Report of Operations, a production cost benefit of $600,000 per month would be achieved, rather than the $2 million per month figure shown in the Facility Rationalization. *See* Tr. at 637–40. A $16.8 million difference per year.

3. Making unrealistic assumptions and projections about improved incremental value effect by overloading other USX facilities, particularly Fairless at 103 percent. *See* Tr. at 652–53.

4. Examining Geneva only as "shutdown." *See* Tr. at 1054–58. The document does not: consider Geneva operating through 1989; compare Geneva with Fairless or other USX facility; or, consider changing market conditions.

The court finds that a corporation as sophisticated as USX would not prepare a study as error stricken and limited in scope as the Facility Rationalization to be seri-

---

**29.** USX argues that its decision to close Geneva and other plants resulted from a desire to improve operating costs by an estimated $230 million annually. However, as it related to Gene-

va, the figure is substantially inflated. The $13 million error is just one of many in the study which significantly undermine USX's arguments about Geneva.

ously used to determine what should be done with Geneva. The inescapable conclusion is that the recommendation to idle Geneva was predetermined based on the benefits studies, and the Facility Rationalization was the pretext, the "good reasons", needed to shroud USX's motivation.

Finally, USX alleges that it was cost effective to switch from Geneva to Fairless as the source for Pit–Cal, due to Fairless' low freight rates. Although the railroad did lower the freight rate from Fairless to Pit–Cal in 1986, that concession was not obtained until February of 1987, after the decision to idle was made. *See* DX 78. Even at the lower rate of $38/ton, however, Fairless could not match Geneva's freight rate of $14.65/ton. USX also claims that Fairless produced higher quality steel than Geneva. USX failed, however, to submit quality reports which establish the relative grade of Geneva and Fairless steel, or that Fairless steel was superior to Geneva's.

In sum, the court finds that USX's nondiscriminatory reasons for idling Geneva are pretextual. Neither USX's assertion that Fairless was a better source than Geneva for the Pit–Cal hot bands, nor its alleged reliance on the Facility Rationalization is not credible. The only evidence available to USX upon which it could reasonably rely to make its decision concerning the ongoing operation of Geneva prior to its idling was a series of pension benefit cost studies. Thus, based on the evidence presented, the court must find that a determinative factor, indeed *the* motivating factor, in USX's decision to idle Geneva was the avoidance of benefit liability in violation of section 510 of ERISA.

Based on this court's finding that USX violated section 510 of ERISA by idling Geneva, it now becomes the task of each individual Active or Management plaintiff to prove his or her measure of relief. The amount of actual damages, if any, suffered by any particular individual will be determined in the second phase of this case.

▮▮▮ Plaintiffs claim that their damages should be measured by an assumed shut down of Geneva as of October 1989. The

court disagrees. Plaintiffs present no authority which supports the proposition that the court may set an arbitrary date for measuring damages based solely on a public promise made by a company's chairman. It is undisputed that USX, through its president and others, promised to keep Geneva open until October of 1989. USX did not do so. However, there is no indication that USX was legally bound by its promise to keep Geneva open. Indeed, with the consent of the USWA, Geneva was sold to BM & T in August of 1987. Clearly, USX could legally have disposed of Geneva at any time prior to, or even after, October of 1989.

Rather, the court finds that the proper measure of individual relief is dependent on USX's actual treatment of each Geneva employee. Having found that USX violated section 510 by indefinitely idling Geneva at the end of the work stoppage, the court necessarily finds that the plaintiffs are entitled to continued benefits as if Geneva had not been idled at that time. Further, these benefits continued to accrue up to the moment in time in which USX lawfully shutdown, sold, or otherwise disposed of Geneva.

Thus, plaintiffs who were discriminated against in violation of section 510 continued to accrue benefits after the work stoppage ended, as if they were active employees of USX, until the time at which their status as USX employees was terminated. Because these employees were terminated from USX upon the sale of Geneva to BM & T in August of 1987, the Active and Management plaintiffs' damages or measure of relief must be measured within the terms of the 1987 BLA, Pension Agreement, as if they had remained active employees who were terminated when Geneva was sold to BM & T in August of 1987. Of these plaintiffs, those that went to work for BM & T accrued further pension benefits under the USX plan while employed with BM & T, as will be discussed in section VII of this Opinion.

E. *Actives and Managements/June Agreement and Sale*

In this portion of the Opinion the court analyzes the Active and Management plain-

tiffs' second contention, that is, that USX violated ERISA by entering into the June Agreement and selling Geneva to BM & T.[30]

1. Facts

On January 27, 1987, USX and the USWA reached a tentative agreement settling the work stoppage. The agreement was ratified by local union officers and members in February. As part of the settlement, USX and the USWA agreed on the terms of the 1987 BLA and the 1987 Pension Agreement. *See* DX 8 and 5. Within a few days of the ratification, USX publicly announced the USX Board of Directors decision to idle Geneva. *See* PX 317.

In February of 1987, USX negotiated with BM & T for the sale of Geneva. *See* Tr. at 6804. Sale talks prior to February had been continued from time to time. On March 24, 1987, USX offered to sell Geneva to BM & T for $60 million. *See* DX 142. No agreement was reached.

Pursuant to section 16(A) of the 1987 BLA, on April 2, 1987, USX sent notice to the USWA of its intention to shut down Geneva on July 1, 1987, offered to meet with the USWA to discuss alternative ideas to USX's shut down decision. *See* DX 106. Accordingly, in May of 1987, USX and the USWA began a series of bargaining meetings to discuss Geneva's future. *See* Tr. at 4944. In the event that Geneva was sold, the USWA stated an interest in the option of its eligible members to be able to elect either employment with Geneva's buyer, or to be able to elect Magic Number pensions with USX. *See* DX 105A. Additionally, the USWA proposed that USWA workers continue to accrue service for vesting and eligibility purposes under the USX 1987 Pension Agreement while working for BM & T. *See id.*

In contrast, USX's proposal excluded Rule of 65 eligible employees from receiving the option of a job with BM & T, or a Magic Number pension. USX's proposal

did not include those employees eligible for Rule of 65 pensions. *See* Tr. at 5094. USX's proposal also excluded the USWA's request for continued accrual of a USX pension for former USX employees while employed by BM & T. *See id.*

On June 1, 1987, USX presented the USWA with a settlement proposal. *See* DX 105C. The USWA rejected the proposal, stating, among other things, that the USWA was unsatisfied with USX's treatment of employees eligible for Rule of 65 pensions and the continued accrual of USX pensions while employed for BM & T. Despite ongoing discussions, USX and the USWA were unable to reach an agreement. Accordingly, USX informed the USWA that, because no agreement had been reached, the company would proceed with its plan to shut down Geneva on July 1, 1987. *See* DX 107. On June 3, USX changed its mind concerning the settlement negotiations, and agreed to allow eligible Rule of 65 plaintiffs the option of working for BM & T or taking their Magic Number pensions. In large part because of USX's Rule of 65 concession, on June 8, 1987, the parties settled the dispute.

The June Agreement was entered into pursuant to subsection three of Appendix P of the 1987 BLA, entitled "Letter Agreement on Successorship". Appendix P states in relevant part:

[USX] will not sell ... any plant ... except under one of the following conditions:

1. The Company has declared the plant (or substantial portion of the plant) permanently shut down, or

2. The buyer shall have assumed all collective bargaining agreements including the Basic Labor Agreement, the Pension Agreement, and the Insurance Agreement applicable to employees at that plant (or substantial portion of that plant), or

3. The buyer shall have entered into an agreement with the Union establishing

---

**30.** Plaintiffs also assert that the June Agreement violated ERISA because at the time the Agreement was entered into plaintiffs were already eligible for Magic Number pensions due to a

December 31, 1986 shut down of Geneva. Having previously found that Geneva was not shut down as of December 31, 1986, the court rejects plaintiffs' contention.

the terms and conditions of employment to be effective as of the date of sale.

*See* DX 5.

The terms of the June Agreement required certain plaintiffs to make a choice. Specifically, paragraph 4 required that $^{70}/_{80}$ eligible employees choose between employment with BM & T or receipt of a $^{70}/_{80}$ shutdown pension. Paragraph 4 states in pertinent part:

Notwithstanding any provision to the contrary contained in any other agreement ..., [USX] will at any time during the one year period commencing with the date of sale approve application for $^{70}/_{80}$ retirement under mutually satisfactory conditions by any Geneva Works employee who satisfies the age and service requirements for such retirement as of the date of application and who has not accepted employment with Buyer or who, after accepting such employment has resigned from such employment within 45 days of accepting such employment.

PX 55. Paragraph 5 of the June Agreement required Rule of 65 eligible employees to make the same choice. Paragraph 5 states:

Any Geneva Works employee who is not employed by the Buyer, or who after accepting such employment, has resigned from such employment within 45 days of accepting such employment, and who (1) has 20 or more years of continuous service as of the last day worked for [USX], (2) has satisfied the age and service requirements for Rule of 65 retirement by the end of the two year period following the last day worked for [USX], and (3) is not made an offer of [suitable long term employment] by [USX] shall be granted a Rule of 65 retirement under the [USX] Plan upon inccurrence of a service break due to layoff or disability.

PX 55.

In prior sales of plants, USX had either shut down the plant and then sold it, or sold it as an ongoing business. If a plant was shut down and then sold, former employees received all of their shutdown benefits and were entitled to take a job with the new employer. On the other hand, if a plant was sold as an ongoing business without first shutting it down, the new employer normally was assigned the labor agreements of USX, and as a result, there was no change in the present or future employees' benefits.

The proposed sale to BM & T was markedly different from prior sales. USX wanted to sell Geneva without first shutting it down. However, BM & T was not capable of assuming the existing labor agreements. Accordingly, the June Agreement enabled USX to sell Geneva as an ongoing business without first shutting it down, even though the new employer did not adopt the USX labor agreements.

On June 12, 1987, after the execution of the June Agreement, BM & T and the USWA entered into a collective bargaining agreement. *See* DX 32A. After the BM & T labor agreement was entered into, the USWA prepared a summary and explanation of both the BM & T labor agreement and the June Agreement, entitled "Summary of Tentative Settlement with USX and [BM & T] Concerning Pensions and the Continuation of Operations at Geneva Works." *See* DX 162.

The Summary of Tentative Settlement made clear that the BM & T labor agreement and the June Agreement would only be effective if ratified by the affected employees. *See* DX 162. The Summary further explains the choice facing the Geneva employees between an immediate USX pension and employment with BM & T as follows:

As a result of our discussions, USX, while not agreeing that the sale is a shutdown has nevertheless agreed that each employee who is eligible for a $^{70}/_{80}$ or Rule of 65 pension will get it. When you take a pension, you leave your job. So, USX will approve your pension application if you are otherwise eligible and so long as you have *not accepted* a job with [BM & T] or, if you have accepted a job then so long as you resign it within 45 days. If you are awarded a pension and *later* go to work for [BM & T], your pension will be suspended while you

work for [BM & T]. In that event your pension will be resumed when you terminate your employment with [BM & T] and in addition you will receive whatever pension you have earned from [BM & T] for your service with [BM & T].

*Id.* at 1–2 (emphasis in original). The Summary also explained that Geneva employees who worked for BM & T would be able to receive service credit toward an immediate pension with USX as follows:

If you cannot during the two years creep into an immediate pension, some of you may still be able to qualify for pension *with USX* by going to work for [BM & T]! This is how. USX has agreed that service with [BM & T] will be counted for "eligibility" and "vesting" purposes—but not for "benefit" purposes. Let us illustrate this. The employee who is 40 years old with 20 years of service with USX cannot "creep" into a Rule of 65 pension—but his [or her] time worked with [BM & T] will be counted for pension "eligibility" purposes. So if he [or she] works for [BM & T] for ten years, USX has agreed to tack these ten years on to his [or her] 20 years so that he [or she] qualifies at that time for a 30 year pension. The pension amount will then be calculated on the basis of 20 years as a multiplier and will be in addition to whatever pension entitlement he [or she] then has with [BM & T]. This ability to "tack" service with [BM & T] on to service with USX is applicable for becoming eligible for normal, $^{62}/_{15}$, 30 year, permanent incapacity and deferred vested retirements and surviving spouse benefits but not to $^{70}/_{80}$ [or] Rule of 65 pension.

*Id.* at 2–3 (emphasis in original).

The principal features of the June Agreement were also reported in the Daily Herald, the primary newspaper in Utah County, in early June 1987. *See* DX 473. At that same time, USX Human Resource employees at Geneva also drafted a Summary and Election Form to assist employees in selecting the alternatives presented to them by the June Agreement. *See* DX 464. Over a thousand copies of that Summary were handed out to Geneva employees.

The June Agreement and the BM & T collective bargaining agreement were set for ratification on June 20, 1987. On June 19, 1987, the day before the ratification vote, the USWA held a meeting to discuss ratification of the agreements. The agreements were ratified on June 20. *See* DX 473.

After the ratification of the June Agreement and the BM & T labor agreement, USX and BM & T continued to negotiate over the sale of Geneva. An Asset Sales Agreement was eventually signed by the parties which contemplated, among other things, payment of a portion of the purchase price by a $25 million subordinated note. Closing was to occur on July 31, 1987. *See* PX 58.

On July 31, BM & T's financing fell through. On August 2, 1987, BM & T made a new offer to purchase Geneva which contemplated a $15 million cash down payment. *See* DX 144. USX rejected the offer. To facilitate the sale, BM & T called on Senator Orrin G. Hatch of the State of Utah to help facilitate the sale. Hatch met with USX and urged the company to reduce the price for the plant so that BM & T could obtain financing. As a direct result of the Hatch meetings, USX recast the proposal with BM & T with a lesser price and more viable financing. *See* Tr. at 4129–30.

Geneva was sold to BM & T on August 31, 1987. A financial summary of the sale showed, among other things, that USX's employee benefit liabilities accrual as of December 31, 1986 needed to be adjusted downward in USX's favor by $35 million. *See* Tr. at 4332.

2. Analysis

Initially, USX asserts that prohibited conduct under section 510 of ERISA does not include "a sale of a facility, even if shut down benefits [were] not paid or future pension accruals cease[d]." Memorandum in Support of USX's Tenth Motion for Partial Summary Judgment (Counts I, III, VI and VII) at 35. USX further argues that a sale does not violate section 510 even if the motivation behind the sale was specifically

to avoid pension benefits. *See id.* (citation omitted). Thus, USX claims that with respect to the sale of Geneva, the Active and Management plaintiffs failed to state a claim under ERISA. The court disagrees.

■ In essence, USX argues that the sale of a facility does not violate section 510 because termination due to a sale cuts along independently established nondiscriminatory lines. As previously noted, class based discrimination, whether based on race, sex, or pension rights, is as illegal as individualized discrimination where individuals comprise a category or class.[31] *See Nemeth,* 677 F.Supp. at 907.

The analysis set forth in *Nemeth,* which involves the shutdown of a facility, is equally applicable to a situation involving the sale of a facility. The *Nemeth* court found that the plaintiffs had asserted a cognizable claim under section 510 by stating, "ERISA does not distinguish between the termination of one employee and the termination of 100 employees. Either action is illegal if taken for the purpose of avoiding pension liability." *Nemeth,* 677 F.Supp. at 907. The court further stated that, "[w]hile termination of employees in order to reduce labor costs is not always illegal, ERISA prohibits such actions if the primary reason for high labor costs is pension liability." *Id.*

■ Just as a shutdown, when motivated by the intent to interfere with pension benefits, violates section 510, the court finds that a sale, when primarily motivated by the intent to interfere with pension ben-

efits, also violates ERISA. Section 510 was intended to prohibit discrimination of an employee which amounts to or threatens "constructive discharge," and which is carried out for the purpose of interfering with the employee's attainment of future benefits or for the purpose of punishing the employee for the exercise of protected rights. *See West,* 621 F.2d at 240. For section 510 purposes, the court finds no distinction between discharge as the result of a shutdown, and discharge as the result of a sale. Accordingly, based on *Nemeth,* plaintiffs have properly stated a claim under section 510, that is, that USX sold Geneva, thereby discharging plaintiffs, with the specific intent to interfere with plaintiffs' pension benefits.[32]

a. Prima Facie Case

■ Having carefully examined the Active and Management plaintiffs' claims with respect to the June Agreement and the sale of Geneva, and confined to those two events, the court finds that plaintiffs have failed to establish a *prima facie* case by a preponderance of the evidence that USX violated ERISA by engaging in prohibited conduct under section 510. As set forth below, the court finds that USX did not execute the June Agreement and sell Geneva to BM & T for the purpose of interfering with the attainment of a right to which the plaintiffs may have become entitled.[33]

Plaintiffs' *prima facie* case on these issues consists of several events surrounding the execution of the June Agreement and

---

**31.** USX fails to cite a section 510 case which expressly states the proposition that a sale, when motivated by the avoidance of pension benefits, does not state a cause of action under ERISA. USX relies on *Sutton v. Weirton Steel Div. of Nat. Steel Corp.,* 567 F.Supp. 1184 (N.D.W.Va.1983), as standing for the proposition that even if a plant was specifically sold to avoid pension liability, such conduct does not violate section 510. *Sutton* is not a section 510 case, and the court will not rely on it.

**32.** The court recognizes that the sale of a business can be based on numerous nondiscriminatory factors and that therefore, proving a violation of section 510 due to the sale of a business may be difficult. However, the court cannot

foreclose the possibility that such a scenario could occur.

**33.** As an affirmative defense, USX unpersuasively asserts that plaintiffs were foreclosed from attacking the June Agreement because they ratified the Agreement. *See* PTO at 39. Plaintiffs are not attacking the terms of the Agreement. Rather, plaintiffs are attacking USX's motive when it entered into the June Agreement. Plaintiffs' ratification of the terms of the Agreement cannot be construed so broadly as to ratify USX's alleged illegal conduct in negotiating the June Agreement. USX presented no evidence that plaintiffs' ratification of the June Agreement was intended to ratify an ERISA violation.

subsequent sale of Geneva. First, as to the June Agreement, plaintiffs suggest that USX was primarily interested in executing an agreement, with the USWA which avoided the payment of certain Magic Number benefits. During the several negotiations between USX and the USWA over the June Agreement, USX refused, until the final agreement to give eligible employees the option of going to work for BM & T or receiving their Rule of 65 pensions. USX also repeatedly refused the USWA's request that employees be able to receive a USX pension while working for BM & T.

Second, plaintiffs showed that USX's conduct with respect to the June Agreement was inconsistent with previous negotiations concerning the sale of other facilities. Historically, in the case of a shutdown and a subsequent sale, former employees received all of their shutdown benefits and were entitled to take a job, if any were available, with the new employer. At plants which were sold as an ongoing business without first shutting them down, the new employer would assume the labor agreements of USX, and as a result, there would be no change in the employees' benefits. In the case of Geneva, however, USX sold Geneva without first shutting it down, to a buyer who was unable to assume the labor agreements or provide the substantial equivalent in wages and other benefits. Therefore, to facilitate the sale, USX and the USWA negotiated the June Agreement, an agreement that required workers to choose between obtaining shutdown benefits and employment with BM & T.

Based on the foregoing, plaintiffs assert that the avoidance of shutdown benefits was the motivating factor behind the June Agreement negotiations. Plaintiffs claim that the sole purpose of the June Agreement was to minimize USX's shutdown costs by attempting to sell Geneva in such a way as to avoid paying Magic Number benefits to certain plaintiffs. Thus, USX allegedly discriminated against plaintiffs by forcing them to either forfeit future employment income and wages with BM & T or give up substantial shutdown and retirement benefits.

Third, plaintiffs claim that the terms of the sale were also questionable. On August 31, 1987, Geneva was sold to BM & T. The terms of the BM & T Asset Sales Agreement changed when BM & T did not close on the purchase on July 31, 1987. USX dropped a requirement for a note secured by a second mortgage and substituted a royalty payment and some other obligations. Thus, plaintiffs assert that USX lowered the asking price so that BM & T would buy the plant and shutdown costs would be avoided. Moreover, a financial summary of the sale clearly showed the adjustment in USX's favor of a $35 million employee benefit accrual. Therefore, USX was allegedly motivated by pension benefit savings as part of the sale.

Finally, plaintiffs assert that by forcing plaintiffs to make a choice in the June Agreement, USX foresaw a benefit to it in that a number of workers eligible for $^{70}\!/\!_{80}$ and Rule of 65 pensions would choose employment with BM & T over receipt of their pensions. Specifically, plaintiffs note that during the negotiations between USX and the USWA, USX went so far as to estimate the number of people eligible for $^{70}\!/\!_{80}$ and Rule of 65 pensions who would accept a job with BM & T and thereby relieve USX of this pension liability. *See* PX 56.

To establish a *prima facie* case under section 510, plaintiffs must prove that USX's execution of the June Agreement and the subsequent sale of Geneva was accomplished with the specific intent to violate a proscribed action under ERISA. USX argues that plaintiffs failed to establish a *prima facie* case under section 510 by failing to present sufficient evidence that USX acted with the specific intent required by ERISA. The court agrees. First, the evidence shows that it was the USWA that pursued negotiations with USX in order to facilitate the sale of Geneva. On April 2, 1987, USX sent notice to the USWA of its intention to close Geneva on July 1, 1987. Pursuant to section 16(A) of the 1987 BLA, however, USX offered to meet with the USWA in order to discuss USX's proposed course of action. *See* DX 106. Accordingly, the USWA entered vig-

orous negotiations with USX in an effort to arrive at mutually satisfying conditions for sale. Thus, the evidence shows that, in fact, it was the actions of the USWA that kept Geneva from being shut down, rather than some scheme by USX to avoid benefit liability.

Second, the court notes that the USWA negotiations were not unusual. Indeed, the benefit program under the Pension Agreement and BLA is designed to require the employer and the USWA to explore alternatives to shutdown. Appendix P of the 1987 BLA dealt with the conditions for the sale of a plant. The third alternative of Appendix P, which was added to the successorship provisions with the passing of the 1987 BLA, states that "[t]he buyer shall have entered into an agreement with the Union establishing the terms and conditions of employment to be effective as of the date of sale." DX 8. Accordingly, the evidence shows that both USX and the USWA acted within the scope of the 1987 BLA, just as the two parties had done previously. If plaintiffs take issue with the procedures set forth in Appendix P of the 1987 BLA, their concern is best serviced by their union, not by this court.

Third, the court finds that it is not enough for plaintiffs to show that USX negotiated with the USWA to avoid pension benefits. A key topic in most negotiations between the USX and the USWA are pension benefits. Proper negotiations do not amount to a *per se* violation of ERISA simply because USX acted to avoid benefit liability. The fact that the negotiation sessions discussed pension benefits, without more, does not violate ERISA. Further, the fact that a *consequence* of proper negotiations resulted in a reduction of pension benefits does not state an ERISA violation. A finding that USX acted with the specific intent to negotiate contractually lower pension liability is not equivalent to a finding that USX acted with the specific intent to engage in discriminatory conduct under ERISA.

Finally, as to the selling price of Geneva, there is no evidence that USX reduced the price solely to facilitate a sale that would avoid large future benefit costs. After BM & T's financing failed on July 31, 1987, USX informed BM & T that Geneva would be shut down. It wasn't until Senator Hatch interceded on BM & T's behalf and urged USX to lower the asking price that USX met BM & T's new price. As a result of political intervention, USX dropped the note requirement and substituted some other requirements concerning inventory and raw materials.

Plaintiffs' assert that USX orchestrated the sale of Geneva to avoid paying the full amount of the employee-related costs estimated for a total plant shutdown. In large part, however, the terms of the sale transaction as related to employee benefits were dependant on the negotiations with the USWA. The USWA could have stopped the sale by refusing to negotiate a labor agreement with BM & T. It was the decision of the USWA to preserve job opportunity for its members, rather than face a shutdown and its long term consequences. Moreover, under the terms of the June Agreement every eligible employee could have elected plant shutdown termination benefits. Given all the parties involved in the sale transaction, and the considerable control each party had over the outcome of the sale, plaintiffs argument that USX created a complicated scheme to avoid certain Magic Number and retirement costs is not persuasive. Thus, the court finds that USX refuted plaintiffs' *prima facie* case, and there is no persuasive evidence that USX entered into the June Agreement and sold Geneva to BM & T with the specific intent to violate ERISA.

This Opinion cannot be construed to mean that, simply because a company acts within the terms of a collectively bargained agreement, the company is immune from committing an ERISA violation. Nor does this Opinion intend to grant an employer unfettered authority to leverage pension benefits against employees as a means to force a sale or avoid a shutdown. The query under ERISA remains, whether an employer has acted with the specific intent to violate a proscribed conduct under ERISA. As set forth above, the court

finds that, limiting this Opinion to the facts of this case, plaintiffs failed to show by a preponderance of the evidence that USX's conduct, with respect to the June Agreement and sale to BM & T, was motivated by an intent to interfere with pension benefits in violation of section 510 of ERISA. Accordingly, with respect to the Active and Management plaintiffs' claims that USX violated ERISA by entering into the June Agreement and selling Geneva to BM & T, the court finds for USX and against plaintiffs.

## VI. SECTION 204(g) OF ERISA

### A. *Introduction*

The LaRoche plaintiffs assert a claim under section 204(g) of ERISA.[34] These plaintiffs were hourly wage employees employed in the nitrogen plant at Geneva, which was sold, along with other USX assets and facilities, to LaRoche Industries on May 30, 1985. The LaRoche plaintiffs contend that USX violated section 204(g) by improperly amending the 1980 Pension Agreement so as to reduce their Magic Number benefits which had allegedly accrued at the time of the sale.[35]

In approximately 1984, USX organized its assets into three classes: Energy, Steel, and Diversified. Diversified, which consisted of miscellaneous manufacturing, fabricating and engineering operations, was comprised of several subdivisions, including the "Agri–Chem Division." The Agri–Chem Division consisted of agricultural chemical operations, including the nitrogen plant at Geneva.

In early 1985, LaRoche Industries offered to purchase the majority of the Agri–Chem Division assets, including the nitrogen plant. In May of 1985, following several months of negotiations, LaRoche Industries purchased the Agri–Chem Division assets for $115 million. Pursuant to the terms of the sale, over 1,600 USX employees were transferred to LaRoche Industries.

### B. *Analysis*

The LaRoche plaintiffs' section 204(g) amendment claim is premised on a finding that the nitrogen plant was shut down prior to its sale. The court finds that it need not reach the LaRoches' section 204(g) claims because the plaintiffs have failed to show by a preponderance of the evidence that the nitrogen plant was shut down prior to its sale. To prevail on their shutdown theory, plaintiffs must demonstrate that the nitrogen plant was shut down in May of 1985, within the terms, conditions, and procedures set forth in section 16(A) of the 1983 BLA. It is insufficient for plaintiffs to merely argue that because the nitrogen plant was sold, the facility was necessarily shut down.

A shut down occurs under section 16(A) when:

[USX gives] the Union, when practicable, advance written notification of its intention. Such notification shall be given at least 90 days prior to the proposed closure date, and the Company will thereafter meet with appropriate Union representatives in order to provide them with an opportunity to discuss the Company's proposed course of action *and to provide information to the Company and to suggest alternative courses.* Upon conclusion of such meetings, which in no event shall be less than 30 days prior to the proposed closure or partial closure date, the Company shall advise the Union of its final decision. The final closure decision shall be the exclusive function of the Company.

DX 3 (emphasis in original). As analyzed below, the court finds that plaintiffs failed to prove a requisite condition of section

---

**34.** The Layoff, Active, Management and Retired plaintiffs also assert claims under section 204(g). These plaintiffs' claims are based on a finding that Geneva was shut down as of December 31, 1986. Having previously found that Geneva was not shut down as of December 31, 1986, the court rejects plaintiffs' contentions.

**35.** Section 204(g) states in pertinent part:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section [302](c)(8) or 1441 of this title.

29 U.S.C. § 1054(g).

16(A), that is, that USX, in its sole judgment, made a decision to shut down the nitrogen plant in May of 1985.

The first step in effecting a shutdown under section 16(A) of the 1983 BLA occurs "[w]hen, in the sole judgment of [USX], it decides to close permanently a plant or discontinue permanently a department of a plant or substantial portion thereof ..." DX 7. A final decision to shut down a plant occurs under section 16(A) when a decision to shut down is made by USX's Board of Directors. Prior to such a final, express decision, a shutdown does not occur.

Plaintiffs fail to present evidence that the USX Board of Directors determined to shut down the nitrogen facility in May of 1985. In fact, plaintiffs have not asserted that the Board of Directors even considered shutting down the nitrogen plant. Rather, plaintiffs make the unsupported argument that the sale of a plant amounts to a shutdown of the facility, and therefore, plaintiffs accrued Magic Number benefits upon the sale of the nitrogen facility.

The evidence shows that the nitrogen plant was not shut down pursuant to section 16(A) of the 1983 BLA, but rather that it was sold as an ongoing concern. The nitrogen plant was transferred to LaRoche Industries without either a break in service, or a shutdown. Thus, because there is no basis for asserting that the LaRoche sale reduced accrued shut down benefits, the court finds that the LaRoche plaintiffs have failed to state a claim under section 204(g) of ERISA.[36]

## VII. SECTION 204(h) OF ERISA

### A. *Introduction*

The Layoff, Retired, Active and Management plaintiffs bring claims under section 204(h) of ERISA. The LaRoche plaintiffs also assert a separate claim for relief under section 204(h). Section 204(h) states in pertinent part:

A [defined benefit plan] may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to—

(A) each participant in the plan,

(B) each beneficiary who is an alternate payee ..., and

(C) each employee organization representing participants in the plan....

29 U.S.C. § 1054(h).

Unlike section 204(g), section 204(h) does not forbid a plan amendment which reduces an accrued benefit under the plan. Rather, section 204(h) requires that if a pension plan is amended to significantly reduce the rate of benefit accrual, plan participants and their representatives must be given notice of such an amendment.[37] While there appears to be very little case law interpreting section 204(h), by its terms it forbids secret amendments through which an employee could have the value of his or her benefits reduced by a prospective amendment to the accrual provisions of a pension plan. Through section 204(h), Congress ensured that if a plan sponsor were

---

**36.** Plaintiffs also assert that by amending the Pension Agreement under section 204(h) of ERISA, USX also violated section 302(c)(8). Section 302(c)(8) provides in pertinent part:

No amendment described in this paragraph which reduces the accrued benefits of any participant shall take effect unless the plan administrator files a notice with the Secretary notifying him of such amendment and the Secretary has approved such amendment or, within 90 days after the date on which such notice was filed, failed to disapprove such amendment. No amendment described in this subsection shall be approved by the Sec-

retary unless he determines that such amendment is necessary because of a substantial business hardship....

29 U.S.C. § 1082(c)(8) (1988). Like section 204(g), plaintiffs section 302(c)(8) claim is premised on a finding that the nitrogen plant was shut down. Having found that the nitrogen plant was not shut down, the court does not reach plaintiffs' section 302(c)(8) claim.

**37.** By its terms, section 204(h) of ERISA applies only to a "plan administrator". Under section 11.1 of the 1987 Pension Agreement, USX was named as a USX plan administrator. *See* DX 8.

to amend the plan prospectively, the plan administrator must inform employees and their representatives of those changed circumstances.

Plaintiffs claim that the June Agreement and the LaRoche Sales Agreement, coupled with the USX Board of Directors' Resolutions dated August 11, 1986 and February 8, 1988, violated section 204(h) by amending the applicable pension agreements without proper notice. The court examines both the June Agreement and the LaRoche Sales Agreement below.

### 1. June Agreement

■ The Layoff, Retired, Active and Management plaintiffs claim that the June Agreement and subsequent USX Board of Directors Resolution adopted in February of 1988, amended the 1987 Pension Agreement, and that USX failed to give proper notice of the amendment in violation of section 204(h). In contrast, USX asserts that the June Agreement did not amend the 1987 Pension Agreement, and that even if USX did amend the 1987 Pension Agreement, USX complied with ERISA's notice requirements.

The 1987 Pension Agreement provisions which control the issue before the court are as follows. Under section 1.1, an employing company means any subsidiary company. Under that same provision, a subsidiary company means any corporation which USX shall from time to time designate as a subsidiary *"for purposes of"* the 1987 Pension Agreement. DX 8 (emphasis added). Under section 6.3(a) of the 1987 Pension Agreement:

> Any participant ... who has been retired and receiving a pension or who is eligible for a deferred vested pension under this or a prior Agreement between the parties and *who shall be reemployed by an Employing Company* shall be credited with his continuous service as at the date of his prior retirement *plus his continuous service accruing after reemploy-*

*ment for the purpose of calculating any subsequent pension benefits* to which he may become entitled....

DX 8 (emphasis added).

On June 8, 1987, USX entered into the June Agreement which named BM & T a "subsidiary" under section 1.1(f) of the 1987 Pension Agreement. On February 8, 1988, the USX Special Committee of the Board of Directors Appointed to Consider and Act Upon Certain Pension, Insurance and Savings Fund Plan Matters adopted the June Agreement.

It is undisputed that USX could designate a purchasing company an employing company, and therefore designated a subsidiary, under section 1.1 of the 1987 Pension Agreement. The dispute arises, however, as to whether designating BM & T an employing company, or subsidiary, under section 1.1 is tantamount to designating BM & T an employing company under section 6.3(a) of the Pension Agreement. Plaintiffs assert that if a purchasing company is designated as an employing company under section 1.1, that company is necessarily designated for the purposes of section 6.3(a). The court agrees.

Section 1.1(f) specifically states that an employing company is a subsidiary and a subsidiary company means "any corporation ... which United States Steel Corporation shall from time to time designate as a subsidiary *for the purposes of this Agreement....*" DX 8 (emphasis added). The court finds that the phrase "for purposes of this Agreement" is clear and unambiguous, and that the designation of an employing company under section 1.1(f) necessarily equals the designation of an employing company under section 6.3(a). Having so found, the court finds that, unless otherwise amended, when USX designated BM & T under section 1.1(f) it bound itself to the terms set forth in section 6.3(a).[38]

---

**38.** USX argues that the language of section 1.1, that BM & T may be designated a subsidiary "for purposes of this Agreement", did not necessarily mean that a designation must occur for *all* purposes of the Pension Agreement. The

court disagrees. To assert that USX had the authority both to designate a purchasing company a subsidiary *and* to arbitrarily define the designation of that subsidiary would render section 6.3(a) meaningless.

■ Under section 6.3(a), if USX designates a purchasing company an employing company, USX must include service with the purchasing company for the accrual of additional benefits under the USX Pension Agreement. Despite the specifics of section 6.3(a), however, under the June Agreement the years of service with BM & T differed significantly from the language set forth in section 6.3(a) of the 1987 Pension Agreement. Accordingly, the court finds that when USX limited the designation of BM & T through the June Agreement, USX amended the terms of section 6.3(a), and thus amended the 1987 Pension Agreement within the scope of ERISA section 204(h) which governs such an amendment.[39]

■ Even assuming the June Agreement amended the terms of section 6.3(a), USX argues that the "Merger and Transfer" provision of the November 25, 1986 Pension Rules specifically give USX the authority to limit BM & T's designation. *See* 10E. The Merger and Transfer Provision of the November, 1986 Pension Rules, which were drafted by USX representatives, and implemented by the USX Board of Directors, state in pertinent part:

The Board of Directors may from time to time provide that participants who are employed in a plant or other operation which is sold to a nonaffiliated entity, who continue to be employed by such nonaffiliated entity following the sale and who are not eligible for or do not elect immediate pension at the time of such sale or at the time of a shutdown immediately preceding such sale and who do not accept severance allowance *shall continue to accrue continuous service for eligibility purposes only,* under the pension rules specified by the Board of Directors as though the acquiring entity was an Employing Company; *provided, however, that the earnings and years of service of any participant in the employ of the acquiring entity shall not be used in the calculation of the amount of any benefit under the pension rules.*

DX 10E at 3 (emphasis added). Accordingly, based on the Merger and Transfer provision, USX claims that it had the express authority to alter section 6.3(a). Thus, USX argues that no amendment occurred within the terms of section 204(h), because the June Agreement merely exercised a reserved right under the 1986 Pension Rules.

The court finds that the Merger and Transfer provision does not apply to the case at hand for two reasons. First, the court finds that on its face, the Merger and Transfer provision is ambiguous as to whether or not the provision applies in a non-shutdown sale scenario. The provision states that it applies to those employees who "do not elect immediate pension at the time of such sale or at the time of a shutdown immediately preceding such sale...." DX 10E. Thus, the provision can reasonably be read to either apply to a situation where a plant is shutdown prior to sale, or to apply to situations where the plant is not shutdown prior to sale but is sold as an ongoing business to a designated purchaser.[40]

---

**39.** USX also incorrectly asserts that it did not amend the 1987 Pension Agreement by reducing the rate or manner of computation of future benefit accrual because, prior to the June Agreement, plaintiffs had no right to benefit accrual through service with BM & T. Sections 1.1 and 6.3(a) complement each other. At the moment USX designated BM & T a subsidiary company under section 1.1, USX necessarily agreed that, pursuant to section 6.3(a), service with BM & T would accrue service under the USX Plan for the calculation of benefits. The effect of section 6.3(a) was immediate. Therefore, any modification of plaintiffs' rights under section 6.3(a) amounts to an amendment of the 1987 Pension Agreement within the meaning of section 204(h) of ERISA.

**40.** USX itself seems confused as to the applicability of the Merger and Transfer provision. During trial, James Carney, the USX in-house counsel who helped draft the Merger and Transfer Provision, testified that the provision *was not* limited to situations in which there had been a shutdown, but applied to both shutdown and non-shutdown situations. *See* Tr. at 5404. On cross-examination, however, Carney admitted that in 1985, while testifying in a previous, unrelated case concerning the 1976 version of the Merger and Transfer provision, which is identical to the 1986 version, Carney stated that the Merger and Transfer provision *was* limited to shutdown situations and did not apply to non-shutdown situations. *See* Tr. at 5414.

Having found that the Merger and Transfer provision is ambiguous, the court construes the provision against the drafter, USX, and adopts an interpretation of the provision which is most favorable to the plaintiffs. Accordingly, the court finds that the Merger and Transfer provision should be narrowly construed so as to limit its applicability to those situations in which a shutdown has occurred prior to sale. The court will not apply the provision to a situation in which no shutdown occurred. Having previously found that Geneva was not shutdown prior to the sale to BM & T, the court finds that the Merger and Transfer provision is simply inapplicable to the issues at bar.

Second, the court also finds that, by its own terms, the Merger and Transfer provision is not applicable to the instant case. The Merger and Transfer provision states that the Pension Rules apply to "nonaffiliated entit[ies] ... as though the acquiring entity was an Employing Company...." As stated above, the June Agreement expressly names BM & T an Employing Company. Thus, a reasonable reading of the Merger and Transfer provision, which seems to limit its applicability to nonaffiliated entities that are not employing companies, does not encompass the BM & T purchase.

■■■ The court finds nothing improper in USX's authority under section 1.1 of the 1987 Pension Agreement to designate BM & T as a subsidiary. Further, the court finds nothing *per se* improper in the terms of the June Agreement. Nothing in the 1987 Pension Agreement or ERISA restricts USX from amending the terms of the Pension Agreement *if proper procedures are followed.* ERISA does, however, require proper notice of an amendment if the amendment provides for a significant reduction in the rate of future benefit accrual. *See* 29 U.S.C. § 1054(h). The court finds that limiting the plaintiffs' accrual of service to vesting and eligibility, in direct contrast to section 6.3(a), amounts to a "significant" reduction in the rate of plaintiffs' future benefit accruals within the meaning of section 204(h). Accordingly,

prior to such an amendment, the court finds that USX was required to give plaintiffs proper notice of the change in accordance with the statute.

### 2. Proper Notice and the June Agreement

■■■ USX asserts that, even assuming the June Agreement amended the 1987 Pension Agreement, USX complied with the requisite notice provisions of section 204(h). Specifically, USX argues that plaintiffs had notice of the June Agreement through the USWA, who negotiated the terms of the Agreement. USX also notes that the plaintiffs themselves ratified the terms of the June Agreement.

Section 204(h) states that a plan may not be amended to significantly reduce future benefit accruals unless "the plan administrator provides a written notice ... [to] each participant in the plan...." 29 U.S.C. 1054(h). It is undisputed that USX did not notify each plan participant concerning the terms of the June Agreement. Instead, the evidence merely shows that plaintiffs may have had constructive notice of the terms of the June Agreement though the acts of the USWA.

■■■ Constructive notice through a member's union bears no relation to section 204(h)'s actual language. Section 204(h) requires more than representative communication. Section 204(h) requires "a written notice ... *to each participant....*" 29 U.S.C. § 1054(h) (emphasis added). ERISA does not lessen this requirement when a plan administrator gives notice to a union. To the contrary, section 204(h) requires a plan administrator to provide "written notice ... [to] each participant ... *[and]* each employee organization representing participants in the plan...." 29 U.S.C. § 1054(h). Thus, the court finds that notice to the union is not enough. Accordingly, the court finds that USX violated section 204(h) by failing to give plaintiffs proper notice of the June Agreement amendments. Finally, the court finds no footing for USX's argument that union ratification equals a waiver of notice under section 204(h).

### 3. LaRoche Sales Agreement

■ The LaRoche plaintiffs also bring a claim for relief under section 204(h). The LaRoches claim that the May 30, 1985 LaRoche Sales Agreement, which designates LaRoche Industries an Employing Company under section 1.1(f) of the 1980 Pension Agreement, and the subsequent August 11, 1986 USX meeting adopting the LaRoches Sales Agreement, amended the 1980 Pension Agreement in violation of section 204(h). *See* DX 97. In contrast, USX asserts that the LaRoche Sales Agreement did not amend the 1980 Pension Agreement, and that even if USX did amend the 1980 Pension Agreement, USX complied with ERISA's notice requirements.

The terms of section 1.1(f) and section 6.3(a) of the 1980 Pension Agreement are virtually identical to the 1987 version. Agreement. Accordingly, as set forth above, plaintiffs assert that if LaRoche Industries was designated as an Employing Company under section 1.1, that company was necessarily designated for the purposes of section 6.3(a). The court agrees.

Section 1.1(f) specifically states that an Employing Company is a subsidiary and a subsidiary company means "any corporation ... which United States Steel Corporation shall from time to time designate as a subsidiary *for the purposes of this Agreement....*" DX 8 (emphasis added). Thus, the designation of an Employing Company under section 1.1(f) necessarily equals the designation of an Employing Company under section 6.3(a). Having so found, the court finds that, unless otherwise amended, when USX designated LaRoche Industries under section 1.1(f) is necessarily obligated itself to the terms set forth in section 6.3(a).

Under section 6.3(a), if USX designates a purchasing company an Employing Company, USX must include service with the purchasing company for the accrual of additional benefits under the USX Pension Agreement. Despite the specifics of section 6.3(a), however, under the LaRoche Sales Agreement the years of service for pension purposes with BM & T differed significantly from the language set forth in section 6.3(a) of the 1987 Pension Agreement. *See* PX 220. Thus, by limiting the designation of LaRoche Industries, USX amended the terms of section 6.3(a), and thus amended the 1987 Pension Agreement within the scope of ERISA section 204(h) which governs such an amendment.

Further, the court also finds that, as set forth above in the discussion on the June Agreement, the Merger and Transfer provision is inapplicable to the sale of the nitrogen plant because the plant was not shut down prior to being sold. Thus, the court finds that by limiting the designation of LaRoche Industries, USX amended the terms of section 6.3(a) and thereby amended the 1980 Pension Agreement within the scope of ERISA section 204(h).

### 4. Proper Notice and the LaRoche Sales Agreement

■ USX failed to present any evidence of section 204(h) notice to each plan participant of the amendment set forth in the LaRoche sales agreement. USX did not inform the LaRoche plaintiffs that the nitrogen facility had been sold to LaRoche Industries until July of 1986, approximately three months after the sale. Even then, there was no evidence that USX notified each plan participant of the terms of the LaRoche sales agreement. Accordingly, USX violated section 204(h) of ERISA by failing to give proper notice to the LaRoche plaintiffs of the LaRoche Sales Agreement amendment to the 1980 Pension Agreement.

### B. *Effect of USX's Failure to Give Notice under Section 204(h)*

■ USX's violation of section 204(h) rendered the terms of the June Agreement and the LaRoche Sales Agreement ineffective in so far as the terms limited the accrual of years of service for BM & T and LaRoche Industry employees for vesting and eligibility purposes, but not for the calculation of benefits. Because the amended terms of the June Agreement and the LaRoche agreement are ineffective, it follows that the 1980 and 1987 Pension Agreements, respectively, continued in

force as if no amendment had occurred. *See Pratt v. Petroleum Prod. Management Employee Sav. Plan & Trust,* 920 F.2d 651 (10th Cir.1990) (remedy for section 204(h) violation is computation of pension benefit under pre-amendment version of plan).

Therefore, under section 6.3(a) of the 1980 and the 1987 Pension Agreements, all USX employees who accepted employment with LaRoche Industries or BM & T, respectively, "shall be credited with his [or her] continuous service as at the date of his [or her] prior retirement plus his [or her] continuous service accruing after reemployment for the purpose of calculating any subsequent pension benefits to which he [or she] may become entitled...." [41] DX's 7 and 8. USX's attempt to limit the continuous service credit of those employees who accepted employment with LaRoche Industries and BM & T is ineffective.

Thus, for purposes of those employees who went to work for LaRoche Industries and those that went to work for BM & T, section 6.3(a) of the 1980 and 1987 Pension Agreements, respectively, continues to this day unamended. As a result, benefits continued to accrue, and will continue to accrue, unless such pension plans are effectively amended in accordance with the provisions of section 204 of ERISA.

The court's finding in no sense suggests that a plan participant who went to work for LaRoche Industries or BM & T acquires the full pension of both a LaRoche or a BM & T pension, *and* a USX pension. The relief to which each individual participant may be entitled must be viewed on an individual basis in an effort to make each worker whole, but not more than whole, for both the anticipated benefit from LaRoche Industries and BM & T, and from USX, under the applicable unamended Pension Agreement. In this fashion, LaRoche Industries and BM & T will pay their share of benefits resulting from participants continued employment with those companies, and USX will pay its share, or a current cash equivalent, of its anticipated share of benefits, which would ordinarily have accrued under the existing unamended plan.

The effort of the court has been to establish outside boundaries within which individual relief will be computed on an individual basis based upon individual context and conditions. The court is interested in accommodating the concept of a lawful sale, which the court finds has occurred, preceded by a limited period of section 510 discrimination, as found in section V of this Opinion, *and* the recognition of the ineffective effort to amend a plan, which would result in a significant reduction in anticipated benefits.

It should be clear from the context of this discussion, but the court will say it expressly, that this relief is confined to former Geneva employees who were plan participants at the time the nitrogen plant was sold to LaRoche Industries and at the time Geneva was sold to BM & T, and who were reemployed by either LaRoche or BM & T. The additional accrual of benefits under section 6.3(a) of the 1980 and 1987 Pension Agreements is expressly limited to those employees who were reemployed by the purchasing company. Thus, the benefit of this court's finding that USX violated section 204(h) of ERISA is confined to those plaintiffs who went to work for LaRoche Industries or those who went to work for BM & T.

The court reiterates that at the time USX violated section 510 by idling Geneva in January of 1987, as set forth in section V of this Opinion, USX faced several alternatives as to Geneva's future status. Each of these alternatives could have affected the measure of relief given to those plaintiffs discriminated against when the plant was idled. USX could have started Geneva

---

**41.** A section 204(h) claim was brought by the Active, Management, Retired and Layoff plaintiffs. The remedy for a violation of section 204(h) is to render an invalid amendment ineffective. Thus, those plaintiffs who took employment with BM & T may obtain greater pension accrual than they otherwise would have under the terms of the June Agreement. However, as to those plaintiffs that did not take employment with BM & T, the court's finding does not offer those plaintiffs a remedy. The court finds no authority which offers extra-contractual remedies to plaintiffs under section 204(h).

up again and recalled the workers, thereby limiting their section 510 relief to the time of recall. USX could have continued to idle Geneva, thereby indefinitely continuing the section 510 violation. USX could have shut down Geneva, thereby fully vesting plaintiffs' Magic Number pensions as of the date of shutdown. USX could also have legitimately sold Geneva, while idled, to a designated purchaser, within the terms of the 1987 Pension Agreement, and thereby limited plaintiffs' relief to the date of sale.

Although USX chose this latter alternative, to sell the idled facility, it improperly amended the Pension Plan in violation of section 204(h). Accordingly, although USX effectively limited the measure of relief plaintiffs seek under section 510, it's immediate violation of section 204(h) extended the reemployed plaintiffs' measure of relief past the date of the sale, and continuing through the duration of each plaintiffs' employment with BM & T. The same analysis applies to those plaintiffs reemployed by LaRoche Industries upon the sale of the nitrogen plant. Thus, the reemployed plaintiffs' measure of relief, which began with USX's violation of section 510, continued with USX's subsequent violation of section 204(h) of ERISA.

## VIII. SECTION 404(a) OF ERISA

### A. Introduction

The Retired plaintiffs claim that USX breached it fiduciary duty to them under section 404(a) of ERISA.[42] There is no dispute that approximately twenty-five of the pre-sale retirees were wrongly informed by USX representatives that their pension benefits would be suspended upon full-time employment with BM & T. Nor is there any dispute that such information was incorrect. USX concedes that the June Agreement, which provides for pension suspension for "Geneva Works employees" upon employment by BM & T, was not intended to apply to pre-sale retirees. However, a benefits analyst at USX's office in Pittsburgh, who was interpreting the plan, issued incorrect guidelines to the personnel office at Geneva which indicated to the Retireds that their pension would be suspended upon employment with BM & T.

During the period from September, 1987 to October, 1988, three retirees went to work for BM & T as permanent full-time employees notwithstanding the threatened pension suspension. One such person's pension benefits were suspended. One year later, when the Pension Fund was reviewing the possible suspension of another pre-sale retiree's pension, the erroneous interpretation was discovered.

The USWA, BM & T, and an undetermined number of pre-sale retirees were informed of the changed interpretation. The .person whose pension had been suspended was paid all the benefits due him, plus interest. Many of the pre-sale retirees had been working at BM & T as independent contractors without any pension suspension and at least some of them became permanent employees of BM & T after the suspension interpretation was changed.

Section 404(a) states in pertinent part:
 [A] fiduciary shall discharge his [or her] duties with respect to a plan solely in the interest of the participants and beneficiaries and—
 (A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

 · · · · ·

 (D) in accordance with the documents and instruments governing the plan insofar as such documents and

---

**42.** The Layoff, Active, Management and LaRoche plaintiffs also brought claims under section 404(a) of ERISA. These plaintiffs' claims are based on a finding that Geneva was shut down on December 31, 1986 and that the Geneva nitrogen plant was shut down in May of 1985. Having previously found that neither Geneva, nor the nitrogen plant was shut down, the court rejects plaintiffs' contentions.

instruments are consistent with the provisions of [ERISA]. . . .

29 U.S.C. § 1104(a). Accordingly the Retireds claim that: (1) acting as a fiduciary; (2) USX violated its fiduciary duty by failing to discharge its Pension Plan duties solely in the interest of the plan participants, by actively misrepresenting facts and failing to disclose material information. The court examines each of plaintiffs' assertions.

## B. *USX as a Fiduciary*

USX contends that the Retired plaintiffs' claim fails as a matter of law because USX was not acting as a plan fiduciary under ERISA section 404(a). First, USX asserts that the USX Pension Agreement expressly named the Pension Fund, not USX, as plan administrator. *See* DX 10E. Second, USX argues that even if USX is a fiduciary under the plan, Geneva's personnel office was not fulfilling a fiduciary function at the time of the misrepresentations.

As to USX's first contention, that USX was not named as a plan administrator, the court finds that USX's assertion is erroneous. Section 11.1 of both the 1980 and 1987 Pension Agreements states that "[t]he Company, [USX], through its designated management representatives, shall be responsible for the administration of the benefits set forth in this Agreement." DX's 7 and 8.

■ As to USX's second contention, that Geneva personnel were not fulfilling a fiduciary function at the time of the erroneous statements, the court finds that the weight of the evidence shows otherwise. ERISA section 3(21)(A) provides a functional definition of when a person is a fiduciary engaged in fiduciary activity. That provision provides in pertinent part:

Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (1990). Thus, ERISA's functional definition of fiduciary makes clear that, although USX does not have fiduciary obligations when acting as an employer, it does have fiduciary obligations when acting dealing directly with the Pension Agreements.

The distinction between employer activity and fiduciary activity is universally accepted and applied by the courts in resolving fiduciary claims under ERISA. As the court explained in *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986):

[T]he ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as an employer when not administering the plan or investing its assets.

■ Employer activities are a class of discretionary activities which relate to the formation rather than the management of plans. These so-called "settlor" functions include decisions relating to the establishment, termination and design of plans and are not fiduciary activities subject to Title I of ERISA. For example, the decision to terminate a pension plan, when allowed under the plan, is not subject to ERISA's fiduciary duty requirements. *See U.A.W. District 65 v. Harper & Row Publishers Inc.*, 576 F.Supp. 1468, 1477 (S.D.N.Y. 1983).

The court finds that USX was acting as a fiduciary, rather than as an employer, at the time the Geneva personnel office gave the Retired plaintiffs incorrect information. The Geneva personnel office's activities in communicating to plaintiffs their rights under the Pension Plan in light of the June Agreement were fiduciary activities under ERISA section 404(a). There is no question but that the activity of answering questions about a plan, noting changes in

the plan, disseminating information directly to plan participants concerning their rights within the plan, and in turn communicating information from plan participants back to the Pension Fund are classic fiduciary activities. This case does not concern company business such as when a pension plan is incidentally affected due to the selling of a plant. Accordingly, the court finds that with respect to the Retireds, USX acted as a fiduciary through the conduct of the Geneva personnel office within the meaning of section 404(a).

## C. *Fiduciary Duties*

■ As a fiduciary, USX's conduct was governed by section 404(a) of ERISA, under a "good faith" standard of care. *See Burke v. Latrobe Steel Co.*, 775 F.2d 88, 91 (3d Cir.1985). Thus, the issue before the court is whether a fiduciary does not act in good faith by incorrectly interpreting a document or instrument governing a pension plan.

■ Courts which have considered whether an inadvertent mistake can constitute a violation of section 404(a) have uniformly found that a plan fiduciary does not violate section 404(a) simply by making an incorrect interpretation of documents governing the plan. The incorrect interpretation must be made willfully or in bad faith in order to give rise to a breach of fiduciary duty. *See Burke*, 775 F.2d at 91; *Challenger v. Local Union No. 1*, 619 F.2d 645, 649 (7th Cir.1980).[43]

In *Burke*, pensioners brought suit against a plan administrator alleging, *inter alia*, that the plan administrator breached fiduciary duties by terminating their pensions after they were recalled to work by the employer. The pensioners argued that the plan administrator violated ERISA's fiduciary provisions by interpreting the plan contrary to its provisions. The Third Circuit held that the claim lacked merit, explaining as follows:

**43.** ERISA takes into account that many pension plans are sponsored by private employers and that the fiduciaries of such plans are not professional trustees but may very well be an "officer, employee, agent or other representative" of the plan sponsor. 29 U.S.C. § 1108(c)(3). Because

[A] pensioner does not establish a violation of fiduciary duty simply by showing that the administrator did not follow the terms of the plan. If such action is undertaken pursuant to a good faith, albeit erroneous, interpretation, ERISA's fiduciary provisions are not violated. To establish liability, willful or bad faith conduct must be proved.

*Burke*, 775 F.2d at 91.

Similarly, in *Challenger*, plaintiff alleged that plan fiduciaries violated ERISA section 404 by incorrectly interpreting a pension plan's break-in-service provisions. The Seventh Circuit rejected the claim and held:

The trustees do not breach their fiduciary duties by interpreting the plan in good faith, even if their interpretation is later determined to be incorrect. It is, of course, their duty to interpret the plan when passing on an applicant's claim requires them to do so. That duty is discharged when they make a good faith interpretation and act accordingly, unless and until that interpretation is later reversed or modified in a review proceeding under the arbitration article of the plan.

*Challenger*, 619 F.2d at 649.

■ Based on the foregoing case law, this court similarly finds that, because there is no evidence of bad faith of either the benefit analyst's interpretation of the Plan documents, or Geneva's personnel office, section 404(a) was not violated. First, assuming the benefits analyst was acting on behalf of USX, there is no evidence that he was seeking to act contrary to the interests of the Retireds in violation of section 404(a). The Pension Fund itself corrected the suspension interpretation as soon as it realized the initial interpretation was incorrect. The one pre-sale retiree whose pension had been suspended was immediately made whole.

Congress anticipated that pension plan fiduciaries would be ordinary people dealing with complicated plan provisions and benefit agreements, it is not reasonable to find that Congress required perfection of fiduciaries or imposed liability in its absence.

Second, there is no evidence that the benefits analyst failed to act in good faith when he developed the chart containing the initial interpretation about suspending pre-sale retirees' pension benefits. He was familiar with the terms of the pension plan, which contained a pension suspension provision where a participant is employed by a subsidiary. He reviewed the BM & T Asset Sales Agreement and the June Agreement with representatives of BM & T and Geneva's personnel office. BM & T's attorney even initialed the draft of the grid prepared by the benefits analyst which contained the improper interpretation. The USWA was also aware of the benefit analyst's interpretation and agreed with it. The court emphasizes that the 1987 Pension Agreement, June Agreement, and BM & T Asset Sales Agreement are lengthy documents which are not uncomplicated. Despite good faith efforts, the benefit analyst simply made a mistake.

Likewise, Geneva's personnel office did not violate section 404(a). Before informing the Retireds concerning any information about their pension benefit rights, the office sought advice from the Pension Fund and personally reviewed the relevant documents. The director of the personnel office testified that she focused on paragraph 6 of the June Agreement, which stated that the pensions of "any Geneva Works employees" would be suspended upon employment with BM & T. That provision, together with the grid created by the benefits analysis, led her to believe that the information she supplied was, in fact, the interpretation and policy of the Pension Fund regarding its obligations under the plan in the event of employment with BM & T by pre-sale retirees. USX cannot be found liable for correctly and completely communicating through Geneva's personnel office a good faith but mistaken interpretation of the documents and instruments governing the pension plan, particularly where the personnel office made considerable efforts to obtain correct information. Accordingly, the court finds that the Geneva personnel office acted in good faith, and therefore, that USX did not violate its fiduciary duty under section 404(a).[44]

## IX. CONCLUSION

This case concerns the bureaucratic decision-making process of USX, a large and powerful steel company, its motivations for making decisions, and the consequences in the lives of those people affected by USX's decisions. This case involves the public pronouncements of USX, which assured a continued, but limited life of the Geneva Steel Plant, one of the USX's several steel mills. This case is concerned as well with an intervening nationwide-work stoppage, the resolution of the work stoppage, and the failure of USX to recall workers after the work stoppage was settled. It is about USX's preliminary decision to indefinitely idle Geneva, USX's subsequent unilateral decision to early and permanently shut down Geneva, and the intervention of a pre-shutdown purchaser, the USWA, and a powerful political figure.

This case is also about creative accounting practices, leveraged negotiations on a national level, a torn union, and a vulnerable work force on the local level; negotia-

[44]. The court recognizes the harshness of its ruling with respect to the Retireds. USX made a significant mistake which may have resulted in a loss to these plaintiffs. Although the evidence suggests that these plaintiffs desired to continue working for BM & T, the Retireds were improperly induced to give up that employment in order to avoid suspension of their vested benefits. Under common law negligence standards, USX's conduct may indeed be questionable. However, Congress, in its wisdom, has preempted the pension field. ERISA is "a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefits plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). The statute imposes certain requirements on pension plans regarding participation, funding, and vesting, and sets forth standards with respect to such areas as reporting, disclosure, and fiduciary responsibility. *Id.* at 91, 103 S.Ct. at 2896. This court does not have the discretion to modify the strict statutory construction set forth in ERISA. Congress has adopted a good faith standard as set forth under section 404. Hence, although this court is troubled by the outcome of this ruling with respect to the total lack of remedy afforded the Retireds, this court recognizes that it has no authority to rule otherwise.

tions that pitted the desires of a small, ageing community of workers and their need for continued employment and assured retirement benefits, and the efforts of USX to minimize future costs and thus to avoid, if possible, the accumulation of long term benefit liabilities.

This case would not have the aura which it has if USX, a large public company, had adhered to its public promises and pronouncements. Hundreds, if not thousands, of people relied in vain on USX's public promises. Simply put, USX's public word was broken. Nevertheless, the court has previously determined that broken promises are not before the court. The only relevant matters surrounding this complex, multi-faceted dispute involve the meaning and application of ERISA, a broad-ranging statute, which statute, in its area of law, as a matter of Congressional policy, preempts all other traditional forms of relief. Thus, with this in mind, the court reluctantly limits its analysis to those issues presented by the Employment Retirement Income Security Act.

As set forth in section IV of this Opinion, the court finds that Geneva was not shut down on December 31, 1986, as claimed by the plaintiffs. Thus those causes of action which are predicated thereon are dismissed.

As set forth in section V of this Opinion, the court finds that USX violated section 510 of ERISA by failing to recall the Layoffs, as defined in this Opinion, in order to interfere with the accrual of pension benefits as to those workers.

As set forth in section V, USX also violated section 510 of ERISA by, among other things, idling Geneva on January 27, 1987, and failing to recall the Active and Management plaintiffs, as defined in this Opinion, in order to interfere with the accrual of pension benefits. The Active and Management plaintiffs' measure of relief is confined to that period of time in which USX idled Geneva, up and until the time when USX sold Geneva to BM & T.

As set forth in section VII of this Opinion, the court finds that USX violated section 204(h) of ERISA by amending a benefit plan on May 30, 1985 and August 11, 1986, and on June 8, 1987 and February 8, 1988, to significantly reduce the accrual of benefits without proper notice to plan participants. The benefit of the court's finding that USX violated section 204(h) is confined to the LaRoche plaintiffs who were reemployed by LaRoche Industries, and those Active and Management plaintiffs who were reemployed by BM & T.

As to the remaining claims of plaintiffs, the same are insufficient either in law or fact as set forth in this Opinion, and the same are dismissed.

As noted in this Opinion, this portion of the case is concerned with the individual claims of 1,892 plaintiffs, which have been grouped together for purposes of dealing with common issues of fact and law. It appears to the court that because we are dealing with multiple claims and multiple parties, that it would be appropriate at this intermediate stage of this bifurcated case to enter a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure as to the individual plaintiffs for whom relief has been effectively denied. It further appears to the court that, where identified plaintiffs have prevailed as to the liability phase of this bifurcated case, that final judgment as to liability also be entered as to each specific plaintiff.

Plaintiffs' counsel is directed to prepare and submit to the court for consideration a form of judgment as to liability as to all prevailing plaintiffs, with each prevailing plaintiff identified by name. Defendant's counsel is directed to prepare and submit to the court for consideration a form of judgment dismissing plaintiffs' claims on which defendants have prevailed in accordance with this Opinion and Order, which also identifies each plaintiff to which such judgment of dismissal applies. Proposed forms of judgment should be submitted within fifteen days from the date of this Opinion and Order. It is suggested that counsel sign off on each proposed form prior to its submission.

This Opinion and Order shall constitute findings of fact and conclusions of law.

As agreed by the parties and pursuant to the prior order of the court, the amount and kind of relief to which each prevailing individual plaintiff is entitled will be determined on an individual basis in subsequent proceedings.